**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH ACERNO, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v. | JURY TRIAL DEMANDED |
| XP INC., GUILHERME DIAS FERNANDES BENCHIMOL, BRUNO CONSTANTINO ALEXANDRE DOS SANTOS, BERNARDO AMARAL BOTELHO, CARLOS ALBERTO FERREIRA FILHO, GABRIEL KLAS DA ROCHA LEAL, FABRÍCIO CUNHA DE ALMEIDA, GUILHERME SANT'ANNA MONTEIRO DA SILVA, JULIO CAPUA RAMOS DA SILVA, MARTIN EMILIANO ESCOBARI LIFCHITZ, GERALDO JOSÉ CARBONE, FRANCISCO EDUARDO DE ALMEIDA PINTO, MARIA HELENA DOS SANTOS FERNANDES DE SANTANA, JARED WILSON, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, XP INVESTMENTS US, LLC, ITAU BBA USA SECURITIES, INC., BOFA SECURITIES, INC., CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES (USA) LLC, and UBS SECURITIES LLC, | CLASS ACTION |
| Defendants. | |

1

Plaintiff Joseph Acerno ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by XP Inc. ("XP" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.      Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired XP's securities pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with XP's December 2019 initial public offering (the "IPO" or "Offering") compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

2.      In December 2019, Defendants held the IPO, offering approximately 83 million Class A common shares to the investing public at $27.00 per share.

3.      By the commencement of this action, XP's shares trade significantly below its IPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4.      The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District.

7.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of XP securities in this District.

## PARTIES

8.       Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities pursuant and/or traceable to the IPO and was damaged thereby.

9.      Defendant XP purports to be a leading, technology-driven financial services platform and a trusted provider of low-fee financial products and services in Brazil. Defendant XP is incorporated in the Cayman Islands, and maintains its principal executive offices in São Paulo, Brazil. XP shares are listed on NASDAQ under the ticker symbol "XP." The Company's agent for service in the United States, as stated in the Registration Statement, is XP Investments US, LLC, 55 West 46th Street, 30th floor, New York, NY 10036.

10.     Defendant Guilherme Dias Fernandes Benchimol ("Benchimol") was at all pertinent times Chairman of XP's Board of Directors (the "Board") and the Company's Chief Executive Officer ("CEO"). Defendant Benchimol reviewed, contributed to, and signed the Registration Statement.

11.     Defendant Bruno Constantino Alexandre dos Santos ("Constantino") was at all pertinent times a member of the Board and the Chief Financial Officer ("CFO") of XP. Defendant Constantino reviewed, contributed to, and signed the Registration Statement.

12.     Defendant Fabrício Cunha de Almeida ("Almeida") was at all pertinent times a member of the Board and the General Counsel of XP. Defendant Almeida reviewed, contributed to, and signed the Registration Statement.

13.     Defendant Carlos Alberto Ferreira Filho was at all pertinent times a member of the Board of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

14.     Defendant Gabriel Klas da Rocha Leal was at all pertinent times a member of the Board of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

15.     Defendant Guilherme Sant'anna Monteiro da Silva was at all pertinent times a member of the Board of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

16.     Defendant Julio Capua Ramos da Silva was at all pertinent times a member of the Board of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

17.     Defendant Martin Emiliano Escobari Lifchitz was at all pertinent times a member of the Board of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

18.    Defendant Geraldo José Carbone was at all pertinent times a member of the Board of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

19.    Defendant Francisco Eduardo de Almeida Pinto was at all pertinent times a member of the Board of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

20.    Defendant Maria Helena dos Santos Fernandes de Santana was at all pertinent times a member of the Board of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

21.    Defendant Bernardo Amaral Botelho, was at all pertinent times a member of the Board of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

22.    Defendant Jared Wilson was at all pertinent times the authorized representative in the United States of XP and reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

23.    The Defendants named in ¶¶ 10-22 are sometimes referred to herein as the "Individual Defendants."

24.    Each of the Individual Defendants signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Sundial investors, all motivated by their own and the Company's financial interests.

25.      Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is an investment banking firm that acted as an underwriter of XP's IPO, helping to draft and disseminate the IPO documents. Goldman Sachs' address is 200 West St, New York, NY 10282.

26.      Defendant J.P. Morgan Securities LLC ("J.P. Morgan Securities") is an investment banking firm that acted as an underwriter of XP's IPO, helping to draft and disseminate the IPO documents. J.P. Morgan Securities' address is 277 Park Ave, New York, NY 10172.

27.      Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as an underwriter of XP's IPO, helping to draft and disseminate the IPO documents. Morgan Stanley's address is 1585 Broadway Avenue New York, NY 10036.

28.      Defendant XP Investments US, LLC ("XP Investments") is an investment banking firm that acted as an underwriter of XP's IPO, helping to draft and disseminate the IPO documents. XP Investments' address, as stated in the Registration Statement, is 55 W 46th St, 30th Floor, New York, NY 10036.

29.      Defendant Itau BBA USA Securities, Inc ("Itau USA") is an investment banking firm that acted as an underwriter of XP's IPO, helping to draft and disseminate the IPO documents. Itau USA's address is 540 Madison Avenue, New York, NY 10022.

30.      Defendant BofA Securities, Inc. ("BofA Securities") is an investment banking firm that acted as an underwriter of XP's IPO, helping to draft and disseminate the IPO documents. BofA Securities' address is 711 5th Ave, New York, NY 10022.

31.      Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking firm that acted as an underwriter of XP's IPO, helping to draft and disseminate the IPO documents. Citigroup's address is 390 Greenwich St, New York, NY 10013.

32.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an investment banking firm that acted as an underwriter of XP's IPO, helping to draft and disseminate the IPO documents. Credit Suisse's address is 11 Madison Ave, New York, NY 10010.

33.     Defendant UBS Securities LLC ("UBS") is an investment banking firm that acted as an underwriter of XP's IPO, helping to draft and disseminate the IPO documents. UBS Investment's address is 11 Wall St, New York, NY 10005.

34.     Defendants Goldman Sachs, J.P. Morgan Securities, Morgan Stanley, XP Investments, Itau USA, BofA Securities, Citigroup, Credit Suisse, and UBS are referred to herein as the "Underwriter Defendants."

35.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from XP, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from XP and the Individual Defendants that XP would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted XP and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of XP, an undertaking known as a "due

diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with XP's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which XP securities would be sold; (iii) the language to be used in the Registration Statement; what disclosures about XP would be made in the Registration Statement; and (iv) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and XP's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, XP's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

36.     XP, the Individual Defendants, the Director Defendants and the Underwriter Defendants are referred to collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

37.     On or about November 15, 2019, XP filed with the SEC a Registration

Statement on Form F-1, which in combination with subsequent amendments of Forms F-1/A and filed pursuant to Rule 424(b)(1), would be used for the IPO.

38.     On December 11, 2019, XP filed with the SEC its final prospectus for the IPO on Form 424B1 (the "Prospectus"), which forms part of the Registration Statement.

39.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

40.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

41.     In the Registration Statement, XP reported the following, in pertinent part, regarding related party transactions:

- we identified control deficiencies related to controls around the financial reporting closing process, including the calculation of EPS, the identification and disclosure of related party transactions, and the procedures existent to maintain formal accounting policies, processes and controls to analyze, account for and disclose complex transactions; such deficiencies, when considered in the aggregate, would be considered a material weakness.

*       *       *

**Loan Arrangements with Itaú Unibanco**
On April 5, 2017, XP CCTVM [XP Investimentos Corretora de Câmbio, Títulos e Valores Mobiliários S.A.] entered into a loan agreement with Itaú Unibanco S.A. ["Itaú" or "Itaú Unibanco"] in the amount of R$126 million, which was borrowed in order to finance the second installment of the Rico acquisition. The loan accrues interest at a rate per annum equal to 113.0% of the CDI rate, is repayable in 36 monthly installments and matures on March 8, 2021. The loan is secured by a pledge (*alienação fiduciária*) over a certain number of XP CCTVM shares. As of September 30, 2019, there was R$63 million outstanding under this loan. For

further information, see note 9 to the unaudited interim condensed consolidated financial statements included elsewhere in this prospectus.

On May 10, 2017, XP Brazil entered into a loan agreement with Itaú Unibanco – Nassau Branch in the amount of US$189.9 million. The loan accrued interest at a rate per annum equal to LIBOR + 3.454% (hedged to the CDI rate + 2.25%) and was scheduled to mature on May 11, 2022. Following the Itaú Transaction in August 2018, the loan was prepaid in full on August 31, 2018 pursuant to a mandatory prepayment provision triggered in the event that Itaú Unibanco (or any of its affiliates) became a shareholder of XP Brazil.

**Securities and Repurchase Agreement Transactions with Itaú Unibanco**
We enter into bank deposit certificates (CDBs) and repurchase agreements with Itaú Unibanco in the ordinary course of our business. Bank deposit certificates are highly liquid, short term securities. Repurchase agreements are highly liquid cash equivalent operations backed by our own securities or third-party securities, and accrue interest at rates per annum ranging from 75% to 96% of the CDI rate. As of September 30, 2019 and as of December 31, 2018, securities sold under repurchase agreements accrued interest at average interest rates of 5.4% per annum and 6.4% per annum, respectively, with assets pledged as collateral.

The following table sets forth the total amounts of the bank deposit certificates and repurchase agreements entered into with Itaú Unibanco as of the dates indicated[.] [Table omitted.]

\*       \*       \*

**14. Related party transactions**
The main transactions carried with related parties, under commutative conditions, including interest rates, terms and guarantees, and period-end balances arising from such transactions are as follows[.] [Table omitted.]

(i) These transaction are related to Itaú Unibanco who became shareholder of the Company in 2018 and since then a related party. Therefore, transactions and balances with Itaú Unibanco prior to the acquisition are not being reported as transactions with related parties.

Transactions with related parties also includes transactions among the Company and its subsidiaries in the course of normal operations include services rendered such as: (i) education, consulting and business advisory; (ii) financial advisory and financial consulting in general; (iii) management of resources and portfolio management; (iv) information technology and data processing; and (v) insurance. The effects of these transactions have been eliminated and do not have effects on the unaudited interim condensed consolidated financial statements.

\*       \*       \*

**24. Related party transactions**
Transactions and remuneration of services with related parties are carried out in the ordinary course of business and under commutative conditions, including interest rates, terms and guarantees, and do not involve risks greater than normal collection or present other disadvantages.

42.     In the Registration Statement, XP continuously touted its technological prowess, advancement, and position. These statements, in part, include:

**A Differentiated, Advanced Technology Platform –** *we have developed a powerful, integrated suite of proprietary technology assets, technology applications, and technology development resources that enable us to differentiate XP in the market, manage all of our solutions, conduct all of our activities and operate with low-cost advantages and efficiencies.* . .

\*       \*       \*

Over the last two decades, we have sought to transform the Brazilian financial markets to improve the lives of millions of people. *We decided to pursue an initial public offering in the United States to attract the most significant global investors, particularly those focused on technology and global financial markets, to accelerate our growth and the transformation of the Brazilian financial markets.*

*We selected Nasdaq as our listing venue because it is recognized for bringing together the world's leading technology companies.* An initial public offering in the United States allows us to adopt a super voting structure, which is essential for our partnership to keep control of XP, ensuring our continued independence as a public company and aligning our interests with XP's millions of current and future customers.

\*       \*       \*

**Our Technology**
*Our technology is a significant competitive advantage for XP. We have developed a powerful, integrated suite of data-driven technology systems, applications, and development resources that enable us to differentiate XP in the market, manage all of our solutions, conduct all of our activities and operate with low-cost advantages and efficiencies. We are leveraging the significant technology DNA in our company, our innovation and development teams, and agile software development methods to develop a suite of new products, services and technology applications that engage and serve our clients across their financial journeys.*

11

*    *    *

***XP Innovation Development Teams***
***We have also built a dedicated innovation development program, called*** *XP Innovation****, which is comprised of approximately 500 people***, up from approximately 350 people in December 2018, approximately 150 people in December 2017, and approximately 100 people in December 2016. These dedicated technology resources develop and support our solutions by using agile software development methods and leveraging our significant technology and data assets. These include 8 *XP Tribes*, comprised of 2-3 managers each, that help guide and support our development priorities across numerous projects, and 50 *XP Squads*, comprised of autonomous integrated teams of 8-10 people, including a product owner and business expert, a UX specialist, a technology leader and several developers, that collaborate to create new technologies and solutions or improve our current offerings. These teams operate like 50 different start-up companies inside XP with a focus on the total customer experience, conducting client interviews, prototyping, behavior analysis and user tests. One of the most visible external example of our technology capabilities is the suite of technology applications that we provide to our clients and partners.

*    *    *

***Empowerment of the Client Journey*** – We leveraged the significant technology DNA in our company, comprising our innovation and development teams and agile software development methods to develop a suite of new products, services and technology applications that engage and serve our clients across their financial journeys. We launched an advanced suite of cloud-based and mobile technology applications, with sleek advanced UX and easy user experience, that complement our advisory services and provide powerful functionality across the user journey, enabling our clients and partners to better manage their various accounts, trading activities, analytics, and data queries.

(Emphasis added.)

43.    In the Registration Statement, XP reported the following, in pertinent part, regarding Independent Financial Agents ("IFAs"):

"IFAs" means Independent Financial Agents (*Agente Autônomo de Investimento*) subject to CVM [Comissão de Valores Mobiliários, the Securities and Exchange Commission of Brazil] Instruction No. 497.

*    *    *

12

*#1 Independent Financial Investment Network in Brazil* – with a range of proprietary XP Advisory Services and approximately 5,900 IFAs who on-board new clients onto the XP Platform[.]

\*       \*       \*

### Key Market Trends

We believe our market will benefit from several trends that will help provide attractive tailwinds for disruption, including: . . . and (7) the increasing demand for turn-key solutions and technology applications for IFAs to help them manage their operations more effectively.

\*       \*       \*

**Expanding Our Ecosystem –** We believe our self-reinforcing ecosystem provides a strong and highly differentiated advantage to XP, enabling us to reach, engage and empower clients across numerous channels. We intend to expand our ecosystem by: . . . (2) expanding our omni-channel distribution network by driving more users to our various online portals and expanding our network of IFA partners[.]

\*       \*       \*

### IFAs

The activity of IFAs (agentes autônomos de investimentos) is regulated by CVM Instruction No. 497 of June 3, 2011, as amended, or CVM Instruction No. 497, and Comment Letter No. 4/2018-CVM/SMI. Pursuant to such rules, IFAs are individuals, acting as agents and representatives for an institution integrating securities distribution systems, registered with the CVM to conduct client development and attraction, to receive and register orders and transmit such orders to the appropriate trading or registration systems and to provide information on the products offered and on the services provided by the institution that hired them. Although they are individuals, CVM Instruction No. 497 allows IFAs to carry out their activities through an unlimited liability partnership (sociedades simples) or sole proprietorship (firma individual), incorporated for this specific purpose, which must also be registered with the CVM. The IFAs must be engaged by an institution integrating the securities distribution system.

\*       \*       \*

In addition, the following provisions of CVM Instruction No. 497 are noteworthy:

13

• *IFAs must work exclusively for one principal and may only act for one intermediary*, with the exception of the distribution of quotas of investment funds by IFAs;

\*      \*      \*

**On July 1, 2019, the CVM issued Public Hearing Release SDM No. 03/19, or Release SDM 3/19, which may result in significant changes in CVM Instruction No. 497**, such as: (1) providing authorization for IFAs incorporated as corporations, limited liability partnerships and/or other partnerships; (2) abolishing or creating exceptions to the exclusivity rule that IFAs are subject to; and (3) amending transparency rules in connection with the activities of IFAs, in particular the disclosure of compensation received by IFAs (which is currently not required to be disclosed to investors). **According to Release SDM 3/19, suggestions from the general public were to be provided by August 30, 2019. We cannot predict what actual changes may arise from such process.** Please see "Risk Factors—Certain Risks Relating to Our Business and Industry—XP CCTVM depends in part on the performance of its IFAs. If XP CCTVM is unable to hire, retain and qualify such IFAs, our business may be harmed."

\*      \*      \*

*Increasing Number of Independent Financial Advisors* – the career market for registered IFAs is growing rapidly in Brazil as the traditional banks continue to close branches and reduce costs from their large legacy operations. Many top financial services professionals who previously worked in these banks are looking to become IFAs. The total number of IFAs in Brazil has grown from over 5,000 in 2015 to over 9,000 by 2019 according to a report by Oliver Wyman published in 2019.

*Increasing Demand for Turn-Key Solutions and Applications for IFAs* – Many of these IFAs are looking for new platforms, that provide the product suites, business management tools and technology applications that they can use to start their businesses, attract new customers and manage their operations more effectively.

\*      \*      \*

**Expanding Our Ecosystem** – We believe the self-reinforcing ecosystem provides a strong and highly differentiated advantage to XP, enabling us to reach, engage and empower clients across numerous channels. We intend to expand our ecosystem by: . . .

• *Expanding Our Omni-Channel Distribution Network* – We intend to drive more users to our various online portals and expand our network of approximately 5,900 IFA partners, which we believe provide a competitive advantage in promoting the XP brand and signing new clients. We intend to grow these

channels by (1) Cross-promoting our brands through our proprietary media; (2) helping our existing IFA partners succeed and expand their businesses; (3) *promoting the entrepreneurial opportunities of IFA careers in Brazil*; and (4) *signing new IFA relationships onto the XP platform. We believe that these channels will also continue to grow as (1) the investment market in Brazil continues to democratize and open up to new investors*; and (2) traditional financial institutions continue to close branches, continue to cut costs, and their employees look for new career opportunities[.]

*      *      *

*IFA Network – our proprietary distribution network of approximately 5,900 IFA partners, who solicit new clients and help us onboard them as XP clients. These IFAs are located in approximately 620 offices in 132 cities across the country and form the largest independent financial advisor network in Brazil, which is a competitive advantage for XP.* We believe our IFA partners choose to work with XP for a number of reasons including, (1) our deep understanding and appreciation of the IFA business model and our promotion of IFA careers given our origins as an IFA; (2) our dedicated suite of technology tools designed to help IFAs manage their businesses more effectively; (3) our trusted brand and reach across Brazil; and (4) our proprietary market information which can help IFAs reach and sell their services to customers more effectively. We ask our IFA partners to evaluate us on a monthly basis, and recorded an average score of 8.8 out of 10 for the six months ended September 30, 2019.

(Emphasis added.)

44.     In the Registration Statement, XP did not note all of or the true likelihood of the risks involved with its IFAs, a key component of its business strategy. In particular, XP did not describe the full risk involved with IFAs' status as independent contractors or the true likelihood of the end of the exclusivity clause.

45.     In the Registration Statement, XP reported the following, in pertinent part, regarding its change of accounting firm for its audits:

### CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT

On April 17, 2019, the audit committee of XP Brazil approved the engagement of PricewaterhouseCoopers Auditores Independentes ["PwC"] as XP's independent registered public accounting firm for XP Brazil's fiscal years ending on December 31, 2018 and 2017. KPMG [KPMG Auditores Independentes] was dismissed upon completion of its audit of our

consolidated financial statements as of and for the two years ended December 31, 2018 and the issuance of its report thereon dated as of March 26, 2019. The appointment of PricewaterhouseCoopers Auditores Independentes, as independent registered public accounting firm, was the result of a tender process completed in 2019 led by the audit committee of XP Brazil.

As of and for the three years ended December 31, 2018, KPMG Auditores Independentes performed the audit of our consolidated financial statements prepared under the accounting practices adopted in Brazil and based on the pronouncements, orientations and interpretations as issued by the Committee of Brazilian Accounting Practices (Comitê de Políticas Contábeis (CPC)) and issued reports in accordance with International Standards on Auditing (ISA) and Brazilian Auditing Standards (BR GAAS). *During the three years ended December 31, 2018, and the subsequent interim period through March 26, 2019, in connection with these audits conducted in accordance with BR GAAS and ISA, (1) KPMG Auditores Independentes had not issued any reports on our financial statements that contained an adverse opinion or a disclaimer of opinion, nor were the auditors' reports of KPMG Auditores Independentes qualified or modified as to uncertainty, audit scope or accounting principles; and (2) there has not been any disagreement over any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedures, which disagreements if not resolved to the satisfaction of KPMG Auditores Independentes would have caused it to make reference to the subject matter of the disagreement in connection with its auditors' reports, or any "reportable event" as described in Item 4(d) of Form F-1.*

(Emphasis added.)

46.     The statements referenced in ¶¶37-45 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) XP engaged in undisclosed related party transactions; (2) XP failed to disclose its common and large system failures and connected losses; (3) XP's aggressive IFA strategy was and is tenuous; (4) XP had material weaknesses; (5) XP fired its previous accounting firm due that firm finding and disclosing material weaknesses;

and (6) as a result, Defendants' public statements were materially false and misleading at all relevant times.

47.     Then on March 6, 2020, The Winkler Group released a report (the "Report") detailing, among other things, how XP had misled investors and failed to disclose pertinent information generally and in its Registration Statement, including: (i) undisclosed related party transactions; (ii) R$100M in system failure expenses; (iii) great uncertainty with regards to its IFAs; (iv) the full circumstances regarding its firing and replacing its accounting firm KPMG for PwC; and (v) other undisclosed material weaknesses.

48.     The Report noted the following, in pertinent part, regarding XP's undisclosed related party transactions:

> **Nearly $1 Million in Related Party Transactions Not Disclosed**
> ***Omissions and contradictions reinforce a pattern of inconsistency regarding disclosure.***
>
> ***What's not disclosed in the IPO prospectus are the related party transactions XP's broker-dealer in the U.S. felt compelled to disclose. In all, XP Securities, LLC recorded $906,004 in related party transaction disclosures in its annual reports for the years 2013, 2015, 2016, 2017, and 2018.*** [Image omitted.]
>
> The subsidiary disclosed $419,680 in revenue generated from related party transactions. It disclosed $480,423 in commissions due from related party transactions. And it disclosed $5,901 it owed in a related party disclosure. The related parties include parent company XP Investimentos [XP Investimentos S.A.], CCTVM, XP Advisors Inc., and Itaú.
>
> \*     \*     \*
>
> The subsidiary's related party transactions are immaterial to XP's overall revenue. We highlight them only to reinforce XP's pattern of inconsistency regarding disclosures. What XP feels compelled to disclose in once [sic] context differs in another.

(Emphasis added.)

49.     The Report noted the following, in pertinent part, regarding XP's undisclosed

R$100M in systems failures expenses:

### R$100 Million in Systems Failure Costs Not Disclosed
***Systems failures and order execution errors are significant recurring costs and are not being disclosed in XP's IPO prospectus.***

***XP is not disclosing expenses related to systems failures and order execution errors in its IPO prospectus.*** Included here are errors made by XP employees that have resulted in the payment of tens of millions of reais. We also believe XP is being less than forthcoming in its disclosures regarding these expenses.

While XP warns investors that an increase in volume or other errors could cause its systems to malfunction, it says it has never experienced a significant failure of its trading systems. This doesn't appear to be wholly accurate as we've discovered, for example, order execution errors equal to 7.8% of net income in 2018.

In CCTVM's 2018 audit, XP reports more than R$36.7 million in what it calls "operating errors". In a footnote, the company explains that these are largely payments made to customers due to order execution errors for system failures or human error[.] [Image omitted.]

***The operating errors are significant when measured as percentage of XP's net income.*** In 2016, operating errors were equivalent to 8.1% of net income. In 2017, operating errors amounted to 6.6% of net income. In 2018, operating errors are equal to 7.8% of net income. ***The operating errors used to calculate these figures were taken from CCTVM audits and divided by the annual net income reported in XP's IPO prospectus.***

***However, the "Other operating expenses" section in XP's IPO prospectus makes no mention of order execution errors, system failures, or human error[.]*** [Image omitted.]

We wondered if the lack of disclosure in the prospectus might be because the operating errors had been fixed and no longer an issue in 2019. ***But an examination of CCTVM's audit from the first half of 2019 indicates the 70 failures persist***[.] [Image omitted.]

From 2016 through the first half of 2019, CCTVM's audits report operating errors of more than R$95.8 million. In the years 2016-2018, operating errors were the equivalent of more than 5.2% of net income. This is significant in our view and should be disclosed in XP's prospectus just as it is in CCTVM's audits.

***Brazil's Securities and Exchange Commissions (CVM) has taken notice of XP's systems issues. The CVM has accused XP and CEO Benchimol of failing to***

***implement appropriate internal systems controls in connection with securities transactions.***

(Emphasis added.)

50.     The Report noted the following, in pertinent part, regarding XP's IFAs:

**IFA Incentives Don't Guarantee Exclusivity**

***IFAs receiving incentive payments may soon be allowed to work for XP's competitors.***

Investors are likely not aware of the risk in XP's IFA payments. XP's core asset, CCTVM, is highly dependent on its IFA network. The IFAs, according to XP, are responsible for serving nearly a third of CCTVM's active clients. The twenty largest IFA entities serve nearly 10% of CCTVM's active clients. The defection of a significant IFA or IFA entity would have a material impact on XP's results.

But it's not just concentration risk of which investors should be aware.

***If amendments currently under consideration by Brazil's SEC (CVM) are adopted, IFAs may no longer be required to be exclusive to a single financial services platform.*** Terminating what's known as the exclusivity clause could allow IFAs to work with XP's competitors. While we can assume XP would try to claw back incentive payments should an IFA leave for a competitor, this magnifies the risk in XP's strategy of purchasing growth through IFAs.

Two other notable risks include:

**Competitive Risk**
The competition for IFAs among Brazil's financial institutions is intensifying. The incentives XP offers may rise significantly which may further pressure margins. There's also risk in that the IFAs own the relationship they have with retail clients, not XP. The company acknowledges that losing an IFA may also result in the loss of retail clients. Likewise, if XP is forced to cut fees similar to its U.S. peers, as it recently did at its brokerage Clear Correctora, IFA incentives may not generate the returns XP currently expects.

**Legal Risk**
IFAs are considered independent contractors. ***If XP were required to classify IFAs as employees, by legal or legislative action, the company would incur significant additional expenses***, including potentially retroactively paying IFAs for years of service. XP has successfully challenged a number of legal proceedings claiming IFAs should be treated as employees.

(Emphasis added.)

51.     The Report noted the following, in pertinent part, regarding XP's former auditor's firing and its new auditor:

**Auditor Fired After Identifying Material Weaknesses**
***XP acknowledges a reasonable possibility of not detecting or preventing a material misstatement in its regulatory filings.***

The material weaknesses were identified in an audit of XP's consolidated financial statements for the year 2018. The company acknowledges insufficient accounting resources and processes necessary for compliance. In addition to weaknesses related to who has access to its systems, XP also admits its computer operations controls weren't at times operating effectively.

***Immediately after the audit that revealed XP's material weaknesses, XP fired its auditor, KPMG Auditores Independentes.*** Below is a timeline of key events:

● ***March 26, 2019 : KPMG issues report identifying material weaknesses in XP's financial controls***
● ***March 26, 2019 : KPMG is fired as XP's auditor***
● April 2019 : Julio Capua Ramos da Silva relinquishes role as CCTVM's CFO
● April 17, 2019 : PricewaterhouseCoopers Auditores Independentes hired to be XP's new auditor and conduct audits for the years 2017 and 2018 even though KPMG had just completed audits for 2017 and 2018
● November 2019 : Bruno Constantino becomes XP's CFO after becoming CCTVM's CFO at an unspecified point earlier in 2019

We find the timing of KPMG's dismissal interesting given that KPMG was the public accounting firm that conducted the contradictory audits for CCTVM. KPMG kept the CCTVM business for years despite audits that were, at best, clumsy.

***It wasn't until revelations of material weaknesses surfaced, just months prior to XP's IPO, that KPMG was shown the door.*** . . .

**XP Hires New Auditor at Center of Corruption Probe**
***XP did not have an auditor prior to hiring a new firm accused of rubber stamping fraudulent corporate financial statements.***

Just months prior to its IPO, with material weaknesses identified, it appears as if XP was officially without an auditor. ***In a letter to the SEC, KPMG says it was dismissed March 26, 2019. It wasn't until nearly a month later that XP hired its new public accountant.***

Whether the gap in not having an official certifying accountant was simply the timing of contracts being let or whether KPMG was dismissed in haste, it signals XP's lack of prowess as an operator and calls into question management's judgement. Why after learning about material weaknesses would XP risk investor backlash over not having an auditor right before going public?

In another telling move, *XP hired PricewaterhouseCoopers Auditores Independentes as its new public accountant. This is the same auditor accused of rubber stamping materially false and misleading corporate financial statements in connection with the company at the center of a notorious Brazilian money laundering, corruption, and bribery scheme that has resulted in 244 criminal convictions.*

Despite denying wrongdoing, PwC agreed to pay $50 million to settle the fraud case. Years after the probe was launched though, it appears PwC's due diligence is still lacking. In a 2017 inspection conducted by the Public Company Accounting Oversight Board (PCAOB), PwC is accused of rubber stamping its clients' financials without verifying them.

(Emphasis added.)

52.     The Report noted the following, in pertinent part, regarding XP's undisclosed

material weaknesses:

**Undisclosed Material Weaknesses Discovered**
*Material weaknesses in XP's internal controls were discovered years before XP says they were in its IPO prospectus.*

*XP isn't being as transparent as investors might desire with regard to when it implies it identified material weaknesses in its internal controls for financial reporting (ICFR).* The material weaknesses in ICFR were actually discovered by auditors at least five years before XP says it discovered them in its IPO prospectus.

*In the prospectus, XP states that it identified a number of material weaknesses in ICRF in connection with a 2018 audit. The reality though is that material weaknesses were identified at XP's broker-dealer subsidiary in the U.S., XP Securities, LLC., in its 2012 annual report.*

In February 2013, XP Securities, LLC was informed by its auditor of material weaknesses in its internal controls for the years 2011 and 2012[.] [Image omitted.]

The auditor also identified material weaknesses the following year. Yet XP failed to disclose this in its IPO prospectus. Investors should understand XP doesn't have to make such disclosures. While the SEC requires auditors of domestic

registrants to attest to the internal controls of a company's subsidiaries, the same rules do not apply to XP.

XP is registered as a foreign private issuer and qualifies as an emerging growth company and is exempt from many of the disclosures required of companies in the U.S. Specifically, XP does not have to comply with future audit rules established by the PCAOB and its auditors will not need to attest to the company's internal controls. XP will be exempt from disclosing these matters for up to five years, despite the SEC being clear on the subject with regard to its expectations for U.S. companies:

*"We would typically expect management's report on internal control over financial reporting to include controls at all consolidated entities, irrespective of the basis for consolidation."*

***XP actually went above and beyond in its IPO prospectus. Companies are not required to disclose material weaknesses in ICFR in their IPO registration statements. Companies that do so are generally trying to avoid surprising investors with bad news that could negatively impact the price of the stock ahead of a lockup expiration.***

Even the Securities Act Rule 408 is of little help to investors. It requires IPO registration statements to include any material information necessary to ensure required disclosures are not misleading. Since XP wasn't required to disclose its material weaknesses, it seems the company doesn't have to provide information that prevents investors from being misled.

***The voluntary disclosure could lead investors to believe the material weaknesses in ICFR were first discovered in 2019 (following the 2018 audit) when in fact, they were first identified in 2013 (following the 2012 audit). The reality is material weaknesses in ICFR have existed at XP for years and were identified long before the 2018 audit.***

***It seems XP would rather investors not know how pervasive and longstanding its material weaknesses are.***

(Emphasis added.)

53.     On this news, XP shares plummeted $9.12 per share over the rest of the trading day and the next full trading day, or 25.5%, to close at $26.64 per share on March 9, 2020, damaging investors.

54.     Since the IPO, and as a result of the disclosure of material adverse facts omitted

from XP's Registration Statement, XP's stock price has significantly fallen below its IPO price, damaging Plaintiff and Class members.

55.     Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

56.     SEC Regulation S-K, 17 C.F.R. § 229.503, required the "Risk Factor" section of the Registration Statement to discuss the most significant factors that made the Offering risky or speculative and that each risk factor adequately described the risk. Defendants' failure to disclose the already occurring significant problems underlying its base business, as well as the likely material effects it would have on the Company's share price, rendered the Registration Statement's many references to known risks that "if" occurring "may" or "could" adversely affect the Company as false and misleading.

57.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action as a class action on behalf of all those who purchased XP securities pursuant and/or traceable to the Registration Statement (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by XP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the federal securities laws;

b)      whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violations of Section 11 of the Securities Act Against All Defendants**

64.     Plaintiff incorporates all the foregoing by reference.

65.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

66.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

67.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

68.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

69.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

70.     Plaintiff acquired XP securities pursuant to the Registration Statement.

71.     At the time of their purchases of XP securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

72.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT II
## Violations of Section 12(a)(2) of the Securities Act Against All Defendants

73.     Plaintiff incorporates all the foregoing by reference.

74.     By means of the defective Prospectus, Defendants promoted, solicited, and sold the Company's securities to Plaintiff and other members of the Class.

75.     The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased XP securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

76.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired XP securities.

77.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased XP securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

78.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

### COUNT III
### Violations of Section 15 of the Securities Act Against the Individual Defendants

79.     Plaintiff incorporates all the foregoing by reference.

80.     This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

81.      The Individual Defendants were controlling persons of XP by virtue of their positions as directors or senior officers of XP. The Individual Defendants each had a series  of direct and indirect business and personal relationships with other directors and officers and major shareholders of XP. The Company controlled the Individual Defendants and all of XP's employees.

82.     XP and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or

27

authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

83.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

A.     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

B.     awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 21, 2020                    Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         */s/Phillip Kim*
                                         Phillip Kim, Esq. (PK 9384)
                                         Laurence M. Rosen, Esq. (LR 5733)
                                         275 Madison Ave., 40th Floor
                                         New York, NY 10016
                                         Tel: (212) 686-1060
                                         Fax: (212) 202-3827
                                         Email: lrosen@rosenlegal.com
                                         Email: pkim@rosenlegal.com

                                         *Counsel for Plaintiff*