**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE XP INC. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Master File No.: 1:20-cv-01502-BMC<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page(s)**

I. NATURE OF THE ACTION .... 1

II. JURISDICTION AND VENUE .... 6

III. PARTIES .... 7

A. Plaintiffs .... 7

B. Defendants .... 7

IV. XPI'S REGISTRATION STATEMENT WAS SUBJECT TO THE INTERNATIONAL FINANCIAL REPORTING STANDARDS .... 14

A. The International Financial Reporting Standards Applicable to XPI .... 14

B. Relevant IFRS Provisions .... 17

1. IAS 1 and IAS 34 – Ensuring Companies Disclose Material Facts That Will Aid Investors In Their Decisions .... 17

2. IAS 37 – Provisions, Contingent Liabilities, and Contingent Assets .... 20

3. IAS 10 – Events after the Reporting Period .... 21

V. SUBSTANTIVE ALLEGATIONS .... 23

A. Background about XPI .... 23

B. Background about XP CCTVM – XPI's Core Business Unit .... 24

C. XPI conducts its IPO pursuant to the Registration Statement .... 30

D. The market learns that the Registration Statement contained material misstatements and omissions three months after the IPO .... 32

E. XPI's Response to the Winkler Report confirmed the misstatements and omissions in the Registration Statement .... 35

F. XPI'S subsequent filings with the SEC further confirm material inaccuracies in the Registration Statement .... 35

VI. MISSTATEMENTS AND OMISSIONS OF MATERIAL FACTS IN THE REGISTRATION STATEMENT .... 37

A. Misstatements and Omissions of Material Fact Concerning Regulatory and Legal Proceedings .... 41

B. Misstatements and Omissions of Material Fact Relating to IFAs And Competition ........ 44

C. Misstatements and Omissions of Material Fact Concerning Compliance with IFRS ....... 45

VII. THE REGISTRATION STATEMENT FAILED TO DISCLOSE UNCERTAINTIES AND RISKS UNDER ITEM 303 ........ 46

VIII. CLASS ACTION ALLEGATIONS ........ 49

COUNT I ........ 50

COUNT II ........ 52

COUNT III ........ 53

PRAYER FOR RELIEF ........ 55

Lead Plaintiffs Swayam and Usha Prakash and 4F Families, Inc. (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through Plaintiffs' undersigned attorneys, allege the following against Defendants (defined below) based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters. Plaintiffs' allegations are based on the investigation conducted by and through their attorneys, which included, among other things, a review and analysis of United States Securities and Exchange Commission ("SEC") filings by XP Inc. ("XPI" or the "Company"), regulatory filings of the Company's subsidiaries, wire and press releases, earnings call transcripts, analyst reports, media reports, and other publicly available materials. Plaintiffs also consulted with an accounting consultant. Plaintiffs believe substantial additional evidentiary support exists for the allegations set forth herein, which will be developed after reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Defendants raised over $2 billion in XPI's IPO based on a registration statement and prospectus (collectively, the "Registration Statement") that contained misstatements and omissions of material fact, and failed to accurately portray XPI's business, prospects, financial performance, operations, and exposure to certain uncertainties, risks, and liabilities. Plaintiffs, on behalf of themselves and all others similarly situated, seek to recover damages as a result of the inaccuracies in XPI's Registration Statement.

2. XPI describes itself as "a technology-driven financial services platform and a trusted provider of low-fee financial products and services in Brazil." XPI claims to provide Brazilians with access to financial products and services at lower fees, and has been labeled by some market analysts as the "Charles Schwab of Brazil."

3. In mid-2019, XPI decided to avail itself of the U.S. securities markets by becoming a publicly traded company in the U.S. On December 13, 2019, XPI completed an Initial Public Offering ("IPO") in which 83,387,237 Class A common shares were sold at an initial offering price of $27 per share. In the IPO, XPI sold nearly 42.5 million Class A common shares and received gross proceeds of $1.1 billion. Additionally, various selling shareholders, including XPI officers and directors, sold almost 40.8 million Class A common shares, reaping approximately $1 billion in gross proceeds for themselves through the IPO. XPI's IPO was the fourth largest IPO of 2019, and XPI common shares began trading on the Nasdaq Global Select Market ("NASDAQ-GS") on December 11, 2019 under the ticker symbol "XP."

4. This is a securities class action on behalf of all persons and entities that purchased or acquired XPI Class A common stock pursuant and/or traceable to the Registration Statement, declared effective on December 10, 2019, issued in connection to XPI's IPO (the "Class"). This action asserts claims under §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against XPI, its officers and directors, controlling and selling shareholders, and the investment banks that underwrote the IPO (collectively "Defendants"). The claims asserted herein are based exclusively on theories of strict liability and negligence and expressly exclude any allegations of fraud or scienter.

5. Approximately three months after XPI's IPO was completed, on March 6, 2020, an investigative and financial reporting firm called the Winkler Group issued a 37-page report on XPI (the "Winkler Report") titled "Brazil's Charles Schwab: XP Inc.'s Internal Audits Conflict With Its IPO Prospectus." The Winkler Report revealed to XPI investors a series of serious "accounting irregularities, inadequate financial disclosures, and discrepancies between the

company's IPO prospectus and internal audits." Further investigation then uncovered additional material misstatements and omissions in the Registration Statement.

6. The Winkler Report revealed, *inter alia*, that XPI's Registration Statement failed to disclose material, recurring, and pervasive systems failures and order execution errors totaling approximately R$100 million[1] in the Company's core broker-dealer business segment, XP Investimentos Corretora de Cambio, Titulus e Valores Mobiliarios S.A. ("XP CCTVM").

7. Prior to XPI's IPO, XP CCTVM listed these substantial costs in its Brazilian regulatory filings as "Other operating errors" in a single line item accompanied by a disclosure describing the nature of these costs. As XPI confirmed in its March 8, 2020 response to the Winkler Report ("XPI's Response"), the Company's Registration Statement – which now includes XP CCTVM's financial statements – obfuscated these costs by characterizing them as non-descript operating "expenses", and by spreading them across three different line items. None of these line items were accompanied by a disclosure describing the nature of these costs. The failure to disclose these material and recurring costs affecting XPI's core business unit violated International Financial Reporting Standards ("IFRS"), with which the Registration Statement claimed that XPI complied.

8. The Winkler Report also revealed that XPI paid R$5.47 million in penalties to satisfy Brazilian regulators and to compensate harmed clients stemming from charges against key XPI executives. These undisclosed actions include claims by Brazil's Market Supervisor ("BSM") that XPI and Defendant Ramos da Silva, XPI director and then-CFO of XP CCTVM, disregarded and failed to stop a fraudulent securities trading scheme; and, separately, claims by

[1] XPI reports its financial figures in Brazilian reais.

BSM that Defendant Benchimol, XPI's Chairman and CEO, failed to oversee certain trading functions that benefited XPI to the detriment of its customers.

9. Further investigation also revealed that XPI's Registration Statement failed to disclose a regulatory action initiated in April 2019 by the Securities and Exchange Commission of Brazil ("CVM") alleging, *inter alia*, that XP CCTVM, and Defendants Benchimol and Almeidaviolated provisions of CVM 505, which establishes the rules for securities transactions. This regulatory action was still ongoing at the time the Registration Statement became effective and exposed XPI to possible further liability and additional costs. The failure to disclose this contingent liability in the Registration Statement violated IFRS.

10. The Winkler Report additionally highlighted that XPI's core business is "highly dependent" on its network of Independent Financial Agents ("IFAs"), and that competition in Brazil by and among large banks and financial institutions over IFAs was rapidly intensifying, posing competitive and legal risks to XPI. On that subject, the Registration Statement disclosed that XPI had previously entered an agreement with Brazil's Administrative Council for Economic Defense ("CADE") that required the Company, *inter alia*, to refrain from entering exclusive relationships with IFAs (the "CADE Agreement").[2] However, the Registration Statement failed to disclose that Banco BTG Pactual S.A. ("BTG"), an XPI competitor, had filed a complaint with the regulator alleging that XPI was engaging in anticompetitive conduct to ensure the exclusivity of its IFAs in apparent violation of the CADE Agreement. As a result, CADE were investigating XPI for anticompetitive conduct at the time the Registration Statement became effective, exposing XPI to possible material undisclosed risks, including financial

[2] The CADE Agreement was a necessary prerequisite for XPI to obtain regulatory approval for an August 2018 transaction pursuant to which Itau Unibanco S.A. ("Unibanco") acquired 49.9% of the share capital of XP Brazil.

penalties, costly regulatory investigations, and modification of the CADE Agreement. The failure to disclose this contingent liability in the Registration Statement was likewise in violation of IFRS.

11. On March 8, 2020, XPI responded to the Winkler Report in a press release that it later filed with the SEC on Form 6-K. XPI's Response was incomplete and only further confirmed that the Registration Statement contained material misstatements and omissions. For example, XPI's Response effectively conceded that the Registration Statement failed to properly disclose the R$100 million in operating error costs sustained by XP CCTVM in violation of IFRS by spreading those material and recurring costs across three separate and non-descript categories without any accompanying explanation of the nature of those costs.

12. On March 17, 2020, XPI conducted its 4Q19 earnings call. During the conference call, XPI did not address the Winkler Report any further.

13. Also on March 17, 2020, XPI reported its 2019 fourth-quarter and full-year financial results on Form 6-K. In this filing, XPI disclosed that in the fourth quarter of 2019 (ended December 31, 2019), XPI was subject to 453 civil proceedings. The Registration Statement, which became effective only three weeks prior, reported that XPI was subject to 178 civil proceedings as of September 30, 2019. Most if not all of the more than 250 additional lawsuits accounted for in XPI's March 17, 2020 filing must have been pending when XPI's Registration Statement was deemed effective on December 10, 2019. The Registration Statement, nevertheless, failed to disclose the material increase in lawsuits or the financial effect of them. The failure to disclose these events after the reporting period in the Registration Statement violated IFRS.

14. By March 18, 2020, XPI stock was trading at a low of $15.50 per share – over 42% below its IPO price. As a result of the material misstatements and omissions in XPI's Registration Statement, investors lost hundreds of millions of dollars. This action seeks to recover damages for Plaintiffs and the Class harmed by the material misstatements and omissions in XPI's Registration Statement.

## II. JURISDICTION AND VENUE

15. The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 771(a)(2) and 77o.

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions took place within this District.

18. Venue is also proper in this District, *inter alia*, because Defendant J.P. Morgan Securities LLC distributed the final prospectus from within this District through Broadridge Financial Solutions, located at 1155 Long Island Avenue, Edgewood, New York 11717.

19. In connection with the acts, conduct and other wrongs alleged in this consolidated amended complaint, Defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communication and the facilities of a national securities exchange. Defendants disseminated the misstatements and omissions alleged herein into this District, and Defendants solicited purchasers of XPI securities in this District.

## III. PARTIES

### A. Plaintiffs

20. Lead Plaintiffs Swayam and Usha Prakash, both residents of Texas, as set forth in their certifications submitted with their motion for appointment as lead plaintiff, incorporated by reference herein, purchased XPI securities pursuant and/or traceable to the Registration Statement issued in connection with the IPO.

21. Lead Plaintiff 4Fs Family Inc., located in Brazil, as set forth in its certification submitted with its motion for appointment as lead plaintiff, incorporated by reference herein, purchased XPI securities pursuant and/or traceable to the Registration Statement issued in connection with the IPO.

### B. Defendants

22. Defendant XPI purports to be a technology-driven financial services platform and provider of low-fee financial products and services in Brazil. XPI is incorporated in the Cayman Islands, and maintains its principal executive offices in São Paulo, Brazil. According to the Registration Statement, XPI maintains offices in Brazil, New York, Miami, London and Geneva. XPI shares are listed on NASDAQ under the ticker symbol "XP." The Company's agent for service in the United States, as stated in the Registration Statement, is XP Investments US, LLC ("XP Investments"), located at 55 West 46th Street, 30th floor, New York, NY 10036.

23. Defendant XP Controle Participacoes S.A. ("XP Controle") is a Brazilian corporation headquartered in Rio de Janeiro. Prior to the IPO, XP Controle beneficially owned approximately 153 million shares XPI's Class B Common stock (68.68%) vesting it with 60.89% of total voting power. Pursuant to its shareholder agreement, XP Controle is entitled to replace and nominate seven XPI directors as well as their alternates if XP Controle possesses more than 50% of XPI's voting rights.

24. Defendant ITB Holding Brasil Participações Ltda. ("ITB Holding") is a Brazilian corporation. Prior to the IPO, ITB Holding beneficially owned 69.32% of XPI's Class A shares and 25.03% of XPI's Class B shares, vesting it with 30.06% of total voting power. Following the IPO, ITB Holding was expected to beneficially own 57.02% of XPI's Class A shares and 27.38% of its Class B shares, for total voting power of 31.69%. If the underwriters exercised their overallotment option, ITB Holding would beneficially own 55.96% of XPI's Class A shares and 28.29% of XPI's Class B shares vesting it with a total voting power of 32.49%. At the time of XPI's IPO, ITB Holdings also held a controlling interest in Itau BBA USA Securities, Inc ("Itau USA"), one of the IPO underwriters, and possessed and exercised control of Itau USA.

25. Defendant Guilherme Dias Fernandes Benchimol ("Benchimol") was at all pertinent times Chairman of XPI's Board of Directors (the "Board") and the Company's Chief Executive Officer ("CEO"). Defendant Benchimol is a founder of XPI and has served as the Company's CEO ever since its formation in 2001. Defendant Benchimol also owns a substantial equity interest in XP Controle. Defendant Benchimol is a controlling shareholder of XP Controle pursuant to its shareholders agreement. Defendant Benchimol has also served on the board of XP Brazil, a non-operating holding company in Brazil which held substantially all of XPI's assets prior to the IPO, as the Chairman since 2018. Defendant Benchimol reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

26. Defendant Bruno Constantino Alexandre dos Santos ("Constantino") was at all pertinent times a member of the XPI Board and the Chief Financial Officer ("CFO") of XPI. Defendant Constantino joined XP CCTVM in 2012. Defendant Constantino owns an equity interest in XP Controle. Defendant Constantino is a controlling shareholder of XP Controle

pursuant to its shareholders agreement. Defendant Constantino reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

27. Defendant Fabrício Cunha de Almeida ("Almeida") was at all pertinent times a member of the Board and the General Counsel of XPI. Defendant Almeida also owns an equity interest in XP Controle and is a controlling shareholder pursuant to its shareholder agreement. Defendant Almeida reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

28. Defendant Carlos Alberto Ferreira Filho ("Filho") was at all pertinent times a member of the Board of XPI. Defendant Filho owns an equity interest in XP Controle and is a controlling shareholder pursuant to its shareholder agreement. Defendant Filho reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

29. Defendant Gabriel Klas da Rocha Leal ("Leal") was at all pertinent times a member of the Board of XPI. Defendant Leal has been an executive officer at XP CCTVM since 2019. Defendant Leal also owns an equity interest in XP Controle and is a controlling shareholder pursuant to its shareholder agreement. Defendant Leal reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

30. Defendant Guilherme Sant'anna Monteiro da Silva ("Monteiro da Silva") was at all pertinent times a member of the Board of XPI. Defendant Monteiro da Silva owns an equity interest in XP Controle and is a controlling shareholder pursuant to its shareholders agreement. Defendant Monteiro da Silva reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

31. Defendant Julio Capua Ramos da Silva ("Ramos da Silva") was at all pertinent times a member of the Board of XPI. Defendant Ramos da Silva joined the XPI in 2004 to build

the asset management initiatives at XPI. Defendant Ramos da Silva was the CFO of XP CCTVM until April 2019 and an officer of several companies within XPI until the end of 2018, including XP Gestao, XP Advisory, and XP Educacao. Defendant Ramos da Silva owns an equity interest in XP Controle. Defendant Ramos da Silva reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

32. Defendant Martin Emiliano Escobari Lifchitz ("Lifschitz") was at all pertinent times a member of the Board of XPI. Defendant Lifschitz also serves on the board of directors of XP Brazil and is a managing director of General Atlantic (XP) Bermuda, L.P., ("GA XP") a selling shareholder, Defendant Lifschitz reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

33. Defendant Geraldo José Carbone ("Carbone") was at all pertinent times a member of the Board of XPI. Defendant Carbone was also a member of the compensation committee at Unibanco. Defendant Carbone was identified as a director in the Registration Statement.

34. Defendant Francisco Eduardo de Almeida Pinto ("Almeida Pinto") was at all pertinent times a member of the Board of XPI. Defendant Almeida Pinto also served on the Board of Unibanco from 2008 to 2012. Defendant Almeida Pinto was identified as a director in the Registration Statement.

35. Defendant Maria Helena dos Santos Fernandes de Santana ("Fendandes de Santana") was at all pertinent times a member of the Board of XPI. Defendant Fenandes de Santana has been an independent member of the audit committee of XP Brazil since 2018. Defendant Fernandes de Santana has also been an independent member of the audit committee of Unibanco. Defendant Fernandes de Santana was identified as a director in the Registration Statement.

36. Defendant Bernardo Amaral Botelho ("Botelho"), was at all pertinent times a member of the Board of XPI. Defendant Botelho is an executive officer of XP CCTVM, XP Gestão, XP Vista, XP Advisory, XP VP, Tecfinance, XP Educação, and Leadr. Defendant Botelho owns an equity interest in XP Controle. Defendant Botelho is a controlling shareholder of XP Controle pursuant to its shareholders agreement. Defendant Botelho reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

37. Defendant Jared Wilson ("Wilson") was at all pertinent times the authorized representative in the United States of XPI. Defendant Wilson has served in numerous roles at XPI's affiliates including Chief Compliance Officer of XP Securities, LLC, a securities broker-dealer based in New York and is Chief Compliance Officer and AML Compliance Officer at XP Investments. Defendant Wilson reviewed, contributed to, and signed or authorized the signing and issuance of the Registration Statement.

38. Defendant Geraldo Travaglia Filho ("Travaglia Filho") was, at all relevant times, a director of XPI. Defendant Travaglia Fillho was a member of the audit committee of Unibanco until April 2018 and was its president from June 2014 to April 2017. Defendant Travaglia Filho was identified as a director in the Registration Statement.

39. The Defendants named in ¶¶25-38 are sometimes referred to herein as the "Individual Defendants."

40. As disclosed in the Registration Statement, the following Individual Defendants were controlling shareholders of XP Controle: Benchimol, Santos, Botelho, Filho, Leal, Almeida, and Monteiro da Silva.

41. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is an investment banking firm that acted as an underwriter of XPI's IPO, helping to draft and disseminate the IPO documents. Goldman Sachs' address is 200 West St, New York, NY 10282.

42. Defendant J.P. Morgan Securities LLC ("J.P. Morgan Securities") is an investment banking firm that acted as an underwriter of XPI's IPO, helping to draft and disseminate the IPO documents. J.P. Morgan Securities' address is 277 Park Ave, New York, NY 10172.

43. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as an underwriter of XPI's IPO, helping to draft and disseminate the IPO documents. Morgan Stanley's address is 1585 Broadway Avenue New York, NY 10036.

44. Defendant XP Investments is an investment banking firm that acted as an underwriter of XPI's IPO. XP Investments helped to draft and disseminate the IPO documents. According to the Registration Statement, XP Investments was authorized "to receive service of process with respect to any action brought against XPI in the United States under the federal securities laws of the United States or of any state in the United States arising out of this offering." XP Investments' address, as stated in the Registration Statement, is 55 W 46th St, 30th Floor, New York, NY 10036. The Registration Statement noted that XP Investments would receive more than 5% of the net IPO proceeds because XPI owned more than 10% of XP Investments' common equity. Because of this ownership interest, XP Investments was subject to a conflict of interest under FINRA Rules 5121(f)(5)(B) and 5121(f)(5)(C)(ii), respectively.

45. Defendant Itau USA is an investment banking firm and securities broker-dealer that acted as an underwriter of XPI's IPO. Itau USA maintains two offices in New York City. Itau USA's principal office is located at 540 Madison Avenue, 24th Floor, New York, New York

10022; and its secondary office is located at 767 Fifth Avenue, 5th Floor, New York, New York, 10153. Itau USA helped to draft and disseminate the IPO documents. Itau USA suffered from a conflict of interest as defined in FINRA Rule 5121(f)(5)(C)(ii) and FINRA Rule 5121(f)(5)(B) in connection with the IPO due to the receipt of more than 5% of the net offering proceeds by affiliates of Itau USA.

46. Defendant BofA Securities, Inc. ("BofA Securities") is an investment banking firm that acted as an underwriter of XPI's IPO, helping to draft and disseminate the IPO documents. BofA Securities' address is 711 5th Ave, New York, NY 10022.

47. Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking firm that acted as an underwriter of XPI's IPO, helping to draft and disseminate the IPO documents. Citigroup's address is 390 Greenwich St, New York, NY 10013.

48. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is an investment banking firm that acted as an underwriter of XPI's IPO, helping to draft and disseminate the IPO documents. Credit Suisse's address is 11 Madison Ave, New York, NY 10010.

49. Defendant UBS Securities LLC ("UBS") is an investment banking firm that acted as an underwriter of XPI's IPO, helping to draft and disseminate the IPO documents. UBS Investment's address is 11 Wall St, New York, NY 10005.

50. Defendants Goldman Sachs, J.P. Morgan Securities, Morgan Stanley, XP Investments, Itau USA, BofA Securities, Citigroup, Credit Suisse, and UBS are collectively referred to herein as the "Underwriter Defendants."

51. According to the Registration Statement, the Underwriter Defendants received the following stock purchase allotments through the IPO:

| Underwriter | Number of Class A Common Shares |
|---|---|
| Goldman Sachs & Co. LLC | 16,805,407 |
| J.P. Morgan Securities LLC | 16,805,407 |
| Morgan Stanley & Co. LLC | 16,805,407 |
| XP Investments US, LLC | 5,075,746 |
| Itau BBA USA Securities, Inc. | 5,075,746 |
| BofA Securities, Inc. | 2,985,732 |
| Citigroup Global Markets Inc. | 2,985,732 |
| Credit Suisse Securities (USA) LLC | 2,985,732 |
| UBS Securities LLC | 2,985,732 |
| **Total** | **72,510,641** |

52. The Underwriter Defendants also received substantial underwriting discounts and commissions from the IPO as follows:

| | Per Share | Total No Exercise | Total Full Exercise |
|---|---|---|---|
| | | (US$) | |
| Initial public offering price | 27.00 | 1,957,787,307 | 2,251,455,399 |
| Underwriting discounts and commissions to be paid by us | 1.15 | 48,829,788 | 48,829,788 |
| Underwriting discounts and commissions to be paid by the selling shareholders | 1.15 | 34,376,173 | 46,857,068 |
| Proceeds, before expenses, to us | 25.85 | 1,100,106,396 | 1,100,106,396 |
| Proceeds, before expenses, to the selling shareholders | 25.85 | 774,474,950 | 1,055,662,148 |

53. The Underwriter Defendants are liable for the deficient Registration Statement. In connection with the completion of the IPO, the Underwriter Defendants participated in the drafting and dissemination of the Registration Statement. The Underwriter Defendants also participated in pricing the IPO. The failure to conduct adequate due diligence by the Underwriter Defendants was a substantial factor leading to the harm complained of herein.

54. The defendants referenced in ¶¶22-50 are collectively referred to herein as "Defendants."

## IV. XPI'S REGISTRATION STATEMENT WAS SUBJECT TO THE INTERNATIONAL FINANCIAL REPORTING STANDARDS

### A. The International Financial Reporting Standards Applicable to XPI

55. Accounting standards are a set of principles companies must follow when they prepare and publish their financial statements, providing a standardized way of describing the

company's financial position and performance. IFRS are set by the International Accounting Standards Board ("IASB"), which is a standard-setting body of the IFRS Foundation, a not-for-profit, public interest organization established to develop a single set of high-quality, understandable, enforceable and globally accepted accounting standards and to promote and facilitate adoption of the standards.

56. In 2007, the SEC approved a measure allowing foreign registrants like XPI to use financial statements prepared in accordance with IFRS without providing a reconciliation of the IFRS data to the U.S. Generally Accepted Accounting Principles ("GAAP").

57. XPI stated in the Registration Statement that it prepared its financial statements under the IFRS:

> Our unaudited interim condensed consolidated financial statements were prepared in accordance with IAS 34 and our annual consolidated financial statements were prepared in accordance with IFRS, as issued by the IASB….
>
> Our consolidated financial statements are prepared in conformity with IFRS.

58. The *Conceptual Framework for Financial Reporting* ("*Conceptual Framework*") sets out fundamental concepts for financial reporting that guide IASB in developing IFRS standards. It was used by the IASB in September 2010.[3] The *Conceptual Framework* describes the objective of, and the concepts for, general purpose financial reporting. The *Conceptual Framework's* purpose is, among other things, to (a) assist the IASB in the review of existing and development of future IFRSs; (b) assist preparers of financial statements in applying IFRSs and in dealing with topics that have yet to form the subject of an IFRS; and (c) assist users of

[3] The *Conceptual Framework* was subsequently revised in March 2018 and again in October 2018. Such revisions went into effect in January 2020. Although companies were given the choice to adopt the changes early, XPI noted in its (December 2019) Registration Statement that it was not doing so. Thus, XPI's financial reporting in the Registration Statement was under the 2010 *Conceptual Framework* which is quoted throughout this consolidated amended complaint.

financial statements in interpreting the information contained in financial statements prepared in compliance with IFRS.

59. The *Conceptual Framework* states that for financial information to be useful it must be relevant and faithfully represent what it purports to represent.

60. Materiality is an inherent part of relevance. The *Conceptual Framework* discusses relevance as follows:

> Relevant financial information is capable of making a difference in the decisions made by users…
>
> Financial information is capable of making a difference in decisions if it has predictive value, confirmatory value or both…
>
> Information is material if omitting it or misstating it could influence decisions that users make on the basis of financial information about a specific reporting entity. In other words, materiality is an entity-specific aspect of relevance based on the nature or magnitude, or both, of the items to which the information relates in the context of an individual entity's financial report. …
>
> ***To be useful, financial information must not only represent relevant phenomena**, **but it must also faithfully represent the substance of the phenomena that it purports to represent***.

61. The *Conceptual Framework* also states that a "complete depiction" must include all information necessary for an investor to understand what is being described:

> ***A complete depiction includes all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations.*** For example, a complete depiction of a group of assets would include, at a minimum, a description of the nature of the assets in the group, a numerical depiction of all of the assets in the group, and a description of what the numerical depiction represents (for example, historical cost or fair value). ***For some items, a complete depiction may also entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature, and the process used to determine the numerical depiction***.
>
> Information must both be relevant and faithfully represented if it is to be useful. Neither a faithful representation of an irrelevant phenomenon nor an unfaithful representation of a relevant phenomenon helps users make good decisions. The

> most efficient and effective process for applying the fundamental qualitative characteristics would usually be as follows (subject to the effects of enhancing characteristics and the cost constraint, which are not considered in this example). First, identify an economic phenomenon that has the potential to be useful to users of the reporting entity's financial information. Second, identify the type of information about that phenomenon that would be most relevant if it is available and can be faithfully represented. Third, determine whether that information is available and can be faithfully represented. If so, the process of satisfying the fundamental qualitative characteristics ends at that point. If not, the process is repeated with the next most relevant type of information….
>
> ***Enhancing qualitative characteristics should be maximised to the extent possible***. However, the enhancing qualitative characteristics, either individually or as a group, cannot make information useful if that information is irrelevant or does not provide a faithful representation of what it purports to represent.

**B. Relevant IFRS Provisions**

**1. IAS 1 and IAS 34 – Ensuring Companies Disclose Material Facts That Will Aid Investors In Their Decisions**

62. IAS 1 concerns the "Presentation of Financial Statements." That provision provides in pertinent part:

> This Standard prescribes the basis for presentation of general purpose financial statements to ensure comparability both with the entity's financial statements of previous periods and with the financial statements of other entities. It sets out overall requirements for the presentation of financial statements, guidelines for their structure and minimum requirements for their content.
>
> **Scope**
>
> **An entity shall apply this Standard in preparing and presenting general purpose financial statements in accordance with International Financial Reporting Standards (IFRSs).** (Emphasis in original).

63. Under IAS 1, financial statements must "provide information about the financial position, financial performance and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS1.9. Information about assets, liabilities, income and expenses, and cash flows, together with the information in the notes to the financial statements

"assists users of financial statements in predicting the entity's future cash flows and, in particular, their timing and certainty." *Id*

64. IAS 1 also mandates that "[f]air presentation requires the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework." IAS1.15.

65. IAS 1 defines materiality as follows:

> Omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements. ***Materiality depends on the size and nature of the omission or misstatement judged in the surrounding circumstances***. The size or nature of the item, or a combination of both, could be the determining factor.

66. IAS 1 requires "items of dissimilar nature or function" to be presented separately, unless they are immaterial. "When items of income or expense are material, an entity shall disclose their nature and amount separately." IAS 1 further states that "***[a]n entity shall not reduce the understandability of its financial statements by obscuring material information with immaterial information or by aggregating material items that have different natures or functions***." (Emphasis added.)

67. According to IAS 1, a "complete set of financial statements" includes notes to financial statements. IAS 1 emphasizes the importance of information presented in the notes to financial statements in assisting "users of financial statements in predicting the entity's future cash flows and, in particular, their timing and certainty:"

> ***Notes*** **contain information in addition to that presented in the statement of financial position, statement(s) of profit or loss and other comprehensive income, statement of changes in equity and statement of cash flows. Notes provide narrative descriptions or disaggregations of items presented in those statements and information about items that do not qualify for recognition in those statements.** …

> An item that is not sufficiently material to warrant separate presentation in [the financial] statements may warrant separate presentation in the notes. …
>
> The notes shall … provide information that is not presented elsewhere in the financial statements, but is relevant to an understanding of any of them. (Emphasis in original).

68. IAS 34 concerns a company's "Interim Financial Reporting,"[4] and provides in pertinent part that:

> The objective of this Standard is to prescribe the minimum content of an interim financial report and to prescribe the principles for recognition and measurement in complete or condensed financial statements for an interim period. Timely and reliable interim financial reporting improves the ability of investors, creditors, and others to understand an entity's capacity to generate earnings and cash flows and its financial condition and liquidity. …
>
> Each financial report, annual or interim, is evaluated on its own for conformity to IFRSs. …
>
> In the interest of timeliness and cost considerations and to avoid repetition of information previously reported, an entity may be required to or may elect to provide less information at interim dates as compared with its annual financial statements. … The interim financial report is intended to provide an update on the latest complete set of annual financial statements. Accordingly, it focuses on new activities, events, and circumstances and does not duplicate information previously reported.
>
> In deciding how to recognise, measure, classify, or disclose an item for interim financial reporting purposes, materiality shall be assessed in relation to the interim period financial data. …[5]
>
> The overriding goal is to ensure that an interim financial report includes all information that is relevant to understanding an entity's financial position and performance during the interim period. …

---

[4] "Interim financial report means a financial report containing either a complete set of financial statements (as described in IAS 1 Presentation of Financial Statements (as revised in 2007)) or a set of condensed financial statements (as described in this Standard) for an interim period [i.e., a period shorter than a full financial year]."

[5] IAS 34 refers to the definition of materiality included in IAS 1.

69. XPI's Registration Statement violated IAS 1 and IAS 34 by failing to report important costs associated with operating errors and system failures in XPI's core business unit as one separate line-item loss or to disclose these expenses, and the nature of these expenses, in the notes to the financial statements in its interim and annual consolidated income financial statements. Disclosing these costs in the Registration Statement would have apprised XPI investors of a significant and recurring problem in the Company's core business unit, XP CCTVM.

70. Prior to the IPO, XP CCTVM's financial statements presented these costs as one figure – "Other operating expenses – operating errors", accompanied by a disclosure describing the nature of the expenses. By contrast, the Registration Statement opaquely recorded these costs in three different line items: "Operating costs – operating losses and provisions," "Operating costs – other costs," and "Other operating expenses – legal proceedings and agreements with customers". Moreover, the Registration Statement made no disclosure about the fact that these costs pertained to indemnities paid to customers due to pervasive and recurring operating errors and systems failures. This manner of reporting obfuscated an important issue for XPI investors by omitting key facts relating to the "surrounding circumstances" and "nature" (*see* IAS 1) of the expenses; namely, that they all stemmed from recurring system failures and order execution errors in XPI's core business unit. As the Winkler Report disclosed, these order execution errors were material as they were equal to approximately 8.1%, 6.6%, and 7.8% of XPI's net income in 2016, 2017 and 2018, respectively.

**2. IAS 37 – Provisions, Contingent Liabilities, and Contingent Assets**

71. IAS 37 defines a contingent liability as follows:

> A contingent liability is: (a) a possible obligation that arises from past events and whose existence will be confirmed only by the occurrence or non-occurrence of one or more uncertain future events not wholly within the control of the entity; or

(b) a present obligation that arises from past events but is not recognised because: (i) it is not probable that an outflow of resources embodying economic benefits will be required to settle the obligation; or (ii) the amount of the obligation cannot be measured with sufficient reliability.

72. Under IAS 37, "[u]nless the possibility of any outflow [of resources] in settlement is remote, an entity shall disclose for each class of contingent liability at the end of the reporting period a brief description of the nature of the contingent liability and, where practicable: (a) an estimate of its financial effect …; (b) an indication of the uncertainties relating to the amount or timing of any outflow; and (c) the possibility of any reimbursement.[6]

73. XPI violated IAS 37 because it failed to disclose in its interim and annual consolidated financial statements included in the Registration Statement contingent liabilities, including regulatory proceedings in Brazil such as: (i) an action by CVM against XP CCTVM, Benchimol and Almeida for violating provisions of CVM 505; and (ii) an action filed by BTG against XPI with CADE, alleging that XPI coerced, intimidated, and threatened to stifle competitors such as BTG from hiring IFAs that did business with XPI in apparent violation of the CADE Agreement. Nor did the Registration Statement disclose the estimated financial effect of these contingent liabilities, which included possible material financial penalties, costly regulatory investigations, and the modification of the CADE Agreement.

**3. IAS 10 – Events after the Reporting Period**

74. IAS 10 addresses when a reporting entity must adjust its financial statements for events that occurred after the reporting period, and when a reporting entity likewise must update its disclosures to address events that occurred after the reporting period. IAS 10 refers to these two types of events after the reporting period as "adjusting events" and "non-adjusting events".

75. IAS 10 defines the events after the reporting period as follows:

---

[6] IAS 34 requires a company to disclose in its interim financial statements changes in contingent liabilities if they are significant.

> Events after the reporting period are those events, favourable and unfavourable, that occur between the end of the reporting period and the date when the financial statements are authorised for issue. Two types of events can be identified:
>
> (a) those that provide evidence of conditions that existed at the end of the reporting period (*adjusting events after the reporting period*); and
>
> (b) those that are indicative of conditions that arose after the reporting period (*non-adjusting events after the reporting period*).

76. With respect to non-adjusting events, IAS 10 further provides, in relevant part, that:

> If non-adjusting events after the reporting period are material, non-disclosure could reasonably be expected to influence decisions that the primary users of general purpose financial statements make on the basis of those financial statements, which provide financial information about a specific reporting entity. Accordingly, an entity shall disclose the following for each material category of non-adjusting event after the reporting period:
>
> (a) the nature of the event; and
>
> (b) an estimate of its financial effect, or a statement that such an estimate cannot be made.

77. XPI violated IAS 10 because it failed to update its disclosures in the Registration Statement to reflect that, as of the date the Registration Statement became effective, on December 10, 2019, XPI was subject to a substantial increase in civil lawsuits – more than double the number XPI had reported in the Registration Statement for the period ended September 30, 2019 – carrying material liability exposure and other costs. Indeed, in the fourth quarter of 2019 alone (ended December 31, 2019) XPI was named in more than 250 additional proceedings (an astounding 154.5% increase over the prior quarter) carrying millions of dollars of additional liability exposure and costs.

78. Only three weeks remained in the fourth quarter of 2019 when the Registration Statement became effective (on December 10, 2019). Thus, most if not all of these civil lawsuits

reported in the fourth quarter of 2019 were already pending when the Registration Statement became effective. Defendants violated IAS 10 by failing to disclose this material increase in civil lawsuits pending when the Registration Statement became effective and by failing to provide a statement reflecting the financial effect of these lawsuits.

## V. SUBSTANTIVE ALLEGATIONS

### A. Background about XPI

79. XPI is a financial services company that acts primarily as a securities broker-dealer. Defendant Benchimol, XPI's CEO and founder, claims that the Company follows the "Charles Schwab" model, and is becoming the "first real one-stop investment shop in Brazil."[7]

80. According to its SEC filings, XPI provides financial products and services through a variety of channels including: brokerage, investment advisory, and asset management services. XPI's business includes educating investors, providing investors with access to financial services, creating and selling financial products and technology applications, and providing customer service support to investors.

81. XPI generates revenue primarily by: (i) providing existing clients with a growing range of financial products and services in which to invest their existing assets under custody ("AUC") already on XPI's platform; (ii) attracting additional money onto its platform from existing investors to grow its total AUC; and (iii) attracting new clients and money inflows onto its platform across a variety of channels to increase its total AUC.

---

[7] *See* Felipe Marques, Cristian Lucchesi, and Vinicius Andrade *Brazil Broker XP Surges in Debut After $1.96 Billion U.S. IPO*, Bloomberg (Dec. 10, 2019), https://www.bloomberg.com/news/articles/2019-12-10/brazil-broker-xp-is-said-to-price-ipo-above-range-at-27-a-share#:~:text=XP%20Inc.%2C%20Brazil's%20largest%20brokerage,after%20pricing%20at%20%2427%20Tuesday; *see also*, Felipe Marques, Cristian Lucchesi, and Vinicius Andrade, *This Upstart Brokerage Inspired by Charles Schwab Is Changing the Way Brazil Invests*, Bloomberg (Feb. 6, 2019), https://www.bloomberg.com/news/articles/2019-02-06/guilherme-benchimol-s-xp-is-changing-how-brazil-invests.

82. According to its SEC filings, XPI states that it operates a financial product platform, called the Open Product Platform, which provides clients with access to over 600 investment products, including equity and fixed income securities, mutual and hedge funds, structured products, life insurance, pension plans, and REITs.

83. Additionally, XPI's SEC filings state that the Company also offers a suite of advisory services, called XP Advisory Services, which are comprised of: (a) XP Investimentos™ for retail clients in Brazil; (b) XP Private™ for high-net-worth clients; (c) XP Investimentos® for international clients; and (d) XP Issuer Services for corporate and institutional clients. Additionally, XPI offers VIP Customer Service, its premier customer service program and support organization, which provides its clients and partners with client service.

84. Prior to the IPO, XPI's corporate structure consisted of 26 entities, 16 of which were incorporated in Brazil. XPI controlled all of these entities through its 100% ownership interest in XP Investimentos, which held a 100%, or near 100% ownership in the other entities in the group. This included an indirect ownership interest in XP CCTVM, XPI's core business unit.

**B. Background about XP CCTVM – XPI's Core Business Unit**

85. XP CCTVM is a Brazilian broker-dealer entity, and is described in XPI's Registration Statement as "the core entity of the [XPI] group." XP CCTVM has the largest number of XPI employees, and, according to XPI's Registration Statement, as of December 31, 2018, XP CCTVM had assets of R$14,050 million, representing 73.5% of XPI's combined assets, and accounted for 66.5% of XPI's combined revenue in 2018. Prior to the IPO, XP CCTVM reported its financial results to Brazilian regulators. Following the completion of the IPO, XP CCTVM's financial statements were included in the financial results of XPI.

86. All retail clients of XP Investimentos (including XP Direct and through the IFA network), Clear, and Rico onboard and access all of the products in XPI's investment platform

through XP CCTVM. XP Direct is XPI's full-service website for its mass affluent clients and provides access to all of XPI's products and more sophisticated functionality. Clear is XPI's digital portal and electronic trading platform for active retail traders. Rico is XPI's online-only solution for self-directed investors, which provides investment services, decision-making tools, and custom-designed educational software. Over 70% of XPI's clients primarily utilize one of XPI's websites or have an investment adviser through XP Direct, and approximately 29% of XPI's clients are served by IFAs.

87. As XPI explains in its SEC filings, in addition to depending heavily on its systems to facilitate trading, XP CCTVM is highly dependent on its network of IFAs. As such, this IFA network is also at the heart of XPI's business. To that end, XPI's Registration Statement states that "our [core] business depends in part on such IFAs", and explains that XP CCTVM heavily relies on IFAs to (i) prospect and acquire customers; (ii) receive and register orders and transmit such orders to the appropriate trading or registration systems; and (iii) provide information on the products offered and the services provided by XP CCTVM.

88. As of September 30, 2019, XP CCTVM had approximately 5,900 individual IFAs organized into approximately 620 IFA entities, which were responsible for serving approximately 29% of XP CCTVM's active clients. In addition, XP CCTVM's 20 largest IFA entities comprised 1,358 individual IFAs and were responsible for serving approximately 9.5% of XP CCTVM's active clients.

89. Pursuant to XPI's Registration Statement, IFA activity is governed by the CVM:

> The activity of IFAs (agentes autônomos de investimentos) is regulated by CVM Instruction No. 497 of June 3, 2011, as amended, or CVM Instruction No. 497, and Comment Letter No. 4/2018-CVM/SMI. Pursuant to such rules, IFAs are individuals, acting as agents and representatives for an institution integrating securities distribution systems, registered with the CVM to conduct client development and attraction, to receive and register orders and transmit such

> orders to the appropriate trading or registration systems and to provide information on the products offered and on the services provided by the institution that hired them. Although they are individuals, CVM Instruction No. 497 allows IFAs to carry out their activities through an unlimited liability partnership (sociedades simples) or sole proprietorship (firma individual), incorporated for this specific purpose, which must also be registered with the CVM. The IFAs must be engaged by an institution integrating the securities distribution system.

90. Moreover, XPI's Registration Statement describes the regulations applicable to IFAs, in relevant part, as follows:

> In addition, the following provisions of CVM Instruction No. 497 are noteworthy:
>
> • IFAs must work exclusively for one principal and may only act for one intermediary, with the exception of the distribution of quotas of investment funds by IFAs;
>
> • agents shall be transparent with their clients regarding details of their employer and its contractual relationship with the investor;
>
> • IFA acting through a legal entity (pessoa jurídica) may not accept partners that are not accredited as IFAs; and
>
> • agents must not delegate to third parties, in whole or in part, obligations under their contract with their employer.

91. Prior to XPI's IPO, there was already increased competition in Brazil between financial institutions seeking to attract IFAs to increase their client base, AUC, and/or business possibilities. This was already a serious and rapidly growing concern for XPI. After all, clients maintain their relationships directly with the IFAs of their choosing (which are independent contractors vis a vis XPI) and not necessarily with the employees of XP CCTVM, and, as such, a loss in IFAs could result in a loss of clients and AUC for the Company.

92. XPI had to be especially careful about how it competed for and/or maintained its relationships with IFAs. Prior to the IPO, XPI was party to the antitrust-related CADE agreement with CADE that, among other things, prohibited the Company from entering into exclusive relationships with IFAs. As disclosed in the Registration Statement, a breach of the

CADE Agreement could result in financial penalties, probing and costly antitrust investigations, and/or the revision of the CADE Agreement.

**A. Background about the CADE Agreement**

93. Unibanco is a Brazilian bank headquartered in Sao Paulo that provides financial products and services to individual and corporate clients. Unibanco's private client banking services compete with XPI's. Slightly over one year prior to XPI's IPO, in August 2018, Unibanco acquired a 49.9% stake of the share capital of XP Brazil (the "Unibanco Transaction"). XP Brazil is a non-operating holding company in Brazil which held substantially all of XPI's assets prior to the IPO.

94. In order to obtain antitrust regulatory approval for the Unibanco Transaction, XPI had to enter into agreements with CADE and the Central Bank. Acordo em Controle de Contracao ("ACC") Clause 3(a). These agreements, referenced *supra*, imposed restrictions on XPI's business, including its ability to acquire interests in financial investment platforms. Significantly, two of the stipulations in the CADE Agreement: (i) prohibited XPI from entering into exclusive relationships with IFAs (except as regulations permitted); and (ii) required XPI to facilitate the transferability of client's financial products to competing platforms. *See* CADE Agreement at ¶¶2.3.1; 2.4.1-2.

95. The Central Bank also imposed restrictions on XPI's interaction with Unibanco and other entities associated therewith. Specifically, ACC Clause 3(b) mandates that XPI preserve its autonomy from Unibanco, not permitting Unibanco to influence XPI's business and operational strategies. This includes not accepting any nomination by Unibanco for XPI finance or operations executive roles; not permitting Unibanco to access XPI's client database, and not

allowing Unibanco to participate in the meetings of XPI's control group that precede XPI's general meetings, as provided in XPI's shareholder agreement. ACC Clauses 3(b)1 - 3(b)3.

96. Any breach, potential or actual, or a complaint that alleged a potential breach of the CADE Agreement could result in financial penalties, probing and costly investigations by Brazilian regulators, and/or the revision of the CADE Agreement itself. If a breach of these provisions could be proven, XPI would face material reputational and financial harm. *See* CADE Agreement at ¶¶5-5.8; ACC Clauses 11-13. A proven breach would also expose XPI to additional restrictions and penalties on its business. *See id*.

**B. Prior to the IPO, XPI was accused of anticompetitive conduct that potentially violated the CADE Agreement**

97. In January 2019, XPI competitor BTG filed a complaint with CADE that accused XPI of anticompetitive conduct in apparent violation of the CADE Agreement (the "BTG CADE Complaint"). Among other things, BTG claimed that XPI strong-armed IFAs to enter into exclusive relationships with the Company, *inter alia*, by using burdensome contractual provisions, intimidation, and threats to prevent IFAs from transferring their business to companies that compete with XPI.

98. More specifically, BTG alleged that XPI retaliated against at least two IFA firms, including One Agentes Autônomos de Investimentos ("One Agentes") and CDR Agentes Autônomos de Investimentos (known as "Cordier") who were negotiating agreements to distribute mutual funds through BTG. XPI punished these IFA firms by unilaterally cancelling their contracts with XPI, and cutting off their access to XPI's systems, which meant that the IFA

firms could not review client portfolios or place trades for their clients.[8] *See* BTG CADE Complaint ¶¶21, 33. According to the BTG CADE Complaint, IFAs also faced the constant threat of XPI bringing legal action to harass them for perceived breaches of their contracts with XPI. XPI would also send defamatory emails to the clients of IFAs, outlining the purportedly improper conduct of the IFAs. *See* BTG CADE Complaint ¶¶21, 32. The aforementioned tactics allegedly were used by XPI to effectively bind IFAs to an exclusive relationship with the Company, and prevent IFAs from taking their business to industry competitors. This anticompetitive conduct likewise potentially contravened the CADE Agreement.

99. The BTG CADE Complaint also referenced an anonymous complaint that was sent to BTG in October 2018 that further expanded on XPI's alleged anticompetitive conduct. According to the anonymous complaint, XPI issued millions of reais in loans to IFAs with contractual provisions that prevented the IFA from making advance payments toward the loan unless expressly permitted by XPI. *See* BTG CADE Complaint ¶14. This had the effect of creating a dependent relationship between the IFA and XPI, discouraging any move by an IFA towards an XPI competitor. *See* BTG CADE Complaint ¶14. Furthermore, the anonymous complaint alleged that IFAs who refused such loans suffered reprisals. *See* BTG CADE Complaint ¶14.

100. The anonymous complaint referenced in the BTG CADE Complaint further alleged that these XPI loan agreements contained additional clauses that required IFAs to inform XPI of any intent to move toward an XPI competitor. *See* BTG CADE Complaint ¶15. These clauses gave XPI the right to contact an IFA's clients to warn them of the IFA's intention to

[8] *See BTG Accuses XP of Using 'Threats' and Lawsuits to Keep Advisors*, CitywireAmericas, https://citywireamericas.com/news/btg-accuses-xp-of-using-threats-and-lawsuits-to-keep-advisors/a1196398 (last visited July 19, 2020)

leave XPI and to give the clients the option to remain with XPI. BTG CADE Complaint ¶15. The anonymous complaint also alleged that XPI used any indication that an IFA merely considered the possibility of moving to a competitor as the basis for immediately shutting down that IFA's access to XPI's electronic systems, and refusing to fulfill that IFA's clients' orders, such that the IFA was prevented from attending to its clients' needs. BTG CADE Complaint ¶16. The desired effect was to sever the relationship between the IFA and its clients; a substantial deterrent for any IFA to consider going to an XPI competitor. In light of the foregoing, the BTG Complaint alleged that IFAs were effectively strong-armed into exclusive relationships with XPI.

101. The BTG CADE Complaint caused CADE to launch an investigation into XPI for engaging in anticompetitive conduct in violation of the restrictions imposed by the CADE Agreement.

102. The regulatory investigations stemming from BTG's accusations into XPI's alleged anticompetitive conduct remained ongoing for the duration of 2019 – after the Registration Statement became effective on December 10, 2019. Accordingly, this contingent liability, and the risks associated therewith should have been disclosed, in the Registration Statement pursuant to IAS 37, but, as set forth below, did not do so.

### C. XPI conducts its IPO pursuant to the Registration Statement

103. In mid-2019, XPI determined to avail itself of the U.S. markets and to list its shares on the NASDAQ-GS.[9] In connection with its IPO, XPI filed an initial registration

---

[9] *See Investors buy into XP Investimentos' growth story*, Euromoney, https://www.euromoney.com/article/b1jh1w5nbxdb29/investors-buy-into-xp-investimentos-growth-story?copyrightInfo=true (last visited on Jul. 19, 2020).

statement on Form F-1 with the SEC on November 15, 2019. When the Form F-1 was filed, the number of shares to be offered and the price range for the IPO was still not yet decided.

104. Two weeks after the filing of XPI's Form F-1, on November 29, 2019, theCompany executed a corporate reorganization. As a result of this reorganization, XPControle, Unibanco, GA XP, and DYNA III Fundo de Investimento em Participações Multiestratégia ("DYNA III") contributed all of their shares in XP Brazil to XPI. XP Brazil, in turn, transferred all of its assets to XPI, and XPI changed its corporate structure so that it held the group's operating assets.

105. On December 2, 2019, XPI announced that its IPO would be for 72,510,641 Class A common shares with an option for the underwriters to purchase an additional 10,876,596 shares. Approximately 29,957,449 shares of the 72,510,641 would be offered by selling shareholders, while the remaining 42,553,192 shares would be offered by the Company. The selling shareholders were offering the additional underwriter allotment. At the time, the IPO price was estimated to be between $22 and $25 per share.

106. On December 9, 2019, XPI filed its final amendment to the registration statement with the SEC on Form F-1/A which formed part of the Registration Statement. The Registration Statement was declared effective after the close of trading on December 10, 2019. The Company filed its final prospectus on Form 424B1 with the SEC on December 11, 2019. The final prospectus likewise formed part of the Registration Statement.

107. XPI's IPO closed on December 13, 2019. In the end, XPI sold 42,553,192 Class A common shares, and selling shareholders sold 40,834,045 Class A common shares at a price of $27 per share.

108. XPI ultimately received net proceeds totaling $1.1 billion from the IPO after deducting underwriting costs and commissions and before expenses. The Underwriter Defendants received in excess of $95 million from the IPO.

**D. The market learns that the Registration Statement contained material misstatements and omissions three months after the IPO**

109. On March 6, 2020, approximately three months after XPI's IPO, the Winkler Group – run by Nick Winkler – released an investigative financial research report on XPI. The 37-page Winkler Report, titled "Brazil's Charles Schwab: XP Inc.'s Internal Audits Conflict With Its IPO Prospectus," revealed that the Registration Statement materially misrepresented XPI's business, prospects, financial performance, operations, and exposure to certain uncertainties, risks, and liabilities.

110. Among other things, the Winkler Report revealed that XPI's Registration Statement failed to disclose material, recurring, and pervasive systems failures and order execution errors totaling approximately R$100 million in the Company's core business unit, XP CCTVM.[10] Prior to the IPO, XP CCTVM disclosed the costs it incurred as a result of these operating errors in its financial reports to Brazilian regulators. For example, in XP CCTVM's financial statements for the years ended December 31, 2016, 2017 and 2018, XP CCTVM disclosed over R$20 million, R$28.1 million and R$36.7 million, respectively, in costs under the heading "Other operating expenses – operating errors." These costs were accompanied by a further disclosure explaining that they were primarily as a "result of indemnities paid to customers by XP CCTVM derived from errors in the execution of orders or failures of the

---

[10] These operating errors and system failures continued even after the Company's IPO as the Company experienced a huge system failure on February 20, 2020. *See Brazil's XP Says Trading Platform Facing Problems*, Reuters, https://www.reuters.com/article/us-xp-platform/brazils-xp-says-trading-platform-facing-problems-idUSKCN20K2YW (last visited Jul. 19, 2020).

systems or of people." According to the Winkler Report, XP CCTVM's order execution errors were equal to approximately 8.1%, 6.6%, and 7.8% of XPI's net income in 2016, 2017 and 2018, respectively.

111. XPI's Registration Statement further misled investors by warning that an increase in errors *could* cause its key systems to malfunction, but stating that the Company had *never* experienced a significant failure in its systems. As set forth *supra*, that statement was not true. Moreover, as XPI's Response to the Winkler Report confirmed, XPI obfuscated the significant costs associated with these systems and operating errors in its Registration Statement, *inter alia*, by failing to dedicate a separate line item explicitly to expenses resulting from these "operating errors"; by spreading these costs across three separate and non-descript line items; and by failing to include a disclosure explaining the nature of these costs in any of the three line items in which these costs were allegedly recorded. XPI violated IAS 1 and IAS 34 by failing to report these material and recurring costs in a manner in which investors could readily understand their significance.

112. The Winkler Report also revealed that XPI was subject to regulatory and legal proceedings in Brazil, including proceedings involving top executives that resulted in payouts and those that remained pending at the time of the IPO and thus carried material undisclosed risk. For example, the Registration Statement failed to disclose the existence of settlement payouts of nearly R$5.5 million to satisfy regulators and to compensate harmed clients of XPI. In one action, BSM charged XPI and Defendant Ramos da Silva, XPI director and then-CFO of XP CCTVM, with disregarding and otherwise failing to take action to stop a fraudulent securities trading scheme. In another action, Defendant Benchimol, XPI's Chairman and CEO, was charged with failing to oversee certain trading functions that benefited XPI to the detriment of its

customers. Rather than disclose these charges and proceedings involving XPI's leadership, the Registration Statement only generically reported total payments to resolve claims in its financial statements under "Legal proceedings and agreement with customers."

113. These were not the only regulatory actions that the Registration Statement omitted to disclose. In April 2019, XP CCTVM, and certain key executives, including Defendants Benchimol and Almeida were under investigation by the CVM for violating provisions of CVM 505, which establishes rules for securities transactions. XP CCTVM, Defendant Benchimol and Defendant Almeida were charged with failing to have "internal procedures and controls in order to verify the implementation, application, and effectiveness of standards contained in Instruction 505." This action by CVM remained pending at the time of the IPO. The failure to disclose this action in the Registration Statement violated IAS 37, which requires the disclosure of such contingent liabilities and, among other things, the anticipated financial effect thereof.

114. Additionally, the Winkler Report underscored that XPI's core business is "highly dependent" on its IFA network, and that competition by and among large banks and financial institutions over IFAs had already materialized pre-IPO and was rapidly intensifying, posing competitive and legal risks to XPI. On that subject, the Registration Statement disclosed that XPI had entered into the CADE Agreement in connection with the Unibanco Transaction, which required the Company, *inter alia*, to refrain from entering exclusive relationships with IFAs. Based on further investigation, however, the Registration Statement failed to disclose that XPI's competitor, BTG, had accused XPI of engaging in anticompetitive conduct in apparent violation of the CADE Agreement. As a result, CADE and other Brazilian regulators, including the Central Bank, were investigating XPI for anticompetitive conduct at the time of the IPO, exposing XPI to possible material liability, including financial penalties, probing and costly

regulatory investigations, and modification of the CADE Agreement. XPI's failure to disclose this contingent liability and the financial effect thereof, in the Registration Statement likewise violated IAS 37.

### E. XPI's Response to the Winkler Report confirmed the misstatements and omissions in the Registration Statement

115. On March 8, 2020, XPI responded to the Winkler Report via a press release that the Company later filed with the SEC on Form 6-K. XPI's Response largely confirmed that the Registration Statement was materially inaccurate. For example, XPI's Response effectively acknowledged that XPI obfuscated the R$100 million in costs associated with operating errors and system failures by spreading them across three separate and non-descript line items. XPI's Response also acknowledged that the Registration Statement failed to expressly disclose the R$5.47 million in regulatory settlements involving the Company's key executives in the fines and penalties section of the Registration Statement. Instead, XPI vaguely accounted for these settlements in the legal proceedings section in the Registration Statement.

### F. XPI'S subsequent filings with the SEC further confirm material inaccuracies in the Registration Statement

116. On March 17, 2020, XPI held its first earnings call as a public company. At that time, XPI declined to further address the issues raised in the Winkler Report.

117. Also on March 17, 2020, XPI reported its 2019 fourth-quarter and full-year financial results, during which the Company disclosed the following regarding civil claims filed against XPI as of the close of the reporting period (December 31, 2019):

> As of December 31, 2019, there were 29 civil claims for which the likelihood of loss has been classified as possible, in the amount of R$ 2,673 (December 31, 2018 – R$ 5,610).

118. XPI also disclosed that it had potential exposure of R$81.4 million in 2019, as compared to R$64.8 million in 2018, in civil liability – a substantial increase from the amount

disclosed in the Registration Statement that covered the period ended September 30, 2019. XPI disclosed in a footnote:

> The Group is defendant in 6 civil claims by customers and investment agents, mainly related to portfolio management, risk rating, copyrights and contract termination. The total amount represents the collective maximum value to which the Group is exposed based on the claims' amounts monetarily restated.

119. In its April 29, 2020 Form 20-F, XPI further disclosed that the number of "judicial proceedings" in which it was involved had significantly jumped from 178 to 453 during the fourth quarter of 2019, with six claims representing 47% of the R$81 million in exposure:

> As of December 31, 2019, we were party to 29 judicial proceedings of a civil nature for which we recorded a provision of R$3 million. We were also party to 453 judicial proceedings of a civil nature totaling R$81 million, where the likelihood of loss has been assessed by our management as possible based on the opinion of our external legal advisors and for which we have not recorded a provision. With respect to potential judicial proceedings, only 6 claims represent 47% of the total amount and the remaining claims are not individually representative.

120. Accordingly, in the fourth quarter of 2019 alone, XPI was involved in more than 250 additional proceedings (an astounding 154.5% increase over the prior quarter) that XPI estimated carried R$12 million of additional exposure (a 17.4% increase), and only 6 of those claims represented 47% of the total amount of exposure.

121. Only three weeks remained in the fourth quarter of 2019 when the Registration Statement became effective (on December 10, 2019). As XPI's quarterly results show, the number and possible exposure resulting from civil suits materially increased during that quarter. The failure to disclose updated information about these material post reporting events and the financial effect thereof in the Registration Statement violated IAS 10.

## VI. MISSTATEMENTS AND OMISSIONS OF MATERIAL FACTS IN THE REGISTRATION STATEMENT

122. The Registration Statement represented that investors should only consider the information included within it when deciding whether to purchase XPI's stock in connection with the IPO. *See Id.* at i ("This offering is being made in the United States and elsewhere solely on the basis of the information contained in this prospectus").

### A. Misstatements and Omissions of Material Facts About Operating "Expenses"

123. The Registration Statement contained misstatements and omissions of material fact concerning XPI's operating expenses. XPI's Registration Statement disclosed the Company's expenses and costs, as did the included financial statements. The section of the Registration Statement entitled "Description of Principal Line Items," described XPI's "operating costs and expenses." The Registration Statement reported "Other Operating Expenses" as follows:

**29. Other operating expenses, net**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| **Other operating income** | **20,682** | **23,764** | **5,594** |
| Recovery of charges and expenses | 6,873 | 3,165 | 3,436 |
| Reserval of operating provisions | 2,641 | 2,684 | 1,116 |
| Revenue from incentives from Tesouro Direto | 9,931 | 4,226 | — |
| Other | 1,237 | 13,689 | 1,042 |
| **Other operating expenses** | **(51,971)** | **(31,468)** | **(12,060)** |
| Legal proceedings and agreement with customers (a) | (16,385) | (18,370) | (388) |
| Tax incentive expenses | (2,015) | (2,980) | (2,638) |
| Losses on write-off and disposal of assets | (11,064) | (1,503) | (1,355) |
| Fines and penalties | (7,446) | (2,755) | (718) |
| Associations and regulatory fees | (3,059) | (2,073) | (634) |
| Charity | (5,938) | (50) | (59) |
| Other | (6,064) | (3,737) | (6,268) |
| **Total** | **(31,289)** | **(7,704)** | **(6,466)** |

(a) Mainly related to reimbursements to customers due losses they had from their relationship with a former IFA associated to the subsidiary XP CCTVM. A part of these reimbursements has been charged back to IFA's office, included in Other financial assets, under Receivables from IFAs (Note 11).

124. The Registration Statement also reported "operating costs" including "other costs" as follows:

**17. Operating costs**

| | Nine months period ended September 30, 2019 | 2018 |
|---|---|---|
| **Commission costs** | **877,502** | **489,491** |
| **Operating losses and provisions** | **14,825** | **6,791** |
| **Other costs** | **226,640** | **135,896** |
| Clearing house fees | 141,251 | 76,947 |
| Third parties' services | 60,562 | 38,130 |
| Other | 24,827 | 20,819 |
| **Total** | **1,118,967** | **632,178** |

125. These statements omitted material facts when they were made because they failed to disclose the substantial and recurring costs attributed to XPI's operating and systems errors in a single line item accompanied by a disclosure explaining the nature of the costs incurred. Rather, the Registration Statement – as conceded in XPI's Response to the Winkler Report – obfuscated these "costs" by dividing them under three separate and non-descript line items, including "other operating expenses – legal proceedings and agreement with customers", "operating costs – operating losses and provisions", and "operating costs – other costs." Mischaracterizing systemic and recurring errors as mere expenses and diffusing the material loss figure (R$100 million) over three different line items without any explanation of the nature of those costs misled investors about these material issues plaguing the Company's core business unit, XP CCTVM, on a recurring basis. These statements were also materially misleading when made because they violated IAS 1 and IAS 34.

126. XPI also stated in the Registration Statement that operating costs and expenses consisted of five components: (1) "operating costs;" (2) "selling expenses;" (3) "administrative expenses;" (4) "other operating expenses, net;" and (5) "interest expenses."

127. These components were defined in the Registration Statement as follows:

> Operating costs. Operating costs primarily consist of (1) commission costs paid to IFAs based on the revenues they generate from the retail clients that they serve and additional incentives to accelerate business expansion; (2) clearing house, custody and other financial services fees paid, primarily to the B3; (3) operating losses related to our activities in the ordinary course of our business; and (4) provisions for bad debts.
>
> Selling expenses. Selling expenses consist of advertising and publicity/marketing expenses, primarily in connection with our initiatives to promote our brands to retail clients.
>
> Administrative expenses. Administrative expenses primarily consist of personnel related expenses, including fixed and variable compensation, benefits and social and payroll taxes. Administrative expenses also consist of expenses related to (1) data processing services; (2) technical services; (3) third-party services; (4) office rent; (5) depreciation and amortization; (6) communications; (7) travel; (8) legal and judicial; and (9) miscellaneous taxes
>
> Other operating expenses, net. Other operating expenses, net primarily consist of (1) incentives earned from B3 transactions as a result of marketing campaigns to increase our number of retail clients and AUC of certain asset classes; (2) recovery of charges and expenses; (3) reversal of operating provisions, and other income lines, net of expenses; (4) legal proceedings; (5) write-offs and losses on disposition of assets; (6) fines and penalties; and (7) other expenses.
>
> Interest expenses. Interest expenses arising from the loans and debentures that we have borrowed and issued.

128. These statements omitted material facts when they were made because they failed to disclose that XPI had categorized the Company's substantial and recurring costs attributed to system and operating errors – a single line item under XP CCTVM's pre-IPO statements – under three separate and non-descript line items, including "other operating expenses – legal proceedings and agreement with customers", "operating costs – operating losses and provisions", and "operating costs – other costs." Mischaracterizing systemic and recurring errors as mere expenses and diffusing the material loss figure (R$100 million) over three different line items without any explanation of the nature of those costs misled investors about these material issues

plaguing the Company's core business unit, XP CCTVM, on a recurring basis. These statements were also materially misleading when made because they violated IAS 1 and IAS 34.

129. The Registration Statement also misstated material fact by warning investors of the possibility that "systems errors, including as a result of human error, could occur," and claiming that XPI had "never" actually experienced such a problem. In fact, the Company had historically and was still incurring regular and substantial expenses due to these operating and systems errors in XPI's core business unit at the time of the IPO:

> An increase in volume on our systems or other errors or events could cause them to malfunction.
>
> Most of our trade orders to buy or sell securities or invest in the broad range of asset classes we offer are received and processed electronically. This method of trading is heavily dependent on the integrity of the electronic systems supporting it. While we have never experienced a significant failure of our trading systems, heavy stress placed on our systems during peak trading times could cause our systems to operate at unacceptably low speeds or fail altogether. Any significant degradation or failure of our systems or the systems of third parties involved in the trading process (e.g., online and Internet service providers, the systems of the B3, record keeping and data processing functions performed by third parties, and third party software), even for a short time, could cause customers to suffer delays in trading. In addition, systems errors, including as a result of human error, could occur. These delays or errors could cause substantial losses for customers and could subject us to claims from these customers for losses or other regulatory penalties or other sanctions. There can be no assurance that our network structure will operate appropriately in the event of a subsystem, component or software failure or error. Furthermore, we cannot assure you that we will be able to prevent an extended systems failure in the event of a power or telecommunications failure, an earthquake, terrorist attack, epidemic, fire or any act of God. Any systems failure that causes interruptions in our operations could have a material adverse effect on our business, financial condition and results of operations

130. Indeed, as the Winkler Report revealed, XPI, through its core unit XP CCTVM, had already experienced multiple significant failures to its trading systems at the time of the IPO that resulted in material costs totaling approximately R$100 million. These significant errors and

failures incurred substantial expenses of R$20 million in 2016, R$28.1 million in 2017 and R$36.7 million in 2018 for XPI which equaled approximately 6.6%, and 7.8% of XPI's net income in 2017 and 2018, respectively. The above statement was also materially misleading when made because it violated IAS I and IAS 34.

### A. Misstatements and Omissions of Material Fact Concerning Regulatory and Legal Proceedings

131. The Registration Statement also contained misstatements and omissions of material fact concerning regulatory and legal actions facing XPI at the time of the IPO. The following chart, which was included in XPI's Registration Statement, sets forth expenses associated with "Legal proceedings and agreements with customers" from 2016 through 2018:

**29. Other operating expenses, net**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| **Other operating income** | **20,682** | **23,764** | **5,594** |
| Recovery of charges and expenses | 6,873 | 3,165 | 3,436 |
| Reserval of operating provisions | 2,641 | 2,684 | 1,116 |
| Revenue from incentives from Tesouro Direto | 9,931 | 4,226 | — |
| Other | 1,237 | 13,689 | 1,042 |
| **Other operating expenses** | **(51,971)** | **(31,468)** | **(12,060)** |
| Legal proceedings and agreement with customers (a) | (16,385) | (18,370) | (388) |
| Tax incentive expenses | (2,015) | (2,980) | (2,638) |
| Losses on write-off and disposal of assets | (11,064) | (1,503) | (1,355) |
| Fines and penalties | (7,446) | (2,755) | (718) |
| Associations and regulatory fees | (3,059) | (2,073) | (634) |
| Charity | (5,938) | (50) | (59) |
| Other | (6,064) | (3,737) | (6,268) |
| **Total** | **(31,289)** | **(7,704)** | **(6,466)** |

(a) Mainly related to reimbursements to customers due losses they had from their relationship with a former IFA associated to the subsidiary XP CCTVM. A part of these reimbursements has been charged back to IFA's office, included in Other financial assets, under Receivables from IFAs (Note 11).

F-95

132. This chart omitted material facts by describing "reimbursements to customers" only generally, without including a description of the regulatory proceedings and charges in which XPI and its key executives were involved, were planning to resolve, or had resolved. Specifically, the above chart omitted the material fact that BSM had charged the Company and key executives in two actions. In the first action, BSM charged XPI and Defendant Ramos da Silva with disregarding and otherwise failing to take action to stop a fraudulent securities trading

scheme. In the other action, BSM charged XPI and Defendant Benchimol with failing to oversee certain trading functions that benefited XPI and harmed its customers. These actions involved key executives, were material and warranted express disclosure.

133. The above chart was also materially misleading when made because it omitted material information regarding two regulatory actions pending against XPI and key executives at the time of the IPO: (i) that CVM brought in April 2019 alleging that XP CCTVM, Defendants Benchimol and Almeida violated provisions of CVM 505[11]; and (ii) involving CADE stemming from the BTG CADE Complaint filed in January 2019 alleging that XPI engaged in anticompetitive conduct in apparent violation of the CADE Agreement. The financial effect of these actions, and other relevant information, likewise was material information omitted from the above chart or notes pertaining thereto. This chart was thus also materially misleading when made because it violated IAS 37.

134. The Registration Statement also materially understated XPI's exposure to civil lawsuits and claims at the time of the IPO. Indeed, the Registration Statement and omitted to disclose the material increase in civil actions and liability exposure that existed at the time the Registration Statement became effective. Although the lawsuits were events after the relevant reporting period they required disclosure under IAS 10. In that regard, the Registration Statement stated:

> As of September 30, 2019, [XPI was] party to 20 judicial proceedings of a civil nature for which [XPI] recorded a provision of R$3 million. [XPI was] also party to 178 judicial proceedings of a civil nature totaling R$69 million, where the likelihood of loss has been assessed by our management as possible based on the opinion of our external legal advisors and for which we have not recorded a provision.

---

[11] XPI resolved this action after the IPO by paying a R$500,000.00 fine. Defendants Benchimol and Almeida each had to pay an additional R$250,000.00 to settle the CVM proceeding.

135. The Registration Statement also contained the below chart and footnotes in the Contingent Liabilities section of the Company's Registration Statement, which also materially understated XPI's exposure to lawsuits at the time the Registration Statement became effective:

Below is summarized these possible claims by nature:

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Tax (i) | 17,484 | 19,971 |
| Civil (ii) | 68,737 | 64,820 |
| Labor | 5,297 | 4,532 |
| **Total** | **91,518** | **89,323** |

(i) In 2014, the Group was notified by tax authorities for a requirement of social security contributions due to employee profit sharing payments, allegedly in violation of Brazilian Law 10.101/00. Currently, the case at administrative level in assessment by the Administrative Council of Tax Appeals ("CARF"), awaiting the decision on the Group's appeal. There are other favorable CARF precedents on the subject and the Group obtained legal opinions that support the Group's defense and current practice.

(ii) The Group is defendant in 178 civil claims by customers and investment agents, mainly related to portfolio management, risk rating, copyrights and contract termination. The total amount represents the collective maximum value to which the Group is exposed based on the claims' amounts monetarily restated.

136. These statements were materially false and misleading when made because they omitted to disclose the material increase in legal proceedings (and liability exposure and costs associated therewith) that arose between September 30, 2019 and December 10, 2019, the date that the Registration Statement became effective. During that time period, civil lawsuits against XPI had more than doubled, exposing the Company to substantial liability and costs that XPI was obligated to update investors about pursuant to IAS 10.

137. On March 17, 2020, XPI disclosed in its results for the fourth quarter of 2019 that XPI was subject to 453 civil proceedings as of December 31, 2019. A significant portion, if not all of the more than 250 additional lawsuits accounted for in in the fourth quarter (representing an astounding 154.5% increase over the prior quarter), must have been pending when XPI's Registration Statement was deemed effective three weeks prior. XPI was required to update the Registration Statement concerning these material events after the reporting period as well as the financial effect of these events. These statements were thus also materially misleading when made because they violated IAS 10.

### B. Misstatements and Omissions of Material Fact Relating to IFAs And Competition

138. XPI stated in the Registration Statement that the Company relied on its extensive IFA network to develop business, increase AUC, and generate revenue.

139. XPI portrayed its IFA relationships as a strength in the Registration Statement, stating, in relevant part, as follows:

> IFA Network – our proprietary distribution network of approximately 5,900 IFA partners, who solicit new clients and help us onboard them as XP clients. These IFAs are located in approximately 620 offices in 132 cities across the country and form the largest independent financial advisor network in Brazil, which is a competitive advantage for XP. We believe our IFA partners choose to work with XP for a number of reasons including, (1) ***our deep understanding and appreciation of the IFA business model and our promotion of IFA careers given our origins as an IFA***; (2) our dedicated suite of technology tools designed to help IFAs manage their businesses more effectively; (3) our trusted brand and reach across Brazil; and (4) our proprietary market information which can help IFAs reach and sell their services to customers more effectively. We ask our IFA partners to evaluate us on a monthly basis, and recorded an average score of 8.8 out of 10 for the six months ended September 30, 2019.

140. The Registration Statement also recognized the increased competition for IFAs that existed in Brazil pre-IPO, in relevant part, as follows:

> In Brazil, there is increased competition between financial institutions seeking to attract IFAs to increase their client base, assets under custody and business possibilities. No assurances can be given that XP CCTVM will be able to remain an attractive player to such IFAs or to retain such agents in its business platform. Furthermore, many clients have their commercial relationship directly with the IFA of their choice and trust and not with the employees of XP CCTVM. Accordingly, the loss of IFAs may result in loss of clients and assets under custody, which would affect XP CCTVM's business.

141. These statements omitted material facts when they were made as they failed to disclose that (i) BTG, prior to the IPO, had accused XPI of violating the CADE Agreement by coercing, intimidating, and threatening to stifle competitors such as BTG from hiring IFAs that did business with XPI; and that (ii) an adverse determination or outcome in the pending

regulatory investigations and proceedings associated therewith would materially affect the Company. These risks included financial penalties, costly regulatory investigations, and modification of the CADE Agreement. These statements were also materially misleading when made because they violated IAS 37.

142. The Registration Statement further disclosed the existence of the CADE Agreement and described XPI's pledge to CADE and the Central Bank, in relevant part, as follows:

> Pursuant to our agreement with CADE, we agreed, among other measures, to: (1) adopt equal treatment practices in our relationships with suppliers of financial products; (2) refrain from entering into exclusive relationships with financial advisors (except as permitted by applicable regulations); (3) facilitate transferability of clients' financial products to competing platforms; and (4) maintain a "no fee" policy for specific types of financial products. A breach by us of any of the aforementioned measures could result in financial penalties, antitrust investigations and the revision of the agreement with CADE.

143. This statement omitted material facts when it was made because it failed to disclose that XPI competitor BTG accused XPI of violating the CADE Agreement by coercing, intimidating, and threatening to stifle competitors such as BTG from hiring IFAs that did business with XPI. The conduct alleged in the BTG CADE Complaint, which was pending before CADE at the time of the IPO, was in apparent violation of the CADE Agreement. Moreover, an adverse determination or outcome in these pending investigations and proceedings included possible material financial penalties, costly regulatory investigations, and modification of the CADE Agreement. This omission rendered XPI's description of the CADE Agreement materially misleading when made.

### C. Misstatements and Omissions of Material Fact Concerning Compliance with IFRS

144. The Registration Statement described the method by which XPI prepared its financial reports as follows:

> We maintain our books and records in Brazilian reais, the presentation currency for our financial statements and also the functional currency of our operations in Brazil. Our unaudited interim condensed consolidated financial statements were prepared in accordance with IAS 34 and our annual consolidated financial statements were prepared in accordance with IFRS, as issued by the IASB. Unless otherwise noted, XP Brazil's financial information presented herein as of September 30, 2019 and for the nine months ended September 30, 2019 and 2018 and as of December 31, 2018 and 2017 and for the years ended December 31, 2018, 2017 and 2016 is stated in Brazilian reais, its reporting currency. The consolidated financial information of XP Brazil contained in this prospectus is derived from XP Brazil's unaudited interim condensed consolidated financial statements as of September 30, 2019 and for the nine months ended September 30, 2019 and 2018 and XP Brazil's audited consolidated financial statements as of December 31, 2018 and 2017 and for the years ended December 31, 2018, 2017 and 2016, together with the notes thereto. All references herein to "our financial statements," "our audited consolidated financial information," "our audited consolidated financial statements" and "our unaudited interim condensed consolidated financial statements," are to XP Brazil's consolidated financial statements included elsewhere in this prospectus.

145. This statement omitted material facts by failing to disclose that XPI's financial statements were not prepared in accordance with IFRS. In fact, as set forth *supra*, XPI's financial statements violated: (i) IAS 1 and IAS 34 by failing to report material and recurring costs associated with operating errors and system failures in XPI's core business unit as one separate line-item and/or to disclose the nature of these pervasive and recurring expenses in the notes to the financial statements; (ii) IAS 37 by failing to disclose several contingent liabilities, including ongoing investigations by CVM and CADE at the time of the IPO, and (iii) IAS 10 by failing to disclose the substantial increase in civil lawsuits filed against XPI and the financial effect thereof by the time the Registration Statement became effective.

## VII. THE REGISTRATION STATEMENT FAILED TO DISCLOSE UNCERTAINTIES AND RISKS UNDER ITEM 303

146. XPI's failure to disclose that (i) it was subject to charges and claims of anticompetitive conduct for attempting to enforce IFAs to be exclusive in violation of the CADE Agreement; (ii) it was experiencing material and recurring operating errors in its core business

unit that incurred substantial expenses for the Company; (iii) it, along with Defendants Benchimol and Almeida, were subject to ongoing regulatory proceedings; and (iv) the substantial increase in civil lawsuits that were filed against XPI by the time the Registration Statement became effective, meant that the Company's Registration Statement lacked required disclosures under Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303").

147. XPI filed its Registration Statement on Form F-1. The nature of information required in a Form F-1 is governed by the Part 1 Form F-1 entitled "Information Required in a Prospectus." Item 4 of Part I requires disclosure of "information required by Part I of Form 20-F."

148. Item 5 of Part I of Form 20-F requires the issuer to disclose "management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operation in future period."

149. Item 5(D) provides that the Company should discuss any "trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity, or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition."

150. The information that an issuer must disclose under this paragraph is coextensive with the requirement under Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requiring an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The SEC has published interpretive guidance regarding the disclosure known as Management's Discussion and Analysis

of Financial Condition and Results of Operation. In that interpretive guidance, the SEC advised that "companies must identify and disclose known trends, events, demands, commitments, and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance."

151. Additionally, the SEC has recognized, through the publication of additional interpretive guidance, that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. Companies."

152. Because Form F-1 incorporated the MD&A requirements from Form 20-F, and they are the same for domestic issuers, the disclosure of the following uncertainties and trends under Item 303(a) of Regulation S-K were required in the Registration Statement: (i) XPI was experiencing material operating errors that incurred substantial and recurring expenses for the Company; (ii) XPI was subject to charges and claims of anticompetitive conduct for attempting to enforce exclusive IFAs in violation of the CADE Agreement and agreements with other agencies; (ii) the Company, Defendants Benchimol, and Almeida were subject to ongoing regulatory proceedings; and (iv) the Company was experiencing a substantial increase in the amount of civil litigation that it was facing from September 30, 2019 through December 31, 2019.

153. Each one of these trends or events was ongoing at the time of the IPO. Each presented risks and uncertainties that were reasonably likely to have a material adverse impact on the Company's financial condition. Thus, each should have been disclosed by XPI in the Registration Statement.

## VIII. CLASS ACTION ALLEGATIONS

154. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased XPI Class A common stock issued pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

155. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by XPI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

157. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

158. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the federal securities laws;

b) whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c) to what extent the members of the Class have sustained damages and the proper measure of damages.

159. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

## Violations of Section 11 of the Securities Act Against XPI, XP Investments, the Individual Defendants, and the Underwriter Defendants

160. Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

161. This Count expressly excludes and disclaims any allegations that could be construed as alleging intentional or reckless misconduct. This Count is based solely on claims of strict liability and negligence.

162. This claim is brought by Plaintiffs pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against XPI, XP Investments, the Individual Defendants, and the Underwriter Defendants.

163. The Registration Statement was materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements therein not materially misleading, and failed to adequately disclose material facts as described above.

164. XPI is the registrant for the IPO. As the issuer of the Class A common stock, XPI is strictly liable to Plaintiffs and to the relevant members of the Class for the material misstatements and omissions contained in the Registration Statement.

165. The Individual Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement. Each of the Individual Defendants authorized the signing or signed the Registration Statement, and/or was a director of XPI at the time of the IPO.

166. XP Investments, through Defendant Wilson, XP Investments employee, signed the Registration Statement on XPI's behalf. Thus, XP Investments is liable to the same extent as the Individual Defendants who were signatories to the Registration Statement. XP Investments is responsible for the transgressions and acts of its employees, under the principles of agency and *respondeat superior*. Therefore, Defendant Wilson's conduct in signing the Registration Statement is imputed to XP Investments.

167. The Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement.

168. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

169. By reason of the conduct alleged herein, each Defendant named in this Count violated and/or controlled a person who violated § 11 of the Securities Act.

170. Plaintiffs acquired the securities pursuant to and/or traceable to the Registration Statement.

171. Plaintiffs and the Class have sustained damages. The value of XPI Class A common shares declined substantially subsequent to and due to Defendants' violations.

172. When Plaintiffs and the Class obtained their shares of XPI they did so without knowledge of the misstatements and omissions alleged herein.

173. Plaintiffs and members of the Class have sustained damages. The value of their shares declined substantially, subsequent to, and due to, the violations of the Defendants.

174. This claim is brought within one year after the discovery of the untrue statements and omissions of material fact in and from the Registration Statement, and within three years of the effective date of the Registration Statement.

175. By reason of the misconduct alleged herein, Defendants are liable to Plaintiffs and the Class for damages suffered under Section 11 of the Securities Act.

**COUNT II**

**Violations of Section 12(a)(2) of the Securities Act Against XPI, XP Controle and the Underwriter Defendants**

176. Plaintiffs repeat and reallege each of the allegations contained above as if fully set forth herein.

177. This Count expressly excludes and disclaims any allegations that could be construed as alleging intentional or reckless misconduct. This Count is based solely on claims of strict liability and negligence.

178. This claim is brought pursuant to Section 12(a)(2) of the Securities Act 15 U.S.C § 77l (a)(2), on behalf of the Class, against XPI, XP Controle, and the Underwriter Defendants.

179. XPI, XP Controle and the Underwriter Defendants promoted and sold XPI Class A common stock to Plaintiffs and other members of the Class through the Registration Statement.

180. XPI, XP Controle, and the Underwriter Defendants owed Plaintiffs and the other members of the Class who purchased XPI common stock pursuant to the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that the statements were true and that no material facts

181. The Registration Statement contained untrue statements of material fact and/or failed to disclose material facts. Plaintiffs did not know and could not have known of the mistruths and omissions contained in the Registration Statement at the time Plaintiffs acquired XPI common stock.

182. If XPI, XP Controle, and the Underwriter Defendants exercised reasonable care in the preparation and dissemination of the Registration Statement, they would have known the misstatements and omissions contained therein as set forth above. Accordingly, XPI, XP Controle,and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

183. Plaintiffs suffered significant damages in connection with their purchases of XPI stock and as a result of XPI, XP Controle, and the Underwriter Defendants misconduct.

184. This action is brought within one year of the date of the alleged violation and within three years of the date the relevant securities were first offered to the public.

185. By reason of the misconduct alleged herein, XPI, XP Controle and the Underwriter Defendants are liable to Plaintiffs and the Class for damages suffered under Section 12 of the Securities Act.

## COUNT III

## Violations of Section 15 of the Securities Act Against XP Controle, XP Investments, ITB Holding, and the Individual Defendants

186. Plaintiffs incorporate all the foregoing by reference. Plaintiffs expressly disclaim and exclude any allegation that could be construed as alleging fraud or intentional or reckless

misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

187. Defendants XP Controle, ITB Holding, and each of the Individual Defendants were control persons of XPI by virtue of his, her or its position as a director, senior officer, and/or major shareholder of XPI, which allowed each of these Defendants to exercise control over the Company and its operations.

188. Defendants XP Controle and ITB Holding alternatively, were control persons of the Individual Defendants because they wielded the voting power, and/or had a contractual right, to add or remove directors and/or officers of XPI, including some or all Individual Defendants.

189. Further, XP Investments controlled Defendant Wilson because Wilson was an employee of Defendant XP Investments. Additionally, Defendant Wilson signed the Registration Statement and committed violations of the Securities Act at XP Investments' request and direction. Under principles of *respondeat superior* and agency, XP Investments caused Defendant Wilson to engage in such violations.

190. Additionally, Defendant ITB Holding controlled Defendant Itau USA as a result of ITB Holding's ownership interest in Itau USA. As the Registration Statement states:

> [S]ince one of our significant shareholders owns more than 10% of our common equity and more than 10% of the common equity of Itau BBA USA Securities, Inc., one of the underwriters of this offering, a "conflict of interest" exists for Itau BBA USA Securities, Inc. within the meaning of FINRA Rule 5121(f)(5)(B). Also, Itau BBA USA Securities, Inc. will have a conflict of interest as defined in Rule 5121(f)(5)(C)(ii) due to the receipt of more than 5% of the net offering proceeds by affiliates of Itau BBA USA Securities, Inc.

191. Defendants XP Controle, XP Investments and ITB Holding, and each of the Individual Defendants, were culpable participants in primary violations §§11 and 12(a)(2) of the Securities Act, for having: (i) signed and/or authorized the signing of the Registration Statement;

(ii) been named in the Registration Statement and identified as a director therein; and/or (iii) played a material role or substantially participated in the process which allowed the IPO to be completed.

192. By reason of the conduct alleged herein, these Defendants violated § 15 of the Securities Act and Plaintiffs and the Class have suffered harm as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

A. declaring this action to be a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Class Counsel;

B. awarding damages in favor of Plaintiffs and the other Class members against Defendants, jointly and severally, together with interest thereon;

C. awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 29, 2020

Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

By: */s/ Laurence J. Hasson*
Stanley D. Bernstein
Laurence J. Hasson
Joseph R. Seidman
Matthew E. Guarnero
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
bernstein@bernlieb.com
lhasson@bernlieb.com
seidman@bernlieb.com
mguarnero@bernlieb.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Class*

**THE ROSEN LAW FIRM, P.A.**
By: */s/Jacob A. Goldberg*
Jacob A. Goldberg
Leah Heifetz-Li
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19012
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
lheifetz@rosenlegal.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Class*

# **CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/Laurence J. Hasson*
LAURENCE J. HASSON