**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re XP Inc. Securities Litigation.<br><br>This Document Relates To:<br><br>All Actions. | Master File No.: 1:20-cv-01502-BMC<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS XP INC., XP INVESTMENTS US, LLC,
MARTIN EMILIANO ESCOBARI LIFCHITZ, JARED WILSON,
AND THE UNDERWRITERS'
MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Counsel for Defendants XP Inc., XP Investments
US, LLC, Martin Emiliano Escobari Lifchitz, and
Jared Wilson*

MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Counsel for the Underwriters*

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ........................................................................................................................ 4

ARGUMENT ............................................................................................................................. 6

I.   PLAINTIFFS' SECTIONS 11 AND 12(a)(2) CLAIMS FAIL FOR LACK OF AN
     ACTIONABLE OMISSION OR MISSTATEMENT ......................................................... 9

     A.  Alleged Omissions or Misstatements Regarding Regulatory and Legal Proceedings
         Are Inactionable ......................................................................................................... 9

     B.  Alleged Omissions or Misstatements Regarding "Anticompetitive" Conduct Are
         Inactionable ............................................................................................................... 13

     C.  Alleged Omissions or Misstatements Regarding Operating Error and System Failure
         Costs Are Inactionable .............................................................................................. 17

     D.  Plaintiffs Fail to Allege a Violation of Item 303 ...................................................... 23

II.  PLAINTIFFS LACK STANDING TO ASSERT SECTION 12(a)(2) CLAIMS ................. 24

III. PLAINTIFFS' CONTROL-PERSON CLAIMS MUST ALSO BE DISMISSED .............. 25

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*In re Adient plc Sec. Litig.*,
    18-cv-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..............................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................6

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................................20

*Ballay v. Legg Mason Wood Walker, Inc.*,
    925 F.2d 682 (3d Cir. 1991) ...............................................................................24

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017) ...........................................................14, 15

*In re Barclays Bank PLC Sec. Litig.*,
    09-cv-1989, 2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017)..................................13

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................................8

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017) ..................................................................23

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) ....................................................................7

*Blackmoss Invs. Inc. v. Aca Capital Holdings, Inc.*,
    07-cv-10528, 2010 WL 148617 (S.D.N.Y. Jan. 12, 2010)..............................23, 24

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2009) ..................................................................8

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)...............................................................................13

*In re China Valves Tech. Sec. Litig.*,
    979 F. Supp. 2d 395 (S.D.N.Y. 2013) ................................................................19

*In re Citigroup Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010) ...............................................................7, 8

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ....................................................................10, 14, 15

*Dekalb Cty. Emps.' Ret. Sys. v. Contraladora Vuela Compañía de Aviación, S.A.B. de C.V.,*
15-cv-1337, 2016 WL 3685089 (S.D.N.Y. July 6, 2016) ...................................................12, 13

*DeMaria v. Andersen,*
318 F.3d 170 (2d Cir. 2003) ...........................................................................................22

*In re Deutsche Bank AG Sec. Litig.,*
09-cv-1714, 2016 WL 4083429 (S.D.N.Y. July 25, 2016) ......................................................25

*Doron Precision Sys. v. FAAC, Inc.,*
423 F. Supp. 2d 173 (S.D.N.Y. 2006) ...............................................................................19

*Doubleline Capital LP v. Odebrecht Fin., Ltd.,*
323 F. Supp. 3d 393 (S.D.N.Y. 2018) ..........................................................................13, 16

*In re Duke Energy Corp. Sec. Litig.,*
282 F. Supp. 2d 158 (S.D.N.Y. 2003) ...............................................................................12

*ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,*
553 F.3d 187 (2d Cir. 2009) ....................................................................................8, 12, 18

*In re Fannie Mae 2008 Sec. Litig.,*
742 F. Supp. 2d 382 (S.D.N.Y. 2010) ...............................................................................21

*In re Fuwei Films Sec. Litig.,*
634 F. Supp. 2d 419 (S.D.N.Y. 2009) .......................................................................10, 11, 24

*In re Gen. Elec. Co. Sec. Litig.,*
856 F. Supp. 2d 645 (S.D.N.Y. 2012) .................................................................................8

*Gusinsky v. Barclays PLC,*
944 F. Supp. 2d 279 (S.D.N.Y. 2013), *vacated in part on other grounds sub nom.,*
*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
750 F.3d 227 (2d Cir. 2014)...................................................................................13, 16

*Gustafson v. Alloyd Co.,*
513 U.S. 561 (1995) ...................................................................................................24

*Halperin v. Ebanker Usa.com, Inc.,*
295 F.3d 352 (2d Cir. 2002) .......................................................................................14, 22

*Harris v. AmTrust Fin. Servs.,*
135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) ...................20, 21

*Hinerfeld v. United Auto Grp.,*
97-cv-3533, 1998 WL 397852 (S.D.N.Y. July 15, 1998) ..........................................................10

*In re Hudson Tech., Inc. Sec. Litig.,*
98-cv-1616, 1999 WL 767418 (S.D.N.Y. Sept. 28, 1999).......................................................18

*Hutchison v. Deutsche Bank Sec., Inc.*,
    647 F.3d 479 (2d Cir. 2011) ............................................................................11

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) ..............................................................................23

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017) .............................................................10

*Jiajia Luo v. Sogou, Inc.*,
    19-cv-230, 2020 WL 3051019 (S.D.N.Y. June 8, 2020)..................................23

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) .............................................................19

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012) .............................................................21

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011) ............................................................................25

*Lia v. Saporito*,
    909 F. Supp. 2d 149 (E.D.N.Y. 2012) .............................................................16

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012) .............................................................22

*In re Lions Gate Ent. Corp. Sec. Litig.*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) ........................................................ *passim*

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ..............................................................................8

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
    676 F.3d 83 (2d Cir. 2012) ..............................................................................16

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) .............................................................15

*In re Merrill Lynch & Co. Res. Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) .............................................................12

*In re MF Global Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013) ...............................................................7

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) ........................................................................8, 25

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
    08-cv-9203, 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) .............................23

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
   98 F.3d 2 (2d Cir. 1996) ..................................................................................10

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018) ............................................................15

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
   432 F. Supp. 3d 131 (D. Conn. 2019)..............................................................16

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ............................................................24

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
   135 F. Supp. 3d 145 (S.D.N.Y. 2015) ........................................................8, 24

*In re ProShares Tr. Sec. Litig.*,
   728 F.3d 96 (2d Cir. 2013) ...............................................................................8

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   714 F. Supp. 2d 475 (S.D.N.Y. 2010)............................................................24

*Resnik v. Swartz*,
   303 F.3d 147 (2d Cir. 2002) .............................................................................8

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ......................................................15, 16

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ...........................................................................10

*Rubenstein v. Credit Suisse Grp. AG*,
   19-cv-1069, 2020 WL 2036850 (S.D.N.Y. Apr. 28, 2020)..............................12

*Singh v. Schikan*,
   106 F. Supp. 3d 439 (S.D.N.Y. 2015) ..............................................................7

*In re Smith Barney Transfer Agent Litig.*,
   765 F. Supp. 2d 391 (S.D.N.Y. 2011) ............................................................12

*Stadnick v. Vivint Solar, Inc.*,
   861 F.3d 31 (2d Cir. 2017) .............................................................................23

*Stratte-McClure v. Morgan Stanley*,
   784 F. Supp. 2d 373 (S.D.N.Y. 2011), *aff'd*, 776 F.3d 94 (2d Cir. 2015)...............21

*In re UBS Ag Sec. Litig.*,
   07-cv-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.*,
   *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)............................................................................15

v

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ...................................................................7

*Yung v. Lee*,
    432 F.3d 142 (2d Cir. 2005) ...............................................................................24

### Statutes & Rules

17 C.F.R. § 229.303 ..............................................................................................23

15 U.S.C. § 77k(a) ..............................................................................................7, 8

15 U.S.C. § 77l(a) .................................................................................7, 8, 24, 25

Fed. R. Civ. P. 12(b)(6)........................................................................................1, 6

### Other authorities

Gelter & Eroglu, *Whose Trojan Horse? The Dynamics of Resistance Against IFRS*,
    36 U. Pa. J. Int'l L. 89 (2014)................................................................................21

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999)................................................8

Defendants XP Inc. ("XP" or the "Company"), XP Investments US, LLC ("XPI"), Martin Emiliano Escobari Lifchitz, Jared Wilson, and Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Itau BBA USA Securities, Inc., BofA Securities, Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, and UBS Securities LLC (together, the "Underwriters," and, collectively, with XP, XPI, Lifchitz, and Wilson, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the consolidated amended complaint of Swayam and Usha Prakash and 4F Families, Inc. ("Plaintiffs") (Dkt. No. 43) (the "CAC") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

In December 2019, XP—a leading technology-driven provider of low-fee financial products and services in Brazil—conducted its initial public offering in the United States. Several months later, with XP's stock price temporarily dipping amidst an historic global downturn precipitated by the COVID-19 pandemic, Plaintiffs initiated this meritless securities action.  XP stock now trades well above the offering price, and investors who retained their shares have made a handsome profit.  Plaintiffs nevertheless assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act"), alleging that XP's Offering Materials (defined below) omitted or misstated information concerning three aspects of XP's business.  As set out below, none of these categories is actionable: they concern matters that were actually and affirmatively disclosed in the Offering Materials, matters not required to be disclosed, matters so *de minimis* in their impact as to be legally immaterial, or some combination of all three.  Plaintiffs' claims are deficient as a matter of law and should be dismissed.

*First*, Plaintiffs allege that XP failed to disclose details of certain civil actions and regulatory proceedings involving XP or its executives as well as a purported increase in the

overall volume of civil claims facing the Company in Q4 2019.  But the CAC's own allegations make clear that the supposedly undisclosed litigation exposure falls well short—both quantitatively and qualitatively—of any applicable materiality standard, with the "omitted" civil proceedings, for example, amounting to a *total* of less than U.S. $3 million in "*possible*" additional losses (for a Company with over U.S. $9 *billion* in assets).  The Offering Materials, moreover, expressly disclosed the existence of multiple pending judicial and administrative proceedings, fully accounted for any settlement payments made to date, and warned that still-ongoing or future actions could carry significant financial, reputational, or other risks for XP.  Plaintiffs identify no statute or regulation mandating disclosure of any additional detail about individual proceedings, and none was required.

*Second*, Plaintiffs claim that the Offering Materials omitted to disclose a regulatory investigation arising from a competitor's complaint that XP had engaged in "anticompetitive" conduct involving independent financial advisors ("IFAs") in "potential" violation of an earlier settlement with that regulator.  The Offering Materials, however, specifically advised that XP faced, and would continue to face, significant risks relating to its IFA network as well as regulatory investigations and private complaints of purported competition law violations.  The Offering Materials also disclosed the existence of XP's regulatory settlement, described its IFA-related requirements, and warned that the consequences of breach could be significant.  XP had no duty to describe its competitor's allegations or the resulting investigation (which concluded well before the CAC with no violation charged).  Issuers need not disclose uncharged, unadjudicated "misconduct," predict adverse outcomes for open regulatory inquiries, or otherwise accuse themselves of wrongdoing.  And Plaintiffs plead no facts beyond the competitor's own accusations to suggest the alleged conduct ever actually occurred.

*Third*, Plaintiffs complain that XP's consolidated financial statements did not aggregate into a single "dedicated" line item several categories of costs and expenses that they contend reflected "operating errors" or "system failures."  Plaintiffs plead no facts, however, to suggest that aggregating these outflows into a single line item would have been proper, much less required.  Instead, Plaintiffs claim only that these expenditures were reported together by a Brazilian subsidiary of XP—an entity subject to entirely different, mandatory accounting standards.  The CAC alleges nothing whatsoever to support its core premise that these disparate costs and expenses arose from any particular "recurring" or "pervasive" problem that would have been material to investors.  Indeed, beyond conclusory labels, *Plaintiffs do not even allege what any of these supposed "errors" or "failures" actually were*.  And, notably, Plaintiffs declined the Court's invitation to include "any more details" in "an amended complaint."  (Ex. A at 31:19-32:23[1]; Dkt. No. 49.)  Nor does the CAC allege that XP's accounting treatment altered its bottom-line financial metrics or violated an objective requirement of any applicable accounting standard.  To the contrary, XP's financial statements undisputedly reflected all of the relevant outflows as operating costs or expenses, and Plaintiffs' disagreement with management's accounting judgment on categorization or labeling cannot support a securities claim.

*Fourth*, Plaintiffs' own certifications show that they did not purchase stock directly in XP's initial public offering.  As a result, Plaintiffs do not have standing under Section 12(a)(2).

*Finally*, because Plaintiffs have not alleged any primary violation of the 1933 Act, their control-person claims under Section 15 necessarily fail as well.

For all of these reasons, and because Plaintiffs have already declined the opportunity to amend following the pre-motion conference, the CAC should be dismissed with prejudice.

---

[1] Citations to "Ex. __" are to the exhibits to the accompanying Declaration of Antonio J. Perez-Marques.

## BACKGROUND

Founded in 2001, XP is a leading technology-driven financial services company based in Brazil.  (CAC ¶¶ 2, 22, 79.)  Through its corporate operating group, comprised of approximately 26 entities as of the offering at issue (the "XP Group"), XP provides clients with two principal types of offerings: a suite of financial advisory services and an open platform with hundreds of investment products.  (*Id.* ¶¶ 2, 22, 80-84; Ex. B at 1-3.)

In December 2019, XP conducted its initial public offering of Class A common shares in the United States (the "IPO").  (CAC ¶¶ 3, 103-07.)  In connection with the IPO, XP filed a prospectus with the Securities and Exchange Commission ("SEC") on Form 424B1 that formed part of its registration statement (collectively, the "Offering Materials").  (*Id.*)  Plaintiffs allege in conclusory fashion that they acquired XP shares "pursuant and/or traceable to" the Offering Materials.  (*Id.* ¶ 4.)  Plaintiffs' Private Securities Litigation Reform Act certifications (Dkt. Nos. 9-2, 15-2) ("PSLRA Certifications"), both of which are incorporated by reference into the CAC (CAC ¶¶ 20-21), nonetheless demonstrate that they purchased their XP shares in the aftermarket, weeks or, in some cases, months after the completion of XP's IPO.

The Offering Materials contained robust disclosures advising prospective purchasers of information they should consider before investing, including several years' worth of financial and operating results[2] and a 38-page discussion of risk factors potentially bearing on the Company's future performance.  (*See, e.g.*, Ex. B at 23-59.)  Pertinent here, the Offering Materials expressly warned, among other things, that:

---

[2] As the Offering Materials and CAC explain, XP itself was first incorporated in August 2019 to become the 100% holder of XP Investimentos S.A. ("XP Brazil"), the XP Group's principal non-operating holding company and itself the owner (directly or indirectly) of all other XP Group entities.  (Ex. B at ii, 60, 239; CAC ¶¶ 25, 93 144.)  Because XP itself had limited pre-IPO operating history, the Offering Materials included the financial statements of XP Brazil rather than XP.  (Ex. B at 60, 239.)  Any discussion herein of the pre-IPO financial or operating results of "XP" refers to those of XP Brazil.

- The Company was currently, and could be in the future, party to multiple judicial and administrative investigations and proceedings presenting at least U.S. $16.15 million (R$85 million) in "probable" or "possible" losses and the risk of materially adverse impacts on XP's financial condition, business position, and operational results (*see, e.g.*, *id.* at 40, 176, F-25-F-30);

- XP was subject to oversight by various regulatory authorities, including Brazil's Securities and Exchange Commission ("CVM") and Market Supervisor ("BSM"), both of which could institute "punitive processes" and/or "enforcement actions" and levy financial "penalties" and other "disciplinary measures" (*id.* at 122-126);

- XP was subject to competition law regimes and faced the ongoing risk of antitrust claims and investigations by governmental agencies and industry competitors that could be "expensive to defend," result in "significant judgments" against the Company, and create "negative publicity" (*id.* at 38);

- In order to obtain antitrust regulatory approval for a 2018 transaction with affiliate Itaú Unibanco S.A., XP had entered into an agreement with Brazil's Administrative Council for Economic Defense ("CADE") that partially prohibited "exclusive relationships" with IFAs and could expose XP to "financial penalties [and] antitrust investigations" if breached (the "CADE Agreement") (*id.*);

- XP had incurred hundreds of millions of *reais'* worth of operating costs or expenses across several categories (including "agreement[s] with customers") in both 2018 and year-to-date 2019, which stemmed from "operating losses" sustained in the "ordinary course of . . . business" (*id.* at 94, F-29-F-30); and

- XP faced the constant risk of customer claims and attendant losses from operating errors, delays, and/or systems failures (*id.* at 29).

The IPO closed on December 13, 2019, raising over U.S. $1 billion in proceeds. (CAC

¶ 3.)  Approximately three months later, on March 6, 2020, the Winkler Group—a self-described

"investigative financial firm"—issued a "report" that purported to "brin[g] to light" previously

unknown information about XP (the "Winkler Report").  (CAC ¶¶ 5-10; Ex. C at 1.)  In reality,

the Winkler Group was simply an investor with an admitted "short" position in XP hoping to

benefit from a drop in its stock price.  And the "facts" that the Winkler Report supposedly

"revealed" consisted variously of outright mistakes and mischaracterizations by the Winkler

Group and matters (such as those described above) that already were disclosed in the Offering

Materials.  (CAC ¶¶ 5-10; Ex. C at 1, 37; *see also* Ex. B at 1.)  Accordingly, on March 8, 2020, XP filed a Form 6-K disclosure with the SEC (the "6-K"), explaining that the Winkler Report was "full" of "basic errors" and "respond[ing] to each claim in the spirit of complete transparency with [its] various stakeholders."  (Ex. D at 1; CAC ¶ 11.)

Nevertheless, multiple law firms—including Plaintiffs' co-counsel, The Rosen Law Firm, P.A. ("Rosen")—immediately issued press releases announcing "investigations," and plaintiff Joseph Acerno (represented by Rosen) filed the first of the two initial complaints in this consolidated action two weeks after the Winkler Report's publication.  (Dkt. No. 1.)  Following the lead plaintiff appointment process, Plaintiffs filed the CAC on July 29, 2020.  (Dkt. No. 43.)

Tellingly, the CAC disregards most of the supposed "irregularities" raised in the Winkler Report.  It alleges that the Offering Materials reflected omissions or misstatements relating to: (i) regulatory and legal proceedings involving XP or certain of its executives; (ii) supposedly "anticompetitive conduct" with respect to IFAs and a resulting regulatory investigation prompted by a competitor; and (iii) expenses stemming from purported operating errors and system failures.  (CAC ¶¶ 123-43.)  The CAC asserts claims under Section 11 of the 1933 Act against all moving Defendants, Section 12(a)(2) claims against XP, XPI, and the Underwriters, and claims for control-person liability under Section 15 against XPI, Lifchitz, and Wilson.[3]

## ARGUMENT

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[4]  A claim is facially plausible

---

[3] The remaining defendants named in the CAC have neither been served nor appeared in this action.

[4] Unless otherwise noted, case citations herein omit internal quotation marks, citations, emphases, and alterations.

when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[F]acts that are merely consistent with a defendant's liability" do not suffice. *Id*. Nor do "[t]hreadbare recitals of the elements of a cause of action" or "legal conclusion[s] couched as . . . factual allegation[s]." *Id*.

Section 11 of the 1933 Act provides a private right of action for purchasers if the registration statement (i) "contained an untrue statement of material fact," (ii) "omitted to state a material fact required [by law] to be stated therein," or (iii) "omitted to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) overlaps with Section 11 but is more limited. To plead a Section 12(a)(2) claim, a plaintiff must allege that (i) it purchased securities directly in a public offering from a "statutory seller" and (ii) the securities were sold pursuant to a "prospectus or oral communication" that contained "an untrue statement of a material fact or omit[ted] . . . a material fact necessary in order to make the statements . . . not misleading." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 744 (S.D.N.Y. 2015); § 77l(a)(2)). "Because Sections 11 and 12(a)(2) are [1933] Act siblings with roughly parallel elements," courts usually "analyze the two together." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 368 (S.D.N.Y. 2011). And a "plaintiff who fails to plead a Section 11 claim necessarily fails to plead a Section 12(a)(2) claim as well." *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 308 (S.D.N.Y. 2013). Section 15 provides for control-person liability, and requires allegations of (i) a primary violation of the 1933 Act and (ii) "'control' by the defendant." *Singh v. Schikan*, 106 F. Supp. 3d 439, 447 (S.D.N.Y. 2015).

In cases under the 1933 Act, a plaintiff does not plead an actionable omission unless it alleges *both* that the defendant had a duty to disclose the purportedly undisclosed information and that the information was material. *In re CitiGroup Inc. Bond Litig*., 723 F. Supp. 2d 568,

593 (S.D.N.Y. 2010) (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 361-65

(2d Cir. 2010)); 15 U.S.C. §§ 77k(a), 77l(a)(2); *see also In re ProShares Trust Sec. Litig.*, 728

F.3d 96, 101 (2d Cir. 2013) ("[M]ateriality alone does not demand disclosure, nor does the duty

to disclose encompass non-material information.").  There is no abstract duty to disclose all

information that could "be relevant or of interest to a reasonable investor."  *Resnik v. Swartz*, 303

F.3d 147, 154 (2d Cir. 2002).  Claims based on purported misstatements similarly require

plaintiffs to plead and prove that "the misrepresentation was material."  *In re Britannia Holdings*

*Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 412-13 (S.D.N.Y. 2009).

      An omission is material only if there is "'a substantial likelihood that the disclosure of the

omitted fact would have been viewed by the reasonable investor as having significantly altered

the total mix of information made available.'"  *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d

645, (S.D.N.Y. 2012) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  "Likewise,

a misstatement is material if 'there is a substantial likelihood that a reasonable shareholder would

consider it important in deciding how to act.'"  *Britannia*, 665 F. Supp. 2d at 413 (quoting *ECA,*

*Local 134 IBEW Joint Pension Tr. of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 197 (2d

Cir. 2009)).  Courts draw "guidance" on "quantitative" and "qualitative" materiality from SEC

Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ("SAB No. 99").  *In re Ply Gem*

*Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015) (quoting *Litwin v.*

*Blackstone Grp. L.P.*, 634 F.3d 706, 717 (2d Cir. 2011)).  Under SAB No. 99, the "financial

magnitude" of the alleged omission or misstatement is assessed against a "five percent numerical

threshold," below which "the amount is presumptively immaterial" as a quantitative matter.

*ECA,* 553 F.3d at 197, 204.  Courts assess qualitative materiality by reference to such "factors"

as (i) "concealment of an unlawful transaction," (ii) "significance of the misstatement in relation

to the company's operations," and (iii) "management's expectation that the misstatement will result in a significant market reaction." *Id.* at 197-98.

Plaintiffs' claims fail to meet these standards because they are based on information that was either disclosed in the Offering Materials, not required to be disclosed, or legally immaterial.

# I.   PLAINTIFFS' SECTIONS 11 AND 12(a)(2) CLAIMS FAIL FOR LACK OF AN ACTIONABLE OMISSION OR MISSTATEMENT

## A.   Alleged Omissions or Misstatements Regarding Regulatory and Legal Proceedings Are Inactionable

Plaintiffs first allege that Offering Materials failed to make adequate disclosure of certain civil lawsuits and BSM/CVM proceedings in which XP or certain executives were purportedly involved between 2016 and 2019.  (*See, e.g.*, CAC ¶¶ 8-9, 73, 77, 112-13, 117-121, 131-37.)  For multiple reasons, these allegations cannot support 1933 Act claims.

First, the Offering Materials contained robust disclosures concerning XP's legal and regulatory exposure.  They advised, for example, that XP (i) was subject to a variety of then-pending civil and administrative proceedings in Brazil, (ii) could be subject to additional proceedings going forward, (iii) might be required to expend "significant" resources to resolve such matters, and (iv) could see its financial position, operational results, and/or reputation "materially affect[ed]" as a result.  (Ex. B at 40, 94, 126, 176-77, F-25, F-30.)  XP further warned that the BSM and CVM—the very regulators that the CAC alleges were investigating or had charged XP or its employees—had authority to bring "enforcement actions" and impose "penalties."  (Ex. B at 122-26.)  In addition, XP's consolidated financial statements (included in the Offering Materials) undisputedly reflected all settlements paid pre-IPO to resolve the allegedly undisclosed actions in a line item clearly referencing "Legal proceedings."  (*Id.* at F-30; CAC ¶¶ 112, 115.)  Finally, XP advised that it had reserved R$16 million for any still-ongoing proceedings carrying a "probable" risk of loss and estimated that it faced an additional

R\$69 million worth of "possible" losses.  (Ex. B at 176, F-25-27.)  1933 Act claims fail "if they

charge omissions of what was in fact disclosed."  *Hinerfeld v. United Auto Grp.*, 97-cv-3533,

1998 WL 397852, at *4 (S.D.N.Y. Jul. 15, 1998) (citing *Olkey v. Hyperion 1998 Term Trust,*

*Inc.*, 98 F.3d 2, 9 (2d Cir. 1996)).  Indeed, courts have frequently dismissed securities claims

based on legal/regulatory disclosures similar to XP's.  *See, e.g.*, *In re Inv. Tech. Grp., Inc. Sec.*

*Litig.*, 251 F. Supp. 3d 596, 615-17 (S.D.N.Y. 2017);[5] *In re Lions Gate Ent. Corp. Sec. Litig.*,

165 F. Supp. 3d 1, 15-16 (S.D.N.Y. 2016); *see also City of Pontiac Policemen's & Firemen's*

*Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

Second, any suggestion that XP was required to disclose additional details about the civil

or regulatory proceedings alleged in the CAC is legally unfounded.  There is no affirmative duty

to disclose specific information on *all* legal proceedings pending as of a securities offering—

only those *material* to the company.  *See* SEC Form F-1, Item 4(a); SEC Form 20-F, Items 5(d),

8(a)(7); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 443-44 (S.D.N.Y. 2009).

The CAC alleges no facts to show that the proceedings at issue here were material to XP.  To the

contrary, it demonstrates that they were legally *immaterial*.

As to quantitative materiality, the CAC makes clear that the "hundreds" of "omitted"

civil claims amount to a *total* purported increase of approximately U.S. $2.98 million (R\$12.4

million) in exposure to "*possible*" litigation loss—not actual, out-of-pocket expenses or even

*probable* ones—over and above the total quoted in the Offering Materials.  (CAC ¶¶ 117-120,

134, 137 (emphasis added).)  And the "omitted" regulatory proceedings had exposed XP and/or

---

[5] *Inv. Tech. Grp.*, and certain other cases cited herein, involved claims under Section 10(b) of the Securities and Exchange Act of 1934.  Such decisions are nonetheless apposite here: as the Second Circuit has explained, "[t]he test for whether a statement is materially misleading" is "identical" as between Sections 11, 12(a)(2), and 10(b). *Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004).

its executives to approximately U.S. $1.3 million (R$5.47 million) in *aggregate* settlement payments as of the IPO.  (*Id.* ¶¶ 8, 112, 115.)  Neither figure even approaches SAB No. 99's 5% materiality threshold, regardless of whether measured against XP's total assets (U.S. $9.4 billion as of September 30, 2019; U.S. $4.3 billion in 2018), total revenue (U.S. $825 million; U.S. $711 million), net income (U.S. $168 million; U.S. $112 million), or any other appropriate metric. (Ex. B at 18-19.)  *See, e.g.*, *Fuwei*, 634 F. Supp. 2d at 443-44 (arbitration seeking damages constituting 2% of total assets "immaterial as a matter of law"); *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 488-89 & n.5 (2d Cir. 2011) (U.S. $30.4 million "falls well short of SAB No. 99's 5% threshold" and is "presumed to be quantitatively immaterial").  Even focusing only on XP's "net revenue from services rendered"—a metric driven by "revenue from contracts with customers"—shows that the larger, civil litigation-related portion of the exposure constitutes no more than a *de minimis* .5% of XP's overall customer income (U.S. $ 562 million; U.S. $348 million).  (Ex. B at 93, 95, F-27.)

Nor does the CAC allege anything to support qualitative materiality.  The CAC provides *no facts whatsoever* about any undisclosed lawsuits, including the claims or claimants involved. (CAC ¶¶ 13, 77-78, 117-20, 134-37.)  Indeed, when asked by the Court to identify "anything in the complaint that describes that nature of the lawsuits as affecting the quality of the nondisclosure," Plaintiffs could point only to paragraphs 135 and 137 of the CAC.  (Ex. A at 13:14-15:21.)  At *most*, however, those allegations suggest that the "undisclosed" actions "must have" fallen into the same sorts of broad categories identified in the Offering Materials.  (CAC ¶¶ 112, 137.)  That lawsuits may generally "relate[]," for example, to "portfolio management" says nothing about their overall significance (if any) to XP's operations.  (*Id.* ¶ 118.)

The regulatory proceedings, for their part, (i) relate overwhelmingly to matters identified years before the IPO, (ii) largely concluded with *de minimis* settlement payments made well prior to the IPO (that were reflected in the Offering Materials), and (iii) stem from discrete compliance issues not alleged to constitute recurrent or ongoing problems for XP.  (*See, e.g.*, *id.* ¶¶ 8, 112, 133; Ex. C at 1 n.1.)  Plaintiffs identify no adverse market reaction to the proceedings.  *See, e.g.*, *ECA*, 553 F.3d at 204.  They do not claim the proceedings arose from any illegality or other intentional misconduct on the part of XP.  *Id.*  And they allege no implications at all, let alone "significan[t]" implications, for XP's operations.  *Id.*[6]  The CAC's vague assertions that the conduct at issue in some of these proceedings resulted in unspecified "harm[]" to unidentified XP "clients" (CAC ¶¶ 8, 112, 132) changes nothing: conclusory, unsupported allegations are insufficient to plead materiality.  *See, e.g.*, *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (qualitative materiality allegations "far too vague"); *Dekalb Cty.*, 2016 WL 3685089, at *4-5 (plaintiffs "cannot speculate" in alleging qualitative materiality).

Finally, Plaintiffs' invocations of International Accounting Standards ("IAS") 10 and 37 fail to convert their deficient claims into viable ones.  (CAC ¶¶ 73, 77-78, 113, 121, 133-34, 136-37, 145.)  Plaintiffs contend that XP's "failure" to update its Offering Materials following the financial statements' September 30, 2019 "as-of" date to reflect the purported Q4 2019 increase in civil claims violated IAS 10.  (*See, e.g.*, *id.* ¶ 77.)  But IAS 10 requires only the disclosure of

---

[6] Additionally, certain proceedings—including the 2016 BSM proceeding allegedly focused on XP's "fail[ure] to oversee certain trading functions" (CAC ¶¶ 8, 112; Ex. C at 1 & n.1)—were widely reported *months before* the IPO, independently obviating any supposed "duty" to detail them further in the Offering Materials.  (*See* Exs. E-G); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) ("Sections 11 and 12(a)(2) do not require the disclosure of publicly available information."); *Rubenstein v. Credit Suisse Group AG*, No. 19-cv-1069, 2020 WL 2036850, at *6 (S.D.N.Y. Apr. 28, 2020) (same) (collecting cases); *see also In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 397 (S.D.N.Y. 2011) ("A court may . . . take judicial notice of news articles discussing the conduct raised in the complaint.").

"*material*" post-reporting period events.  (*Id.* ¶¶ 75-76 (emphasis added).)  Plaintiffs plead no

facts showing that the "undisclosed" lawsuits were material—just the opposite, as discussed

above.[7]

       IAS 37 provides that financial statements shall include descriptions of contingent

liabilities "'unless'" the possibility of material outflow "'is remote.'"  *Gusinsky v. Barclays PLC*,

944 F. Supp. 2d 279, 290 (S.D.N.Y. 2013) (quoting IAS 37), *vacated in part on other grounds*

*sub nom.*, *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir.

2014); (CAC ¶ 72).  Plaintiffs suggest that XP should have disclosed an April 2019 CVM

proceeding—supposedly still pending at IPO—as a contingent liability.  (*See, e.g.*, CAC ¶¶ 9,

113, 133.)  But they plead no facts about the proceeding to suggest that XP had reason to believe

it presented anything other than a remote risk of material loss.  *DoubleLine Capital LP v.*

*Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 446 (S.D.N.Y. 2018); *Gusinsky*, 944 F. Supp. 2d at

290-91.  Vague speculation that it "exposed XP[] to possible further liability and additional

costs" at some indeterminate future point (*id.* ¶ 9) is insufficient.  *See Dekalb Cty.*, 2016 WL

3685089, at *5 ("[M]ateriality is determined in light of the circumstances existing at the time of

the alleged misstatement occurred, not based on what could occur on some future date.").

### B.    Alleged Omissions or Misstatements Regarding "Anticompetitive" Conduct Are Inactionable

       Plaintiffs' allegations concerning the regulatory risks of XP's supposedly

"anticompetitive" conduct with respect to IFAs are equally unavailing.  Plaintiffs allege that an

industry competitor, BTG, accused XP of "strong-arm[ing] IFAs to enter into exclusive

relationships" by "using burdensome contractual provisions, intimidation, and threats."  (CAC ¶¶

---

[7] Even if Plaintiffs did plausibly allege a violation of IAS 10, that alone would be insufficient to state claims.  *See In re Barclays Bank PLC Sec. Litig.*, 09-cv-1989, 2017 WL 4082305, *15 n.22 (S.D.N.Y. Sept. 13, 2017).

10, 97-102.)  BTG's complaint supposedly precipitated an "investigation" into whether XP breached the CADE Agreement.  (*Id.*)  These bare allegations are insufficient to state a claim.

First, the Offering Materials in fact disclosed all of the material information that Plaintiffs claim was omitted.  As discussed, the Offering Materials advised that XP was "subject to regulatory activity" under "competition laws" and that "governmental agencies" and "competitors" could "allege that [XP's] actions violate antitrust or competition laws, or otherwise constitute unfair competition."  (Ex. B at 38; *see also id.* at 40 (ongoing or prospective "administrative investigations" and other "proceedings" implicated "competition" issues).) These sorts of allegations, XP warned, could give rise to "claims and investigations," which, even if "unfounded," could be "expensive to defend, involve negative publicity," and result in "significant" adverse judgments.  (*Id.* at 38.)  In addition, XP specifically disclosed the CADE Agreement itself, highlighting its partial prohibition on "exclusive relationships" with IFAs and emphasizing that any "breach" could precipitate "financial penalties" and "antitrust investigations."  (*Id.*)  Thus, the Offering Materials affirmatively warned of substantially the same risks that Plaintiffs complain were omitted.  *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 651 (S.D.N.Y. 2017); *see also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) ("[A] reasonable investor could [not] have been misled" into thinking that "the risk that materialized . . . did not actually exist.").

Moreover, XP had no obligation to specifically identify the alleged CADE investigation instigated by BTG.  "It is well established that 'companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.'"  *Banco Bradesco*, 277 F. Supp. 3d at 650 (quoting *City of Pontiac*, 752 F.3d at 184).  For that reason, "a government investigation, without more, does not trigger a generalized duty to disclose."  *Lions Gate*, 165 F. Supp. 3d at 12-13.  Indeed, "a

company need not accuse itself of wrongdoing nor disclose an ongoing investigation where the failure to do so would not make the company's statements misleading." *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 226-27 (S.D.N.Y. 2018).

Plaintiffs here allege nothing more than an investigation based on the accusations of a competitor that was "ongoing" at the time of the IPO with any particular outcome unclear. (CAC ¶¶ 9-10, 97-102.)  "Plaintiff[s] do[] *not* allege" that XP "admitted any unlawful conduct," "paid any fines," was "subjected to any sanctions," "entered into any deferred prosecution agreements or settlements," or was "adjudicated guilty of any charges." *Banco Bradesco*, 277 F. Supp. 3d at 652 (emphasis added).  And besides the accusations of BTG—themselves premised largely on "an anonymous complaint" (CAC ¶¶ 99-100)—the CAC alleges no facts to suggest that XP *actually* engaged in any "anticompetitive" conduct.  *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) (when securities claims "rest[] on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred").  Nor does the CAC allege facts suggesting that CADE's investigation was likely to yield an adverse outcome for XP; rather, it speculates, without support, that XP's conduct "potentially contravened" the CADE Agreement and that a finding of breach was "possible."  (CAC ¶¶ 10, 96-98, 114, 143.)  None of this creates a duty to disclose the investigation.  *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) (companies not "bound to predict" adverse consequences "as the imminent or likely outcome" of pending investigations); *In re UBS AG Sec. Litig.*, 07-cv-11225, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) (there is "no affirmative duty to speculate" about results of ongoing investigations), *aff'd sub nom.*, *City of Pontiac*, 752 F.3d 173.  Under similar circumstances, courts routinely hold nondisclosure of ongoing investigations inactionable.  *See,*

15

*e.g.*, *Lions Gate*, 165 F. Supp. 3d at 12-13; *Richman*, 868 F. Supp. 2d at 274; *Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 167-68 (D. Conn. 2019).[8]

Plaintiffs are also incorrect to suggest that IAS 37 required specific disclosure of the CADE investigation.  (CAC ¶¶ 10, 71-73, 102, 141.)  Under that provision, "even an investigation does not trigger the duty to disclose where the possibility of liability remains 'remote.'"  *Gusinsky,* 944 F. Supp. 2d at 290-91; *see also supra* p. 13.  For many of the same reasons discussed above, Plaintiffs plead no "facts showing that [XP] had any reason to believe that losses related to the [CADE investigation] were more than a remote possibility at the time the [C]ompany filed its financial statements."  *DoubleLine*, 323 F. Supp. 3d at 446.

The CAC likewise fails to allege that the CADE investigation itself was material.  Plaintiffs do not identify any actual or prospective fine or other loss flowing from the investigation.  To the contrary, it is a matter of public record that the CADE investigation concluded with a finding of no wrongdoing months before the CAC was filed.[9]  And beyond observing that IFAs were generally an important factor in XP CCTVM's (defined below) business overall (CAC ¶¶ 86-88), Plaintiffs allege no reason to think that the CADE investigation itself would be qualitatively material to XP.  Speculation that "*[i]f* a breach" of the CADE Agreement "*could be proven*," CADE's inquiry would yield "*possible* . . . financial penalties," further "investigations," and "modification of the CADE Agreement"—all risks disclosed in the

---

[8] Independently, the CAC makes clear that BTG's accusations and the resulting investigation were reported by the news media for, at minimum, *almost a year prior* to the IPO.  (CAC ¶ 98 (citing article published January 30, 2019).)  XP was therefore not required to disclose this information in the Offering Materials.  *See supra* n. 6.

[9] (*See* Ex. H); *Lia v. Saporito*, 909 F. Supp. 2d 149, 161 (E.D.N.Y. 2012) ("Agency determinations and administrative findings are public records of which a court may properly take judicial notice."); *see also Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 88 n.2 (2d Cir. 2012) (courts may "take judicial notice of any fact that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

Offering Materials, in any event—is insufficient.  (CAC ¶¶ 10, 96, 114, 143 (emphasis added));
*see, e.g.*, *Lions Gate*, 165 F. Supp. 3d at 13-14 (mere "possibility" of materiality insufficient).

Finally, Plaintiffs cannot state a claim by suggesting that disclosure of the CADE
investigation was necessary to render non-misleading separate disclosures regarding XP's IFA
network and the CADE Agreement itself.  (CAC ¶¶ 138-43.)  The CAC targets (i) XP's risk
disclosures concerning "increased competition" for IFAs and the potential consequences of
breaching the CADE Agreement (CAC ¶¶ 140, 142) as well as (ii) XP's statements of "belie[f]"
in its advantages in attracting and working with IFAs (*id.* ¶ 139).  The former, however, in no
way suggested the *absence* of any and all *allegations* of misconduct; to the contrary, as
discussed, the Offering Materials warned that such allegations were an ongoing risk.  And the
latter were qualified by disclosures of "numerous" IFA-related risks, including not only the
CADE Agreement and "increased competition" to "attract IFAs" but also the possibility of
"commercial disagreements" and misalignment of "interests" as between XP and IFAs.  (Ex. B at
24, 26.)  In any event, XP's "belie[fs]" about its IFA network constitute inactionable opinions
and/or puffery, precluding attachment of liability under the securities laws.  *See, e.g.*, *In re
Adient plc Sec. Litig.*, 18-cv-9116, 2020 WL 1644018, at *15-16, 21-23 (S.D.N.Y. Apr. 2, 2020).

### C.    Alleged Omissions or Misstatements Regarding Operating Error and System Failure Costs Are Inactionable

Plaintiffs also allege that the Offering Materials were misleading because XP, in contrast
to its subsidiary XP Investimentos Corretora de Cambio, Titulos e Valores Mobiliarios S.A.
("XP CCTVM"), did not "dedicate a separate line item" in its consolidated financial statements
"explicitly" to expenses resulting from purported "operating errors" and "failures of the system."
(CAC ¶¶ 6-7, 69-70, 110-11, 123-30.)  These allegations, too, cannot support a 1933 Act claim.

As an initial matter, it is undisputed that the Offering Materials *did in fact disclose* the outflows at issue, which stem "primarily" from various "indemnities paid to [XP CCTVM's] customers" because of "errors" in order execution attributable in part to "failures of the system or of people." (CAC ¶¶ 7, 70, 110-11, 125, 128.) The CAC concedes that XP's consolidated financial statements recorded these expenditures in three "Operating costs" or "Other operating expenses" categories. (*Id.* ¶¶ 7, 70, 125; Ex. B at F-29-F-30.) And XP explained that these items related to "agreement[s] with customers" and other "operating losses" from "activities in the ordinary course of business." (*Id.* at 94, F-29-F-30.) Plaintiffs do not (and could not) allege that XP's categorization of these costs and expenses in any way altered its net income or any comparable bottom-line performance metric. *Cf. In re Hudson Tech., Inc. Sec. Litig.*, 98-cv-1616, 1999 WL 767418, at *12 (S.D.N.Y. Sept. 28,1999); *ECA*, 553 F.3d at 204.

Instead, Plaintiffs claim that XP's treatment of these costs and expenses violated IAS 1 and 34 because it "obfuscated" outflows supposedly resulting from "recurring" and "pervasive" issues by "spreading" them across three separate line items. (*See, e.g.*, CAC ¶¶ 6-7, 69-70, 110-111, 115, 125, 128, 145.) But these conclusory allegations do not plausibly plead that XP's Offering Materials were misleading for several fundamental reasons.

First, the *exclusive basis* for Plaintiffs' suggestion that XP was required to employ a single, aggregate line item for these disparate costs and expenses is their allegation that XP CCTVM used one line item in its own pre-IPO financial statements. (*Id.* ¶¶ 110-11, 125, 128.) But, as XP repeatedly explained to investors in the 6-K, the financial statements of XP and XP CCTVM utilize *entirely different accounting standards*—the Brazilian Central Bank's mandated GAAP ("BACEN GAAP") for XP CCTVM and the International Financial Reporting Standards ("IFRS") for XP. (Ex. D at 1, 8; *see also* Ex. B at 18.) There is thus no "inconsistency" between

18

the two financial statements: that BACEN GAAP required XP CCTVM to aggregate miscellaneous "error" and "indemnity"-related outlays into a single line item has no bearing on XP's accounting treatment under a different system.  *See In re China Valves Tech. Sec. Litig*., 979 F. Supp. 2d 395, 411 (S.D.N.Y. 2013) ("plaintiff failed to allege any plausible basis for believing that the discrepancies [in the financial statements] were due to anything other than different reporting standards" in two counties).[10]  Indeed, XP expressly noted in its consolidated financial statements that "[a]ccounting policies of subsidiaries ha[d] been changed where necessary to ensure consistency with the policies adopted by the [XP] Group."  (Ex. B at F-44.) And, as acknowledged in the Winkler Report, XP CCTVM's financial statements—reflecting the line item at issue—were publicly available through XP Group websites.  (*See* Ex. C at 32 & n.69; Perez Aff. ¶ 10); *see also In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Where allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information."); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (judicially noticing "information publicly announced on a party's website"). XP's decision to account for its costs and expenses differently from its subsidiary, so as to comport with applicable IFRS principles, is not misleading and cannot support a claim.

Second, Plaintiffs plead *no facts at all* to support their core assumption that the various expenses and costs disclosed in three line items in XP's financial statements in fact comprised a uniform category of outflows that should have been grouped together.  (*See, e.g.*, CAC ¶¶ 66-70.)  Plaintiffs do not even allege what any of the "operating errors" and "system failures" in

---

[10] Plaintiffs' repeated assertions that XP's 6-K somehow "confirmed," "conceded," or "acknowledged" the Company's "obfuscat[ory]" accounting practices is patently false.  (CAC ¶¶ 7, 111, 115, 125.)  The 6-K made clear that the Winkler Report's allegations were entirely "incorrect" for the reasons explained herein.  (Ex. D at 5.)

question *actually were*—let alone provide any basis to infer some fundamental similarity or

relationship that would have demanded an aggregate line item.  Likewise, beyond conclusory

labels, Plaintiffs do nothing to buttress their repeated suggestion that one or more of these

miscellaneous issues constituted a discrete problem so "pervasive," "systemic," "recurr[ent],"

and/or "significant" as to be "material" to investors.  (CAC ¶¶ 6, 69, 110, 128, 145.)

   Third, Plaintiffs plead no "objective facts" that could support a plausible inference of an

IFRS violation.  *Harris v. AmTrust Fin. Servs.*, 135 F. Supp. 3d 155, 173 (S.D.N.Y. 2015), *aff'd*

649 Fed. App'x 7 (2d Cir. 2016).  The standards Plaintiffs identify (IAS 1 and 34) include no

provision requiring XP to use XP CCTVM's particular line item or otherwise "disaggregat[e]"

expenses along Plaintiffs' preferred lines.  *See, e.g.*, *In re Axis Capital Holdings Ltd., Sec. Litig.*,

456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) (plaintiffs "point to no accounting or reporting

requirements which would require the disaggregation of acquisition costs" or otherwise require

defendant to "identify contingent commissions as a line item"); *Harris*, 135 F. Supp. 3d at 165-

66 & n.21 (no allegation that any required "line items" were actually "missing").  To the

contrary, IAS 1 (which IAS 34 cross-references) includes a list of required income statement line

items, and none remotely contemplates the particular subcategory of expenses that Plaintiffs

purport to identify.  *See* IAS 1 ¶¶ 81A-82A.  And the standard makes clear that any additional

line items are included at management's judgment and discretion, such as when "relevant to an

understanding of the entity's financial performance" and after consideration of various "factors,"

including "materiality and the nature and function of the items of income and expense."  *Id.*

¶¶ 85-86; *see also id.* ¶ 30A ("an entity shall decide" whether and how to "aggregate[]

information in the financial statements" taking "into consideration all relevant facts and

circumstances"); *id.* ¶ 57 ("[t]his Standard does not prescribe the order or format" of line items

and the "descriptions used and the ordering of items or aggregation of similar items may be
amended according to the nature of the entity and its transactions").  That is consonant with the
IFRS' overall "principles-based" approach, which, relative to the "rule-based" U.S. GAAP, calls
for "greater discretion to comply with . . . general objective[s]."  Gelter & Eroglu, *Whose Trojan
Horse? The Dynamics of Resistance Against IFRS*, 36 U. Pa. J. Int'l L. 89, 115-16 (2014).

　　　　In the absence of any affirmative duty or objective requirement to use XP CCTVM's line
item, it is "well-settled" that accounting standards are "subject to interpretation and tolerate a
range of reasonable treatments leaving the choice among alternatives to management."  *Harris*,
135 F. Supp. 3d at 171-73 (without "pointing to objective facts that [d]efendants' accounting
methods violated GAAP," plaintiffs were simply "carping about [the] application of GAAP");
*see also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, (S.D.N.Y. 2010); *Kuriakose v.
Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 180-81 (S.D.N.Y. 2012).[11]  And a
plaintiff's mere "[d]isagreement" with management's "judgement calls" is "insufficient" to plead
a 1933 Act violation.  *Harris*, 135 F. Supp. 3d at 171; *see also Kuriakose*, 897 F. Supp. 2d at
180-81 (court "w[ould] not intervene" in an "accounting judgment" because of a disagreement
between the parties).  As such, generalized assertions of "non-compliance" with "broad"
provisions directing that financial reporting be, for example, "'useful,'" "'reliab[le],'" and/or
"'conservativ[e]'" do not without more state a securities claim.  *Stratte-McClure v. Morgan
Stanley*, 784 F. Supp. 2d 373, 381, 386 (S.D.N.Y. 2011), *aff'd*, 776 F.3d 94 (2d Cir. 2015).
Applying these principles, courts routinely dismiss claims like Plaintiffs'.  *See, e.g.*, *Harris*, 135
F. Supp. 3d at 162-165, 170-74 (with no plausible allegation of a GAAP violation or error in

---

[11] The Offering Materials themselves explained that XP was "require[d]" to make accounting "judgments,"
"estimates" and "assumptions" that "affect[ed] . . . expenses," among other things.  (Ex. B at 108, F-14.)

"total expenses," neither purportedly "misclassified" losses nor plaintiff's inability to "tick and tie" expenses as between a parent and "individual subsidiaries" could state securities claim).

Finally, XP's decision to use its own cost and expense categories in accordance with the IFRS does not make any other aspect of the Offering Materials misleading.  In addition to accounting for the very expenses at issue, the Offering Materials included disclosures warning of the risks Plaintiffs allege.  XP explained that "systems errors, including as a resulting of human error, could occur," potentially "caus[ing] substantial losses for customers" and "subject[ing]" XP to corresponding "claims."  (Ex. B at 29-31 (also noting potential "loss[es]" arising from possible "[d]efects in [XP's] systems," "errors," or "delays," in transaction processing).)  Plaintiffs suggest that these disclosures were deficient in failing to disclose that XP had *already* incurred unspecified "operating error" and "system failure"-related expenses.  (CAC ¶¶ 129-30.)  But it is undisputed that XP simultaneously reported any relevant expenses in its financial statements.  This combination of prospective risk advisories and actual reported results precludes 1933 Act claims.  *See, e.g.*, *DeMaria v. Andersen*, 318 F.3d 170, 181-82 (2d Cir. 2003) (disclosure of data showing actual net losses incurred plus advisory of possible future losses warranted dismissal); *Halperin*, 295 F.3d at 359.  Nor does XP's disclosure that it had "never experienced a *significant* failure of [its] trading systems" support a claim.  (CAC ¶¶ 111, 129-30 (emphasis added).)  Plaintiffs allege no facts to support a plausible inference that any particular "system failure" that may have had occurred pre-IPO was in any way "significant."[12]

---

[12] Plaintiffs also allege that XP's certification of its financial statements failed to disclose that they purportedly "were not prepared in accordance with IFRS."  (CAC ¶¶ 144-45.)  Because Plaintiffs have not plausibly alleged an underlying violation of any IFRS requirement, a claim premised on XP's certification necessarily fails as well.  *See, e.g.*, *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 345 (S.D.N.Y. 2012).

### D.        Plaintiffs Fail to Allege a Violation of Item 303

Plaintiffs also fail to allege any violation of Item 303 of SEC Regulation S-K, 17 C.F.R. §

229.303.  (CAC ¶¶ 146-53.)  Item 303 requires registrants to describe "any known trends . . . the

registrant reasonably expects will have a material . . . impact on net sales or revenues or

income."  *Stadnick v. Lima*, 861 F.3d 31, 39 (2d Cir 2017) (quoting 17 C.F.R.

§ 229.303(a)(3)(ii)).  Plaintiffs relying on Item 303 to allege a 1933 Act claim must plead, "with

some specificity, facts establishing that the defendant had actual knowledge of the purported

trend."  *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 07-cv-10528, 2010 WL 148617, at

*9 (S.D.N.Y. Jan. 14, 2010); *see also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir.

2016).  Importantly, the "trend" requirement means that "Item 303 does not require companies to

disclose isolated occurrences" even if they "affect their financial performance."  *In re Noah*

*Educ. Holdings, Ltd. Sec. Litig.*, No. 08-cv-9203, 2010 WL 1372709, at *6 (S.D.N.Y.

Mar. 31, 2010).  Additionally, the "'reasonably expects will have' standard" set out above

requires a "fairly substantial probability that the known risk at issue will materialize and have a

material impact."  *In re BHP Billiton Sec. Litig.*, 276 F. Supp. 3d 65, 88 (S.D.N.Y. 2017); *Jiajia*

*Luo v. Sogou, Inc.*, 19-cv-230, 2020 WL 3051019, at *12 (S.D.N.Y. June 8, 2020).

For many of the same reasons already discussed, the CAC does not satisfy these

requirements.  Plaintiffs allege that Defendants violated Item 303 by failing to disclose that

(i) accusations of anticompetitive conduct with respect to IFAs had prompted an investigation of

XP's potential breach of the CADE Agreement; (ii) XP was incurring expenses stemming from

operating errors; (iii) XP, Benchimol, and Almeida were the subject of ongoing regulatory

proceedings; and (iv) a number of additional civil lawsuits had been filed against XP in Q4 2019.

(CAC ¶¶ 146, 152.)  As shown, however, each of these issues was affirmatively disclosed in the

Offering Materials, presented no material risk to XP, or both.  *See, e.g.*, *Lions Gate*, 165 F. Supp.

23

3d at 20 (SEC investigation not material for purposes of Item 303); *Ply Gem*, 135 F. Supp. 3d at

150 (Item 303 allegations insufficient to plead materiality).  Moreover, nothing in the CAC

suggests that they constituted anything other than an "isolated incident" outside the purview of

Item 303.  *See, e.g.*, *Lions Gate*, 165 F. Supp. 3d at 20 (investigation arose from "isolated

incident" rather than a "trend" or "uncertainty"); *Noah*, 2010 WL 1372709, at \*6 (no allegations

that rising material costs constituted a "trend rather than an isolated event"); *Blackmoss*, 2010

WL 148617, at \*10 (no facts to show that rising foreclosure rates constituted trend).

## II.     PLAINTIFFS LACK STANDING TO ASSERT SECTION 12(a)(2) CLAIMS

  Plaintiffs' Section 12(a)(2) claims should also be dismissed for lack of standing.  (CAC

¶¶ 176-85.)  Section 12(a)(2) provides that any person who offers or sells a security "by means

of a prospectus or oral communication, which includes an untrue statement of a material fact or

omits to state a material fact . . . shall be liable . . . to the person purchasing such security from

him[.]"  15 U.S.C. § 77*l*(a)(2).  Unlike Section 11, Section 12(a)(2) provides a cause of action

only "to plaintiffs who purchased their shares directly in the initial public offering," not in

subsequent "'aftermarket'" transactions.  *Fuwei*, 634 F. Supp. 2d at 445 (citing *Gustafson v.*

*Alloyd Co.,* 513 U.S. 561, 578 (1995)); *Yung v. Lee*, 432 F.3d 142, 148 (2d Cir. 2005); *Ballay v.*

*Legg Mason Wood Walker, Inc*., 925 F.2d 682, 684 (3d Cir. 1991).  Plaintiffs that "fail to allege

that they purchased their shares in the public offering" lack Section 12(a)(2) "standing" as a

matter of law.  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015).

  Plaintiffs here do not allege they purchased their XP shares directly in the IPO.  They

repeatedly allege only that they purchased stock "pursuant and/or traceable" to the Offering

Materials.  (*See, e.g.*, CAC ¶¶ 4, 20-21, 154, 170.)  As multiple courts have recognized, this

"rather coy[]" formulation is insufficient to "expressly allege . . . standing." *Pub. Emps. Ret. Sys.*

*of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479, 484 (S.D.N.Y. 2010) (citing cases).

That is "because it is ambiguous whether the plaintiff is alleging they were a direct or indirect purchaser." *In re Deutsche Bank AG Sec. Litig.*, 09-cv-1714, 2016 WL 4083429, at *35 (S.D.N.Y. July 25, 2016) (courts are "appropriately wary" of purchase allegations other than "simply 'pursuant to an offering'").  In this case, however, there is no ambiguity: Plaintiffs' own PSLRA Certifications make clear that they purchased XP shares weeks or months *after* the December 13, 2019 IPO.  (*See* Dkt. No. 15-2 at 3, 5 (showing initial purchases on March 6, 2020 and January 28, 2020, respectively); Dkt. No. 9-2 at 4 (initial purchase on January 6, 2020).)  Plaintiffs are indisputably aftermarket purchasers and thus lack standing.[13]

## III.    PLAINTIFFS' CONTROL-PERSON CLAIMS MUST ALSO BE DISMISSED

To state a claim for control-person liability under Section 15, a plaintiff must allege a "primary violation" of Section 11 or (12)(a)(2).  *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185-86 (2d Cir. 2011).  Because Plaintiffs fail to plead any such predicate violation, their Section 15 claims also necessarily fail.  *Morgan Stanley*, 592 F.3d at 358.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant their motion and dismiss the CAC with prejudice.

[*Signature block to follow*]

---

[13] Underscoring this point, Section 12(a)(2) provides for a rescission remedy.  *See* 15 U.S.C. § 77*l*(a) (allowing purchasers "to recover the consideration paid for such security . . . upon the tender of such security").  That remedy has no application to aftermarket purchases like Plaintiffs' here, because whoever sold the shares to Plaintiffs is an unknown market participant, unconnected to the IPO.  Of course, even if Plaintiffs could validly tender their shares to Defendants (which they cannot), they have not attempted to do so.  Nor would it make sense for them *because XP's stock price—both on the date of the CAC and as of this filing—is significantly higher than the IPO price*.

Dated: New York, New York
September 14, 2020

DAVIS POLK & WARDWELL LLP

By:    */s/ Antonio J. Perez-Marques*
Antonio J. Perez-Marques
Daniel J. Schwartz
Craig J. Bergman
Esther C. Townes
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
antonio.perez@davispolk.com
daniel.schwartz@davispolk.com
craig.bergman@davispolk.com
esther.townes@davispolk.com

*Attorneys for Defendants XP Inc., XP
Investments US, LLC, Martin Emiliano
Escobari Lifchitz, and Jared Wilson*

MILBANK LLP

By:    */s/ Jed M. Schwartz*
Scott A. Edelman
Jed M. Schwartz
Kingdar Prussien
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5283
Facsimile: (212) 530-5219
sedelman@milbank.com
jschwartz@milbank.com
kprussien@milbank.com

*Attorneys for the Underwriters*