**EXHIBIT C**

# Brazil's Charles Schwab: XP Inc.'s Internal Audits Conflict With Its IPO Prospectus

This report raises questions regarding the accuracy of XP's financial statements following the discovery of accounting irregularities, inadequate financial disclosures, and discrepancies between the company's IPO prospectus and internal audits.

In addition, this report raises questions regarding XP's asset values, revenue recognition, and tax deductions. It also documents a pattern of regulatory noncompliance and questionable executive judgement. We are short XP Inc. for the following reasons:

- XP restated EPS figures multiple times just ahead of its IPO
- XP's contradictory financial statements reveal it may be overstating the value of its core asset by R$44 million
- XP's internal audits reveal a R$38 million discrepancy in the annual revenue reported in one audit versus the following year's audit of its core asset
- XP's internal audits reveal a R$167 million discrepancy in the annual cash flow from operations reported in one audit versus the following year's audit of its core asset
- XP's material weaknesses were identified years before XP says they were in its IPO prospectus
- XP fired its auditor after the auditor found material weaknesses in its financial reporting
- XP's ex-CFO was implicated in a penny stock manipulation scheme then promoted to the board of directors and audit committee
- XP's new CFO claims he has held the job seven years despite just starting
- XP was accused of knowingly violating securities laws and FINRA regulations in a $10 million lawsuit
- XP acquired a company for 10x its market value from a businessman targeted in a Swiss bank money laundering probe
- XP's irregular accounting practices inflate tax deductible goodwill by 200%
- XP did not disclose nearly $1 million in related party transactions in its IPO prospectus
- XP made a broker who was allegedly fired for violating rules its U.S. Compliance Chief
- XP is not disclosing R$100 million in system failures and errors in its IPO prospectus
- XP's CEO profited from harming clients then failed to disclose a R$5.47 million fine ahead of his book launch and IPO.

# XP's CEO Profited From Harming Clients Then Failed to Disclose a R$5.47 Million Fine Ahead of IPO

***XP's CEO is copying Charles Schwab's famous marketing campaign and did not reveal a serious regulatory matter that could negatively impact his book launch and XP's IPO.***

*Talk to Guilherme*. That's the call-to-action Guilherme Benchimol, CEO of Brazilian financial services platform XP Inc., is copying from Charles Schwab to attract customers. What investors should be talking to Guilherme about is why he did not disclose a multi-million Brazilain reais fine in XP's IPO prospectus.





Brazil's markets supervisor (BSM) recently accused Benchimol and XP of irregularities and conflicts of interest that harmed its clients. Specifically, the BSM stated XP operated in a manner that caused clients to have their trading orders not executed, executed late, or at a worse price.[1] XP profited from the improper trading and was ordered to reimburse clients and pay fines and penalties totaling R$5.47 million.

The BSM's final judgement was handed down on August 12, 2019[2]:

---

[1] BSM Administrative Process No. 12/2016  https://bit.ly/396A9io
[2] Final Judgement  https://bit.ly/2VwOdxl

1



**PROCESSO ADMINISTRATIVO Nº 12/2016**

**EXTRATO DA ATA DA SESSÃO DE JULGAMENTO PELO PLENO DO**

**CONSELHO DE SUPERVISÃO DA BSM SUPERVISÃO DE MERCADOS**

**REALIZADA EM 12.08.2019**

**I - DATA, HORA e LOCAL:** Realizada no dia 12 de agosto de 2019, às 14h30, na Avenida Brigadeiro Faria Lima, nº 1663, 2º andar, nesta cidade de São Paulo – SP.

**II – ORDEM DO DIA:** Sessão de Julgamento do Processo Administrativo nº 12/2016, distribuído ao Pleno do Conselho de Supervisão.

Yet, the $R5.47 million fine does not appear to be disclosed in XP's IPO prospectus as the company reports just $R1.01 million in fines and penalties in the nine month period ending September 30, 2019:

**19. Other operating income (expenses), net**

| | Nine months period ended September 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **Other operating income** | **152,674** | **28,147** |
| Recovery of charges and expenses | 52,876 | 6,229 |
| Reserval of operating provisions | 10,405 | 312 |
| Revenue from incentives from Tesouro Direto | 52,069 | 9,931 |
| Interest received on tax credits | 29,429 | 1,462 |
| Other | 7,895 | 10,213 |
| **Other operating expenses** | **(34,187)** | **(47,344)** |
| Legal proceedings and agreement with customers | (3,503) | (10,311) |
| Losses on write-off and disposal of assets | (6,583) | (7,861) |
| Fines and penalties | (1,011) | (4,082) |
| Associations and regulatory fees | (3,138) | (2,171) |
| Charity | (5,917) | (4,020) |
| Other | (14,035) | (18,899) |
| **Total** | **118,487** | **(19,197)** |

It's possible XP hadn't yet paid the fine by September 30th. So we contacted the BSM and asked how soon fines must be paid following a final judgement.

2

The BSM told us this:

> *"After the decision has become final (after the final judgment), the accused is informed by BSM through correspondence that he must pay the fine within 5 days. If the accused does not pay the fine within this specified period BSM will take the appropriate legal measures to collect the fine."*

There were 49 days between the final judgement and the end of the nine month reporting period in XP's IPO. Unless it took 7 weeks for XP to receive the BSM's correspondence, XP would have been required to pay the fine and penalties prior to the end of the September 30, 2019 reporting period in its IPO. It would have also been required to disclose the penalty.

Did XP intentionally hide the fact it was penalized for harming clients to preserve its reputation ahead of its December 10, 2019 IPO?

Even if the non-disclosure resulted from a payment timing issue, XP knew it was on the hook for a significant fine a year and a half earlier (February 23, 2018) when it proposed a settlement with the BSM but didn't make a provision for the penalty as it does for judicial and legal proceedings for which it believes losses are probable. For 2019, XP disclosed R$15.7 million in provisions and contingent liabilities for items similar to the penalty in question.

The non-disclosure in this instance is puzzling. While the matter is unflattering, it pales in comparison to many of the other issues revealed in this report. Besides possibly preserving XP's reputation ahead of its IPO, investors are left to wonder whether the lack of disclosure might also be connected with Benchimol's personal brand building efforts.

Benchimol, a self-proclaimed multi-billionaire, suggests he is "one of the most successful stories of entrepreneurship in Brazil" in the book[3] he released four days prior to XP's IPO. As the Director of Market Relations, the BSM held Bnechimol personally responsible for XP's irregular conduct. Improperly executing client orders for the gain of the firm, intentional or not, is not news Benchimol would welcome on such an important week for his reputation.

This is not the only nor the most significant nondisclosure we've uncovered.

Guilherme is no Chuck. And XP is no Charles Schwab. Here's why.

## XP Appears to Overstate Asset Value by R$44 Million

***Contradictory financial statements indicate the company may be overstating the value of its core asset and inaccurately calculating its share of total company assets.***

---

[3] Na Raca, Published November 26,2019  https://amzn.to/2SuAMMx

In its IPO prospectus, XP claims XP CCTVM, its core asset, had assets of $14,050 million, or 73.5% of the company's combined assets as of December 31, 2018[4]. However, an audit of XP CCTVM, while still a private company, reveals total assets of R$14,006[5]. This indicates the asset value in XP's IPO prospectus inflates the value of CCTVM's assets by R$44 million, or $10.5 million USD at an exchange rate of R$4.18/$1.00 USD.

Even XP's own math is incorrect. With total company assets of R$17,724 million, CCTVM actually accounts for 79.27% rather than 73.5% of total assets as the company claims in its prospectus.

The inconsistency is even more pronounced for 2017. XP's IPO prospectus reports CCTVM had assets of R$5,336 million, or 44.3% of total combined assets as of December 31, 2017.

Here's XP's IPO Prospectus:

*XP Investimentos Corretora de Câmbio, Títulos e Valores Mobiliários S.A., or XP CCTVM*

XP CCTVM is a Brazilian broker-dealer entity and the core entity of the group, with the highest concentration of the group's employees. All retail clients of XP Investimentos (including XP Direct and through our IFA network), Clear and Rico brands onboard and access all the products in our investment platform through XP CCTVM. In addition, it provides brokerage and issuer services to institutional and corporate clients. XP CCTVM had assets of R$5,336 million (representing 44.3% of our combined assets) as of December 31, 2017 and R$14,050 million (representing 73.5% of our combined assets) as of December 31, 2018. XP CCTVM recorded total revenue and income of R$1,380 million during 2017 (representing 72.4% of our consolidated total revenue and income) and R$1,967 million during 2018 (representing 66.5% of our consolidated total revenue and income).

Even before checking this against CCTVM's audit, the math once again doesn't work in XP's IPO prospectus. The balance sheet in the prospectus shows total assets of R$7,136. If CCTVM had assets of R$5,336, that would amount to 74.7% of XP's total assets, not 44.3%. The CCTVM audit shows total assets of R$5,315 in 2017, or R$21 million less than the inflated number in XP's IPO prospectus.

Here's CCTVM's audit:

| | | | |
|---|---|---:|---:|
| **Fixed assets** | | 502,214 | 484,553 |
| **Fixed assets** | 15a | 93,864 | 41,377 |
| **Intangible assets** | 15b | 408,350 | 443,176 |
| **Total assets** | | 14,006,820 | 5,315,578 |

Unless the CCTVM audits are inaccurate, the evidence suggests XP is overstating the value of its core asset prior to offering shares to the public.

---

[4] XP IPO Prospectus, p. 8  https://bit.ly/39i8iLP
[5] XP CCTVM Audit 2018, p. 10 https://bit.ly/2UutXfr

Likewise, overstating the value of a core asset while, at times, understating the percentage that asset represents of the total firm's assets suggests XP may be implying its other subsidiaries are worth more than they are. XP does not provide audits for its other entities on its site which might allow us to reconcile the discrepancies. XP appears to be overstating the value of its core asset to investors prior to the company's public share offering.

## XP Forced to Restate EPS Mid-IPO

***XP restated its EPS figures multiple times in the months leading up to its IPO, raising red flags about the company's financial controls.***

In the midst of multiple restatements to EPS, it appears as if XP overstated its earnings per share by 39.7% for the year 2016. In fact, at one point the company had overstated its EPS calculations for two of the three years provided in the prospectus. In the original Draft Registration Statement (DSR), filed 9/13/2019,[6] XP stated it earned R$0.2265 per share in 2018 and R$0.0973 per share in 2016.

However, in a revised DSR dates 10/17/2019,[7] XP suddenly restated its EPS figures. Now XP claimed it earned R$0.2339 per share in 2018 and R$0.1360 in 2016:

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018 (US$)(1) | 2018 (R$) | 2017 (R$) | 2016 (R$) |
| | | (in millions, except amounts per common share) | | |
| Gross revenue(2) | 830 | 3,216 | 2,065 | 1,347 |
| Sales tax(3) | (67) | (258) | (158) | (95) |
| **Total revenue and income** | **764** | **2,958** | **1,907** | **1,252** |
| | | | | |
| **Operating costs and expenses** | | | | |
| Operating costs | (243) | (941) | (580) | (376) |
| Selling expenses | (25) | (96) | (33) | (24) |
| Administrative expenses | (304) | (1,177) | (650) | (471) |
| Other operating expenses, net | (8) | (31) | (8) | (6) |
| Interest expense on debt | (19) | (72) | (61) | — |
| **Income before income tax** | **165** | **641** | **576** | **374** |
| **Income tax expense** | **(45)** | **(175)** | **(152)** | **(130)** |
| **Net income for the year** | **120** | **465** | **424** | **244** |
| | | | | |
| **Net income attributable to:** | | | | |
| Owners of the Parent company | 119 | 461 | 414 | 189 |
| Non-controlling interest | 1 | 4 | 10 | 55 |
| Basic and Diluted earnings per common share – R$(4)(5) | 0.0604 | 0.2339 | 0.2134 | 0.1360 |

But just three weeks later, in a revised DSR dated 11/4/2019,[8] XP sowed even more confusion when it restated EPS figures for 2016 and 2018 lower, consistent with the company's original DSR filing:

---

[6] XP DRS 9/13/2019, p. 16  https://bit.ly/2S3xVtN
[7] XP revised DSR 10/17/2019 p.17  https://bit.ly/2SmGtuN
[8] XP revised DSR 11/4/2019 p.18  https://bit.ly/39b8Hzx

| | For the Nine Months Ended September 30, | | | | For the Year Ended December 31, | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2019 | 2018 | 2018 | 2018 | 2017 | 2016 |
| | (US$)(1) | (RS) | | (US$)(1) | (RS) | | |
| | | | | (in millions, except amounts per common share) | | | |
| Gross revenue and income(2) | 887 | 3,695 | 2,259 | 772 | 3,216 | 2,065 | 1,347 |
| Sales tax(3) | (62) | (259) | (186) | (62) | (258) | (158) | (95) |
| **Total revenue and income** | **825** | **3,437** | **2,073** | **711** | **2,958** | **1,907** | **1,252** |
| | | | | | | | |
| **Operating costs and expenses** | | | | | | | |
| Operating costs | (269) | (1,119) | (632) | (226) | (941) | (580) | (376) |
| Selling expenses | (20) | (82) | (64) | (23) | (96) | (33) | (24) |
| Administrative expenses | (311) | (1,294) | (828) | (283) | (1,177) | (650) | (471) |
| Other operating expenses, net | 28 | 118 | (19) | (8) | (31) | (8) | (6) |
| Interest expense on debt | (15) | (63) | (60) | (17) | (72) | (61) | — |
| **Income before income tax** | **239** | **997** | **470** | **154** | **641** | **576** | **374** |
| Income tax expense | (71) | (298) | (118) | (42) | (175) | (152) | (130) |
| **Net income for the period / year** | **168** | **699** | **352** | **112** | **465** | **424** | **244** |
| | | | | | | | |
| **Net income attributable to:** | | | | | | | |
| Owners of the Parent company | 166 | 692 | 350 | 111 | 461 | 414 | 189 |
| Non-controlling interest | 2 | 7 | 2 | 1 | 4 | 10 | 55 |
| Basic and Diluted earnings per common share – R$(4) | 0.0816 | 0.3397 | 0.1796 | 0.0544 | 0.2265 | 0.2134 | 0.0973 |
| Pro forma Basic and Diluted earnings per common share (after giving effect to the Share Split) – R$(5) | | | | | | | |

In the same revised 11/4/2019 DSR though, XP contradicts its own EPS figures on page 18. Buried in the footnotes[9] we once again find the elevated EPS figures, R$0.2339 per share in 2018 and R$0.1360 in 2016:

| | | | | |
|---|---|---|---|---|
| **Total comprehensive income attributable to:** | | | | |
| Owners of the Parent company | | 466,750 | 413,732 | 189,832 |
| Non-controlling interest | | 3,890 | 9,667 | 54,632 |
| | | | | |
| Basic and diluted earnings per common share – R$ (*) (restated for 2018 and 2016 note 3.xx) | 30 | 0.2339 | 0.2134 | 0.1360 |

When the SEC noticed and questioned XP[10] about the inconsistencies, the company restated its EPS figures yet again. In a revised DSR 16 days later dated 11/20/2019,[11] XP bumped its figures back up to mirror those it submitted in its first DSR revision; EPS R$0.2339 in 2018 and R$0.1360 in 2016.

Buried in the footnotes[12] is this:

> *"The Company's earnings per share amounts for the years ended December 31, 2018 and 2016 as disclosed in note 30, have been restated to correct an error in the weighted average number of shares used in the denominator for the years ended December 31, 2018 and 2016. The error has no impact in the balance sheet, statement of changes in equity, net income and statements of cash flows."*

The error is related to an earlier disclosure[13] that reads:

---

[9] XP revised DSR 11/4/2019 p.F-39   https://bit.ly/39b8Hzx
[10] SEC Letter 11/15/2019 https://bit.ly/2tFqGPC
[11] XP revised DSR 11/20/2019 p.18 https://bit.ly/31tP6Ij
[12] XP revised DSR 11/20/2019 p. F-64 https://bit.ly/31tP6Ij
[13] XP revised DSR 12/9/2019 p. 18 https://bit.ly/2va4lEC

> *"Share and per share data in the table below has been retroactively adjusted to give effect to the Share Split."*

There are two share splits investors shouldn't confuse. The first is a four-to-one share split that occurred November 30, 2019, approximately two months after the original prospectus was filed. This split is accounted for on the Pro Forma EPS line.[14]

The second split, which occurred March 3, 2017[15] is what XP suggests is the source of confusion. Serious concerns remain though. Even if we attribute the original restatement to nothing more than clerical clumsiness, the note XP provides is still lacking:

> *"The basic and diluted earnings per common share are in effect with the share split occurred on March 3, 2017 to allow comparability between years."*

Investors are led to believe that the revised share count in 2017 is accurate and is the denominator by which net income should be divided going forward. It's not surprising then that 2016's EPS would be restated. However, it is concerning that XP would have to restate 2018's EPS since it allegedly arrived at an accurate share count a year prior. Investors are right to be suspicious of the share count and EPS figures XP provides, especially after submitting contradictory EPS numbers in the same document.

## XP's Revenue Recognition Doesn't Add Up

***XP's financial reporting is inadequate as audits reveal that revenue contributions from XP's core asset are inconsistent with what XP reports in its IPO prospectus.***

XP acknowledges material weaknesses[16] related to the recognition and measurement of revenues. The prospectus states these issues could result in a material misstatement of its revenues. The SEC noticed and seemed to suggest XP was reluctant to provide[17] more detail regarding the growth of its management fees between 2016-18. The SEC also requested better disclosure regarding the make up and split between the management and performance based fees it earns.

Combining these and other disclosures XP was required to make pre-IPO with CCTVM's internal audits yields a muddied picture regarding the revenue generated by XP's core asset. First, it's important to understand how XP calculates revenue. First, XP calculates gross revenue by adding (1) net revenue from services rendered with (2) net income from financial instruments[18]. XP then backs out what it calls sales tax, defined as the sum of (1) Sales taxes

---

[14] XP revised DSR 12/9/2019 p. 18 https://bit.ly/2va4IEC
[15] XP revised DSR 12/9/2019 p. F-40 https://bit.ly/2va4IEC
[16] XP IPO Prospectus 12/10/2019 p. 34 https://bit.ly/31y9Tuf
[17] SEC Letter 10/31/2019 https://bit.ly/386MVN4
[18] XP IPO Prospectus 12/10/2019 p. 75  https://bit.ly/31y9Tuf

and contributions on revenue; and (2) Taxes and contributions on financial income. The result is what XP calls total revenue and income.

In 2018, XP states in its prospectus that CCTVM generated R$1,967 million,[19] or 66.5% of XP's consolidated total revenue and income. This appears inconsistent with the total revenue and income we calculate from CCTVM's 2018 audit of R$2,221 million.[20] Note that CCTVM's audit doesn't categorize line items exactly as XP does in its prospectus:

**Total Revenue and Income**
**(+) Income from services rendered:**          **R$1,701,805**
**(+) Income from financial intermediation:**  **R$691,567**
**(-) Tax expenses:**                                       **R$172,361**
    **Total:**                                       **R$2,221 million**

If our calculation is correct, it means CCTVM is actually 75% of total revenue and income in 2018 rather than 66.5% as is stated in the prospectus This assumes XP's total revenue and income of R$2,958 million in the prospectus is correct. Likewise, CCTVM's total revenue and income for 2017 is also inconsistent with the revenue contribution ratio XP states in its DSR.

It makes no sense that XP would understate CCTVM's revenue. Especially after apparently inflating CCTVM's asset value and restating its EPS higher. What seems more likely is that XP's financial reporting is so inadequate, it's not capable of producing financial statements in its prospectus that are consistent with CCTVM's past audits. Nor does it appear XP is capable of accurately determining CCTVM's contribution as a percentage to firm-wide revenue.

The revenue XP reports may be even more suspect when you discover that CCTVM's reports different revenue numbers for the same year in different audits.

## Internal Audits Exposed as Contradictory Including a R$38 Million Revenue Discrepancy

***The accuracy of XP's pre-IPO financial statements are suspect if they're based on audits that reveal significant discrepancies, including a R$167 million cash flow variance.***

Investors may not be able to trust CCTVM's audits for the inputs necessary to accurately calculate total revenue and income for comparison with XP's IPO prospectus. Investors can inspect CCTVM audits back to 2010.[21] In examining them here, we're exposing significant discrepancies in the results reported in these audits.

---

[19] XP IPO Prospectus 12/10/2019 p. 149  https://bit.ly/31y9Tuf
[20] XP CCTVM Audit 2018 https://bit.ly/2OBv1uq
[21] XP Compliance https://bit.ly/2tyZYb9

In 2016, CCTVM reports financial intermediation income of R$474,861[22] yet the following year's audit, which includes the prior year, shows R$512,711.[23] Included is a difference of R$20,300 in income from derivative financial instruments.

Here's the 2016 audit:

| | Note | 2nd Semester | 2016 Year | 2015 Year |
|---|---|---|---|---|
| **Financial intermediation income** | | **261,644** | **474,861** | **253,411** |
| Loans | | 422 | 728 | 518 |
| Securities income | | 250,103 | 455,640 | 261,455 |
| Income from derivative financial instruments | 7 | 10,658 | 17,144 | (8,608) |
| Foreign exchange operations | | 461 | 1,349 | 46 |

And here's the 2017 audit:

| | | 2017 | 2016 |
|---|---|---|---|
| | 2° semestre | Exercício | Exercício |
| **Receitas da intermediação financeira** | 317.726 | 632.001 | 512.711 |
| Operações de crédito | 234 | 236 | 635 |
| Resultado de operações com títulos e valores mobiliários | 231.336 | 466.278 | 470.668 |
| Resultado com instrumentos financeiros derivativos (Nota 7) | 78.927 | 155.592 | 37.444 |
| Resultado de operações de câmbio | 7.229 | 9.895 | 1.857 |

The two audits expose a R$38 million discrepancy in 2016's reported revenue.

In addition to inconsistent gross income, operating income for 2016 also differs year-to-year, R$324,300 in the 2016 audit versus R$333,324 in the 2017 audit.

While net income of R$109,750 is the same in both audits, the inconsistencies raise red flags for investors. With significantly different gross and operating income figures for the same year across different audits, it's clear XP lacks uniform standards regarding how it counts certain items and where they should be included on an income statement. It's an ad hoc approach that can erode investor confidence and result in different gross profit and operating margins for the same year depending on which audit you're viewing.

In some audits it appears XP changes which revenue streams it includes in financial intermediation income. For instance, in the 2015 audit[24] XP included (1) securities and (2) income from foreign exchange operations. But the following year, in addition to securities and income from foreign exchange operations, the company included (3) loans and (4) foreign exchange operations.

While this may account for some of the inconsistencies in audits that report identical net income, it doesn't explain the glaring discrepancies for 2017. In addition to a R$65,055 difference

---

[22] XP CCTVM Audit 2016 https://bit.ly/2UsCLTb
[23] XP CCTVM Audit 2017 https://bit.ly/3767mZs
[24] XP CCTVM Audit 2015 https://bit.ly/386DOfl

between CCTVM's 2017 operating income in the 2017 audit versus the 2018 audit, the net income differs significantly.

We suspect XP would argue the net income attributable to controlling shareholders in the 2017 audit is identical to net income reported in the 2018 audit. However, there's no note accompanying the net income line in the 2018 audit reconciling the additional R$57,900 of net income it reported in the 2017 audit (presumably for non-controlling interests). Remember, XP says in its prospectus that the 2017 share split impacted EPS not net income.

The cash flow statement offers little help as significant discrepancies also exist. For example, In the 2017 audit, net cash from (used in) operations is R$115,576 and the increase/ (decrease) in cash and cash equivalents is R$68,716 whereas the 2018 audit shows (R$52,095) and (R$31,154).

The discrepancy in cash flow from operations between audits, R$167,671 million, is significant. Remember, XP claims CCTVM is the company's core asset. If these audits were relied upon as key components in producing the consolidated numbers included in the IPO prospectus, investors have reason to question the accuracy of XP's pre-IPO financial statements.

## Ex-CFO Implicated in Penny Stock Manipulation Scheme

***The CFO at the helm when the flawed audits were produced is promoted to XP's board of directors after being fined for his role in an illicit trading plot.***

Julio Capua Ramos da Silva was responsible for the accounting on which the contradictory audits were based.[25] He joined the XP Group in 2004, began overseeing its accounting in 2007, and served as CCTVM's chief financial officer until April 2019. The discrepancies uncovered in the audits span years and raise questions about the rigor of Capua's oversight. Especially when you consider Capua was also in charge of XP Group's financial and legal affairs and served as an officer for at least three of XP Group's other subsidiaries.

Even more concerning is Capua's role in a penny stock price manipulation scheme that resulted in fines for both he and the company.[26]

Between October 2013 and February 2015 Brazilian regulators say a mother-son duo conspired to manipulate the price of penny stocks via XP's platform. Regulators say the pair made more than 250 trades between themselves that resulted in R$64,000 in illicit profits.[27] Regulators detected the scheme approximately four months after it began but despite notifying XP and Capua, regulators say the scheme was allowed to continue.

---

[25] XP IPO Prospectus 12/10/2019 p. 180 https://bit.ly/3bftS5j
[26] BSM Market Supervision: Administrative Proceeding https://bit.ly/2OT9cqc
[27] BSM Statement of Accusation https://bit.ly/31VBN3o

Regulators say Capua and XP did not prevent the irregularities, even after being notified of the scheme. By allowing the mother and son to make more than 100 additional trades after being alerted to the scheme, regulators say Capua failed in the due diligence that was expected of him.

The following are translated excerpts from the complaint filed by Brazil's Supervisor of Markets (BSM) and reveal Capua's culpability:

- *Julio (Capua Ramos da Silva), under the terms of his appointment as Director of Market Relations for the Broker, is responsible*
- *Even after being warned...regarding the atypicality of operations and the price manipulation strategy used by customers...Julio (Capua Ramos da Silva) did not take effective steps to cease the recurrence of abusive practice*

- *Once aware, it was expected that Julio (Capua Ramos da Silva), as Director of Relations with the Market, would no longer allow business with the same modus operandi and involving the same customers*
- *Julio (Capua Ramos da Silva) should have taken steps to avoid repeating (the) operations demonstrated...which was not the case*
- *Even after the alerts made by BSM, irregular business continued...contributing to the manipulation of prices of assets traded in*

Capua's response to the accusations is telling. While acknowledging liability for mistakes of omission, Capua initially blames the regulator for not being more specific regarding what he should have done after being notified of the scheme.[28] Later, Capua blamed a lack of controls in XP's system for allowing the scheme to continue.

Prior to recommending he be fined R$10,000, Capua argued he should not be held personally responsible. One reason Capua cited was because the scheme did not result in a significant financial windfall for XP:

> *...the financial value involved was low. Obviously, this fact does not diminish or soften the severity... but it has to be considered that the...gross gain of R$64,900.00 for (the perpetrators)...(occurred) in the period of almost 2 years. For the broker (XP), such operations generated a benefit economic value around R$1,000.00.*

We highlight Capua's behavior and argue it is pertinent not because of its economic impact but because of the assertion that the scheme was allowed to continue after XP was warned about it.

---

[28] Defense and Proposed Term of Commitment https://bit.ly/38xxnlM

Ultimately, regulators levied a penalty much harsher than Capua recommended. He was fined R$100,000 and XP was fined R$100,000.[29]

Of particular concern for investors in this case is the following claim from regulators that XP and Capua:

> ...continued to demonstrate a misunderstanding of the case by not understand(ing) (the) signs of irregularity…

Regulators meticulously documented the scheme trade-by-trade and presented the evidence to XP and Capua. If regulators are correct that Capua did not understand that asset prices were being manipulated, even after being warned, it might not come as a surprise that Capua oversaw the accounting underpinning CCTVM's flawed and inconsistent audits. Of even greater concern is the possibility these audits are the basis on which the financial statements in XP's IPO prospectus are based.

On the other hand, Capua denies misunderstanding the case and claims he was aware of and understood the irregularities that were occurring. This scenario would seem even more disturbing to investors concerned about CCTVM's audits. It begs the question of whether Capua, while CFO of CCTVM, was aware of the flawed audits. If he was, what emerges is a troubling pattern of behavior where significant problems are known about but not corrected or prevented from reoccurring.

Either scenario raises red flags. And this isn't the only time Capua has paid a fine for failing to prevent market manipulation.[30] Despite the regulatory reprimands and their potential implications regarding the flawed audits, Capua was rewarded recently with a seat on XP's board of directors. Interestingly, Capua is also now a member of the audit committee.

## New CFO Claims to be CFO for 7+ Years Despite Just Starting

**_Biographical imprecision suggests a pattern of carelessness that may help explain audit and accounting discrepancies._**

Remember, Capua was XP CCTVM's CFO until April 2019. Yet if you view the LinkedIn profile[31] of XP's current CFO, Bruno Constantino, you'd be led to believe he has been XP's CFO for nearly eight years:

---

[29] BSM Administrative Proceeding No. 35/2015  https://bit.ly/2vaWMDE
[30] BSM Administrative Proceeding No. 32/2013  https://bit.ly/3cd1BNp
[31] Bruno Constantino, LinkedIn Profile https://bit.ly/2H2SH6w



| People ▼ | Bruno | Constantino, CFA |
|---|---|---|

## Experience



**Partner & CFO**
XP INVESTIMENTOS
Oct 2012 – Present · 7 years 5 months

Rio de Janeiro Area, Brazil

XP didn't exist in its current form in 2012, meaning the CFO position referenced on Constantino's LinkedIn profile didn't exist either. Constantino's XP biography[32] states he became XP's CFO in November 2019, nearly eight years after he says he did on LinkedIn, and the month before the company went public:

**Bruno Constantino**

Chief Financial Officer

Bruno Constantino Alexandre dos Santos is a member of our board of directors, a position he has held since November 2019 and our Chief Financial Officer, a position he has held since November 2019. Mr. Constantino has over 20 years' experience in the financial markets. He joined XP CCTVM in 2012 and has been its chief financial officer since 2019. Prior to joining us, he was CIO of Graphus Capital from 2010 to 2012 and a partner at BTG Pactual from 2000 to 2010. He also served as a member of the board of directors of CEMIG from 2002 to 2004, Light from 2006 to 2009, and Valid from 2010 to 2019. Mr. Constantino was awarded a Chartered Financial Analyst (CFA) charter in 2009. Mr. Constantino holds a bachelor's degree in mechanical engineering from Pontifícia Universidade Católica do Rio de Janeiro and an MBA from IBMEC Group.

Interestingly, a separate biography included in a document dated March 26, 2019,[33] the year XP also claims Constantino became CCTVM's CFO, makes no mention of Constantino being CCTVM's CFO:

**Bruno Constantino Alexandre dos Santos**

Mr. Bruno has a degree in Mechanical Engineering (Pontifícia Universidade Católica do Rio de Janeiro). He holds an MBA degree in Corporate Finance (IBMEC). From 1997 to 1998 he worked as trainee at the Esso Brasileira de Petróleo – EXXON GROUP. Between 1998 and 2000, he was Financial Analyst at Banco Icatu S/A, later undertaking the position of Financial Analyst and Portfolio Manager at BTG Pactual and remaining there from 2000 to 2010, becoming a partner in 2004. From January to October 2010 he held the position of Manager of the Portfolio of Emerging Markets Management and later worked as Graphus Capital's executive partner, where he remained until 2012. Since 2012, he has been a partner in Capital Markets at XP Investimentos.

We're not accusing Constantino of dishonesty or wrongdoing. Even if you believe these are minor clerical errors related to XP's complicated organizational structure, what we aim to

---

[32] XP Corporate Governance https://bit.ly/2Sm8LFO
[33] Valid: Annual Shareholder Meeting Manual https://go.aws/31uaqgP

13

establish by highlighting the imprecision is that, at minimum, a pattern of carelessness and lack of attention to detail exists. It may help explain why the discrepancies in CCTVM's audits weren't corrected after Constantino became CFO ahead of XP's IPO.

It defies logic that the CFO of a public company, especially in the lead up to its IPO, would knowingly make contradictory audits available for public inspection on its website. Especially if the financial statements in these audits are the foundation on which XP built the financial statements included in its IPO prospectus.

At best it is inept.

If Constantino was aware of the contradictory audits, and used them to help construct the financial statements included in XP's prospectus, it begs the question of why he was promoted to be XP's CFO. It raises serious questions about the judgement and oversight of XP's board prior to going public. Understand though that XP's pre-IPO board consisted of just five members, four of whom were executive officers at the company.[34]

Investors should also note that Constantino likely played a pivotal role in firing the auditor that recently exposed the material weaknesses in XP's financial reporting.

## Auditor Fired After Identifying Material Weaknesses

***XP acknowledges a reasonable possibility of not detecting or preventing a material misstatement in its regulatory filings.***

The material weaknesses were identified in an audit of XP's consolidated financial statements for the year 2018. The company acknowledges insufficient accounting resources and processes necessary for compliance. In addition to weaknesses related to who has access to its systems, XP also admits its computer operations controls weren't at times operating effectively.

Remember, XP acknowledges it has revenue recognition and measurement issues as well as difficulty calculating EPS figures. While XP states that none of these weaknesses actually resulted in a material misstatement, the company does offer investors this warning:

*"...there is a reasonable possibility that a material misstatement of the annual or interim consolidated financial statements will not be prevented or detected on a timely basis."*

Immediately after the audit that revealed XP's material weaknesses, XP fired its auditor, KPMG Auditores Independentes.[35] Below is a timeline of key events:

---

[34] XP DSR 9/13/2019 p. 146  https://bit.ly/2H3bj6G
[35] XP IPO Prospectus 12/10/2019 p. 235 https://bit.ly/3bftS5j

- **March 26, 2019**: KPMG issues report identifying material weaknesses in XP's financial controls
- **March 26, 2019**: KPMG is fired as XP's auditor
- **April 2019**: Julio Capua Ramos da Silva relinquishes role as CCTVM's CFO
- **April 17, 2019**: PricewaterhouseCoopers Auditores Independentes hired to be XP's new auditor and conduct audits for the years 2017 and 2018 even though KPMG had just completed audits for 2017 and 2018
- **November 2019**: Bruno Constantino becomes XP's CFO after becoming CCTVM's CFO at an unspecified point earlier in 2019

We find the timing of KPMG's dismissal interesting given that KPMG was the public accounting firm that conducted the contradictory audits for CCTVM. KPMG kept the CCTVM business for years despite audits that were, at best, clumsy.

It wasn't until revelations of material weaknesses surfaced, just months prior to XP's IPO, that KPMG was shown the door. Importantly, investors should be aware of research[36] indicating that following the dismissal of an auditor, the probabilities of future restatements and material weaknesses generally increase.

## XP Hires New Auditor at Center of Corruption Probe

***XP did not have an auditor prior to hiring a new firm accused of rubber stamping fraudulent corporate financial statements.***

Just months prior to its IPO, with material weaknesses identified, it appears as if XP was officially without an auditor. In a letter[37] to the SEC, KPMG says it was dismissed March 26, 2019. It wasn't until nearly a month later that XP hired its new public accountant.[38]

Whether the gap in not having an official certifying accountant was simply the timing of contracts being let or whether KPMG was dismissed in haste, it signals XP's lack of prowess as an operator and calls into question management's judgement. Why after learning about material weaknesses would XP risk investor backlash over not having an auditor right before going public?

In another telling move, XP hired PricewaterhouseCoopers Auditores Independentes as its new public accountant. This is the same auditor accused of rubber stamping materially false[39] and misleading corporate financial statements in connection with the company at the center of a

---

[36] Auditor Dismissals: What Does Timing Reveal that Disclosures Do Not? https://bit.ly/2H2T550
[37] KPMG Letter to SEC 11/15/2019 https://bit.ly/2OwpkxE
[38] XP IPO Prospectus 12/10/2019 p. 235 https://bit.ly/3bftS5j
[39] The Grant Law Firm 2/3/2015 https://bwnews.pr/2S5mPon

notorious Brazilian money laundering,[40] corruption, and bribery scheme that has resulted in 244 criminal convictions.[41]

Despite denying wrongdoing, PwC agreed to pay $50 million[42] to settle the fraud case. Years after the probe was launched though, it appears PwC's due diligence is still lacking. In a 2017 inspection[43] conducted by the Public Company Accounting Oversight Board (PCAOB), PwC is accused of rubber stamping its clients' financials without verifying them.

The inspection characterizes PwC's deficiencies as significant:

> *"In other words, in these audits, the auditor issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement and/or the issuer maintained effective ICFR (internal controls for financial reporting)."*

Not having an official auditor prior to going public should cause investors to further question XP's internal controls. Likewise, hiring PwC does little to alleviate XP's country risk. Of even greater concern to investors is the PCAOB inspection that accuses PwC of engaging in behavior similar to that which resulted in a multimillion dollar legal settlement. The combination is either an indictment on management's judgement or evidence XP cared only about going public quickly.

## $10 Million Lawsuit Accuses XP of Violating Securities Laws

***Trader hired to build XP's U.S. broker-dealer subsidiary says XP knowingly broke the law and violated FINRA regulations.***

David LaPorte Curley filed a lawsuit in 2014 accusing XP of wrongful termination and unlawfully taking his equity ownership stake after repeatedly complaining about what he called XP's disturbing trend of noncompliance.[44] Curley says XP's co-founders Benchimol (now CEO) and Marcelo Maisonnave de Oliveira became annoyed with his insistence on regulatory compliance.

Specifically, Curley says that despite repeatedly warning XP, the company improperly solicited U.S. clients prior to establishing a broker-dealer in the U.S. that was in compliance with FINRA regulations. Even after learning XP wasn't legally allowed to operate yet in the U.S., Curley alleges Benchimol sent an email touting XP's involvement in a roadshow aimed at generating business from institutional investors in the U.S.

---

[40] Reuters: Brazil prosecutors charge 42 people 12/21/2018 https://reut.rs/2UyeHhE
[41] Foreign Policy: Brazil's Car Wash Investigation 6/17/2019 https://bit.ly/2S3Yq2f
[42] Bloomberg Law: PwC Agrees to Pay $50m in $3b in Petrobras Fraud Case   https://bit.ly/385rsUZ
[43] PCAOB 2017 Inspection, 2/28/2019 https://bit.ly/2GYeJra
[44] Curley vs. XP Investimentos Et al.   https://bit.ly/39T1LYf

Curley's complaint states:

> *"Following that email, Maisonnave emailed Curley...apologizing for Benchimol's suggestion that XP might be planning to violate applicable U.S. and Brazilian laws, as well as FINRA rules and/or regulations."*

Ultimately, Curley never received the $10 million in damages for which he was asking. The lawsuit was discontinued in 2015[45]. While Curley may not have proven he was wrongfully terminated, investors may find pertinent the allegations Curley made regarding XP's ethical and legal practices, its founders, and corporate culture:

- *During a visit to XP's headquarters in Rio, Curley noted the company's sophisticated marketing and suggested Maisonnave bragged that XP Investimentos CCTVM copied the marketing from Charles Schwab and translated it into Portuguese to save money*
- *Curley suggested XP's trading desk, acting on inside information, solicited orders from Brazilian clients and drove up the price of an acquisition target 20% but investors lost all of the gains after the merger was announced and the deal's structure had no price impact*
- *At a dinner in Sao Paulo, Curley was dismayed when Maisonnave, after several glasses of wine, told a story how he and Benchimol almost went broke when a client established an extremely risky naked short options position that forced Benchimol to go to the client's house in Rio Grande do Sul and repossess the client's Range Rover to pay for the margin on the trade*
- *Curley suggested XP used its research desk to manipulate stock prices higher, leaving some investors with significant losses after the market smartened up to the ruse*
- *Curley was concerned about XP's research as the retail team had conflicting buy/sell opinions with the research produced for institutional clients and as a result, XP either changed or withdrew the conflicting opinions on the retail reports to match the institutional ones, which...is a violation of Brazil's Operational Qualification Program*
- *In an effort to operate in the U.S. prior to gaining FINRA's approval for equities trading, Curley says XP considered running a parallel trading link...to connect U.S. clients directly with XP Investimentos CCTVM, thereby bypassing XP Securities (the U.S. subsidiary not yet FINRA compliant), which violates FINRA's "Standard 13" prohibiting attempts to evade regulatory requirements*
- *(An XP Securities LLC. employee) explained to Curley, in no uncertain terms, that Curley was seen as a nuisance at XP Investimentos CCTVM due to his obsession with compliance and his objections to distributing various research reports in the U.S.*
- *Curley says that after telling Benchimol he was willing to settle the termination dispute for a reasonable figure, Benchimol became agitated and said, "What? I'm going to destroy your reputation and dirty your name on the entire street! From here going forward you only talk to my lawyers!"*

---

[45] Decision 1/22/2015  https://bit.ly/2SSMW2i

- *Curley says his termination was based in material part on his persistent efforts to ensure legal compliance at XP Investimentos CCTVM and XP Securities*

We reiterate Curley's suit was not successful in obtaining damages. The disagreement wound up in arbitration.[46] It should be noted though that it was Benchimol and Maisonnave, according to court records, who actively sought out Curley to establish XP's broker-dealer subsidiary in the U.S. due to Curley's past accomplishments on Wall Street.

Ironically, it's Curley's involvement in establishing XP's broker-dealer in New York, which is required to file annual corporate reports, that indicates XP did not disclose related-party transactions in its IPO prospectus. These reports also indicate XP was aware of material weakness in its internal controls years earlier than its IPO prospectus states.

## Undisclosed Material Weaknesses Discovered

**Material weaknesses in XP's internal controls were discovered years before XP says they were in its IPO prospectus.**

XP isn't being as transparent as investors might desire with regard to when it implies it identified material weaknesses in its internal controls for financial reporting (ICFR). The material weaknesses in ICFR were actually discovered by auditors at least five years before XP says it discovered them in its IPO prospectus.

In the prospectus, XP states that it identified a number of material weaknesses in ICRF in connection with a 2018 audit. The reality though is that material weaknesses were identified at XP's broker-dealer subsidiary in the U.S., XP Securities, LLC., in its 2012 annual report[47].

In February 2013, XP Securities, LLC was informed by its auditor of material weaknesses in its internal controls for the years 2011 and 2012:

---

[46] XP Securities LLC v. Curley  https://bit.ly/2SQJzc0
[47] XP Securities, LLC Annual Report 2012  https://bit.ly/2Pkbm2l

Our consideration of internal control was for the limited purpose described in the first and second paragraphs and would not necessarily identify all deficiencies in internal control that might be material weaknesses.  However, we identified the following deficiencies in internal control that we consider to be material weaknesses, as defined above.  These conditions were considered in determining the nature, timing, and extent of the procedures performed in our audit of the financial statements of XP Securities, LLC as of and for the period October 27, 2011(commencement of operations) through December 31, 2012, and this report does not affect our report thereon dated February 24, 2013.

The size of the business and resultant limited number of employees imposes practical limitations on the effectiveness of those control policies and procedures that depend on the segregation of duties.  Because this condition is inherent in the size of the Company, the specific weaknesses are not described herein and no corrective action has been taken or proposed by the Company.

The auditor also identified material weaknesses the following year.[48] Yet XP failed to disclose this in its IPO prospectus. Investors should understand XP doesn't have to make such disclosures. While the SEC requires auditors of domestic registrants to attest to the internal controls of a company's subsidiaries,[49] the same rules do not apply to XP.

XP is registered as a foreign private issuer and qualifies as an emerging growth company and is exempt from many of the disclosures required of companies in the U.S. Specifically, XP does not have to comply with future audit rules established by the PCAOB and its auditors will not need to attest to the company's internal controls. XP will be exempt from disclosing these matters for up to five years, despite the SEC being clear on the subject[50] with regard to its expectations for U.S. companies:

> *"We would typically expect management's report on internal control over financial reporting to include controls at all consolidated entities, irrespective of the basis for consolidation."*

XP actually went above and beyond in its IPO prospectus. Companies are not required to disclose material weaknesses in ICFR in their IPO registration statements.[51] Companies that do so are generally trying to avoid surprising investors with bad news that could negatively impact the price of the stock ahead of a lockup expiration.

Even the Securities Act Rule 408[52] is of little help to investors. It requires IPO registration statements to include any material information necessary to ensure required disclosures are not misleading. Since XP wasn't required to disclose its material weaknesses, it seems the company doesn't have to provide information that prevents investors from being misled.

---

[48] XP Securities, LLC Annual Report 2013  https://bit.ly/38T2iJD
[49] SEC 17 CFR  https://bit.ly/37UdT9O
[50] SEC October 6, 2004  https://bit.ly/2SSF00Q
[51] EY Trends in US IPO Registration Statements, P17  https://go.ey.com/37TGM6f
[52] Securities Act Rule 408  https://bit.ly/38VVYRI

The voluntary disclosure could lead investors to believe the material weaknesses in ICFR were first discovered in 2019 (following the 2018 audit) when in fact, they were first identified in 2013 (following the 2012 audit). The reality is material weaknesses in ICFR have existed at XP for years and were identified long before the 2018 audit.

It seems XP would rather investors not know how pervasive and longstanding its material weaknesses are.

# Nearly $1 Million in Related Party Transactions Not Disclosed

***Omissions and contradictions reinforce a pattern of inconsistency regarding disclosure.***

Itaú Unibanco took a 49.9% stake in XP in August 2018. In the IPO prospectus, XP states that transactions with Itaú prior to the bank taking an equity stake would not be considered related party transactions:

**14. Related party transactions**

The main transactions carried with related parties, under commutative conditions, including interest rates, terms and guarantees, and period-end balances arising from such transactions are as follows:

| | Assets/(Liabilities) | | Revenue/(Expenses) Nine months period ended September 30, | |
| --- | --- | --- | --- | --- |
| Relation and transaction | September 30, 2019 | December 31, 2018 | 2019 | 2018 |
| **Shareholders with significant influence (i)** | (777,886) | (451,481) | (14,905) | 258 |
| Securities | 90,530 | 69,647 | 7,279 | 851 |
| Securities purchase (sold) under resell (repurchase) agreements | (805,166) | (426,207) | (18,313) | (35) |
| Borrowings | (63,250) | (94,921) | (3,871) | (558) |

(i)   These transaction are related to Itaú Unibanco who became shareholder of the Company in 2018 and since then a related party. Therefore, transactions and balances with Itaú Unibanco prior to the acquisition are not being reported as transactions with related parties.

Yet, in another part of the prospectus XP discloses related party transactions with Itaú that occurred more than a year before Itaú took its stake in XP:

**RELATED PARTY TRANSACTIONS**

*The agreements described in this section, or forms of such agreements as they will be in effect at the time of this offering, are filed as exhibits to the registration statement of which this prospectus forms a part, and the following descriptions are qualified by reference thereto.*

**Loan Arrangements with Itaú Unibanco**

On April 5, 2017, XP CCTVM entered into a loan agreement with Itaú Unibanco S.A. in the amount of R$126 million, which was borrowed in order to finance the second installment of the Rico acquisition. The loan accrues interest at a rate per annum equal to 113.0% of the CDI rate, is repayable in 36 monthly installments and matures on March 8, 2021. The loan is secured by a pledge (*alienação fiduciária*) over a certain number of XP CCTVM shares. As of September 30, 2019, there was R$63 million outstanding under this loan. For further information, see note 9 to the unaudited interim condensed consolidated financial statements included elsewhere in this prospectus.

On May 10, 2017, XP Brazil entered into a loan agreement with Itaú Unibanco – Nassau Branch in the amount of US$189.9 million. The loan accrued interest at a rate per annum equal to LIBOR + 3.454% (hedged to the CDI rate + 2.25%) and was scheduled to mature on May 11, 2022. Following the Itaú Transaction in August 2018, the loan was prepaid in full on August 31, 2018 pursuant to a mandatory prepayment provision triggered in the event that Itaú Unibanco (or any of its affiliates) became a shareholder of XP Brazil.

What's not disclosed in the IPO prospectus are the related party transactions XP's broker-dealer in the U.S. felt compelled to disclose. In all, XP Securities, LLC recorded $906,004 in related party transaction disclosures in its annual reports for the years 2013, 2015, 2016, 2017, and 2018.

Here's the disclosure in the 2018 report[53]:

**7.    Related Party Transactions**

At December 31, 2018, the Company was due $119,982 in commissions from XP Investimentos CCTVM S/A ("XPI"), an affiliate of the Company.

On August 31, 2018, Itau Unibanco S/A became owner of 49.9% of the total capital of XP Investimentos S/A, Holding which consolidates the investments of the XP Group, with approximately 30% of the voting capital but no change in the control of the XP Group. On December 31, 2018, the Company was due $233,038 in commission from Itau Unibanco S/A which is recognized as accounts receivable in the statement of financial condition.

The subsidiary disclosed $419,680 in revenue generated from related party transactions. It disclosed $480,423 in commissions due from related party transactions. And it disclosed $5,901 it owed in a related party disclosure. The related parties include parent company XP Investimentos, CCTVM, XP Advisors Inc., and Itaú.

In the prospectus XP states:

> *"The effects of these transactions have been eliminated and do not have effects on the unaudited interim condensed consolidated financial statements."*

The subsidiary's related party transactions are immaterial to XP's overall revenue. We highlight them only to reinforce XP's pattern of inconsistency regarding disclosures. What XP feels compelled to disclose in once context differs in another.

## Irregular Accounting Inflates XP's Tax Deductions

***XP is violating accounting rules by inflating its tax deductible goodwill by 200%.***

XP is violating tax accounting rules in the way goodwill is amortized on business combinations. Unlike GAAP accounting in which goodwill is not amortized but tested for impairment once a year, goodwill created in an asset sale is deductible for tax purposes.

In the footnotes of its IPO prospectus, XP states that goodwill is amortized over 5 years:

---

[53] XP Securities, LLC Annual Report 2018  https://bit.ly/38TCWv9

**22. Income tax**

**(a) Deferred income tax**

Deferred tax assets (DTA) and deferred tax liabilities (DTL) are comprised of the main following components:

| | Balance Sheet | | Net change in the year | | |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 | 2016 |
| Tax losses carryforwards | 55,358 | 17,584 | 37,774 | 17,584 | — |
| Goodwill on business combinations (i) | 59,993 | 116,782 | (56,789) | (51,327) | 91,457 |
| Provisions for IFAs' commissions | 31,031 | 26,287 | 4,744 | 26,156 | (1,220) |
| Revaluations of financial assets at fair value | 1,397 | 3,824 | (2,427) | 4,030 | (866) |
| Expected credit losses | 3,079 | 5,424 | (2,345) | 4,329 | 792 |
| Financial instruments taxed on redemption | (13,041) | (6,811) | (6,230) | (6,811) | — |
| Net gain on hedge instruments | (1,441) | 49,982 | (51,423) | 49,382 | 600 |
| Other provisions | 4,024 | 6,596 | (2,572) | 5,251 | 323 |
| **Total** | **140,400** | **219,668** | **(79,268)** | **48,594** | **91,086** |
| **Deferred tax assets** | 152,425 | 226,479 | | | |
| **Deferred tax liabilities** | (12,025) | (6,811) | | | |

(i)   For tax purposes, goodwill is amortized over 5 years on a straight-line basis when the entity acquired is sold or merged into another entity.

F-85

Five years is too aggressive though. U.S. accounting rules require goodwill from acquisitions to be amortized over 15 years,[54] not five:

**(a) GENERAL RULE**

A taxpayer shall be entitled to an amortization deduction with respect to any amortizable section 197 intangible. The amount of such deduction shall be determined by amortizing the adjusted basis (for purposes of determining gain) of such intangible ratably over the 15-year period beginning with the month in which such intangible was acquired.

In effect, XP has inflated its annual tax deductible goodwill by 200%.

For comparison purposes, we've taken the goodwill from business combinations XP discloses in its balance sheet footnotes and calculated the difference between XP's amortization schedule and that which is required by IRC Section 197:

---

[54] 26 U.S. Code 197  https://bit.ly/2HSTyar

22

| | 2017 | 2018 |
|---|---|---|
| Goodwill on business combinations | 116,782 | 59,993 |
| | | |
| Yearly amortization schedule | | |
| 5 Years (XP's treatment) | 23,356 | 11,999 |
| 15 Years (IRC Section 197) | 7,785 | 4,000 |
| | | |
| Difference | 15,571 | 7,999 |

Had XP amortized in accordance with the rules, it would have incurred an additional R$15.5 million tax liability in 2017 and an additional R$7.9 million tax liability in 2018. These additional liabilities amount to 10.1% of XP's income tax expense in 2017 and 4.5% of income tax expense in 2018. If not offset by loss carry forwards or other items, these additional liabilities would have reduced XP's net income by 3.6% in 2017 and 1.6% in 2018.

The determination of whether an error will result in a restatement, according to auditors,[55] hinges on materiality. The rule of thumb, as auditors understand it, is that companies should restate if the error is 5%-10% of pre-tax income. In this case, XP's aggressive amortization amounts to 2.69% of pre-tax income in 2017 and 1.2% in 2018.

We don't expect XP to willingly restate. However, we do expect XP to begin following the tax law it's currently flouting. Even if the impact isn't material, it's cause for concern regarding the accuracy of XP's financial reporting. It's also not the only goodwill issue of concern to investors.

## Suspicious XP Acquisition Linked to the Target of a Swiss Money Laundering Probe

***XP acquired a company for 10x its market value from a firm headed by a businessman accused of helping wealthy Brazilians evade taxes and funnel money to undeclared overseas bank accounts.***

---

[55] EY Financial Restatements: Understanding Differences  https://go.ey.com/2w4C3Bk

Ninety-percent of the price XP paid for an asset manager in 2018 is goodwill. Goodwill represents the money paid for an acquisition above its market value and can signal overpayment.[56] The rationale for the deal included synergies, a word XP misspelled in its IPO prospectus:

**Acquisition of XP Vista**

On January 5, 2018, the Group acquired 99.60% of shares of XP Vista Asset Management Ltda. ("XP Vista"), an asset management entity, through the acquisition of its controlling shareholder Marathon Investimentos e Participações S.A for a consideration of R$ 10,938, mostly comprised of cash in the amount of R$ 525. Goodwill in the amount of R$ 9,799, attributable to sinergies expected from the combined operations within the Group. Marathon was subsequently incorporated by the Group.

The premium paid for Vista far exceeds those of prior acquisitions. Goodwill accounted for 70% of the Rico brokerage acquisition a year earlier. In the U.S., the average M&A premium was 26% in the financial industry and 36% in the technology space in 2018.[57] The nearly 10x premium XP paid for Vista isn't even likely to move the needle as Vista accounts for just 0.7% of XP's revenue.

Instead of focusing on the premium XP paid, we thought our time might be better spent investigating the firm receiving the premium.

Roberto Santos Telles Rudge, a partner at Marathon Investimentos e Participações S.A,., sold a 99.6% stake in Vista to XP for R$10.9 million. Upon closing, Marathon Investments was incorporated by XP.

Rudge is also a founder of GPS Financial Planning[58], a Brazilian wealth management firm in which Julius Baer, a Swiss private bank, owns an 80% stake. In 2013, five years prior to selling Vista to XP, Brazil's Federal Police launched an investigation of Rudge and his GPS partners.[59] The investigation centered around whether Julius Baer had purchased GPS to illegally funnel money from Brazil to Switzerland.[60]

On July 10, 2013, an anonymous letter was sent to the Federal Police alleging criminal activity, including money laundering and tax evasion. The letter was accompanied by documents suggesting the existence of undeclared overseas bank accounts to which GPS funneled money. The letter prompted the Federal Police to launch an investigation on the following grounds[61] which we have translated from federal court records:

> *"This is an anonymous letter forwarding documents that report the practice of 'money laundering' by São Paulo businessmen. Documents report that the founding partners of the company GPS Planejamento Financeiro SA, in addition to money laundering*

---

[56] Too Much Goodwill: A Red Flag for Your Portfolio  https://bit.ly/2wKQoTP
[57] Statista  https://bit.ly/37VOnB7
[58] CNPJ Registration Service  https://bit.ly/2VkFPBj
[59] Brazil: Federal Regional Court, 3rd Region, Procedural File #34388/2015   https://bit.ly/2wMLaqF
[60] Veja: Federal Police Investigate Swiss Luxury Bank Company  https://bit.ly/2vkB7bX
[61] Brazil: Federal Regional Court, 3rd Region, Procedural File #34388/2015   https://bit.ly/2wMLaqF

24

> *operations, would be facilitating the evasion of foreign currency from Brazilian customers through the Swiss bank JULIUS BAER."*

In summarizing law enforcement's investigation, federal court records include the following with regard to Rudge:

> *"...the partners of the company GPS: José Eduardo Nepomuceno Martins, Marco Antonio Belda de Dios Fernandes and Roberto Santos Telles Rudge would have 'undeclared' bank accounts abroad, at HSBC Republic bank Monaco SA."*

The court transcript states the documents law enforcement received were rich in detail:

> *"Among the attachments, it is possible to check the copy of payment of life insurance abroad, by means of a foreign credit card in the name of the defendants; copy of proof of payment of travel by means of a foreign credit card on behalf of the accused; copies of bank account statements abroad in the name of the accused, as well as other documents."*

In February 2015, Rudge and his partners asked a federal judge to grant an injunction that would stop the Federal Police from investigating further, in part, because they claim the evidence against them was obtained by unlawful means:

> *"...the statements contained in the anonymous letter are based on information and documents protected by banking and fiscal secrecy, which could only have been obtained through theft or violation of correspondence."*

The judge granted the injunction, which suspended the police investigation, based on the aforementioned argument and procedural grounds. In Brazil, a police investigation cannot be initiated on the basis of an anonymous complaint without a prior investigation of the facts.

Investors in XP should take no comfort in the investigation being halted. The Federal Police suggested their query was in its infancy. While Rudge's attorney argued the investigation was unfounded, note that the veracity of the evidence wasn't questioned. It was the means by which it was obtained (stolen) that was at issue.

To be clear, the allegations against Rudge are not related to XP's purchase of XP Vista from Rudge and Marathon Investments. No one to our knowledge has accused Rudge, XP, or Marathon Investments of any wrongdoing associated with the Vista transaction.

However, it's only because XP paid Rudge approximately 10x the market value of Vista that we began looking into Rudge's background. We also uncovered evidence that XP is no stranger to allegations involving money laundering.

In 2015, Brazil's markets supervisor (BSM) absolved Benchimol (CEO) and XP in a case that, among other things, alleged XP lacked the controls necessary to prevent money laundering.[62] The case against Benchimol and XP was closed a month after a judge ordered police to stop investigating Rudge.

## Income Statement Understates Initial Cost of Advisor Payments

***XP pays financial advisors "incentives" to use its platform and capitalizes those expenses, thus increasing annual reported net income.***

A key part of XP's strategy to grow CCTVM is to attract new retail clients and inflows by locking down Brazil's independent financial advisors (IFAs), who onboard their clients to XP's platforms. In Brazil, exclusivity is required, meaning IFAs can't use competing financial services platforms once they've selected a custodian or platform. Thus, XP sees building out its network of IFAs as a land grab and is moving quickly.

As of September 30, 2019 XP claims it has 5,900 IFAs in its network. Research[63] indicates there were just 9,300 IFAs in Brazil in 2019, meaning XP has 63.4% of the market. How has XP cornered nearly two thirds of the market in just a few years?

XP credits its "incentive campaign" or the cash advances[64] on compensation it offers to lure IFAs to the company's platform. Specifically, XP "establishes the payment of a financial incentive" for each new account an IFA activates.

The payments XP makes to IFAs are significant. In 2018, it paid R$22,125, or approximately 4.7% of net income for the year. XP paid even more the prior year, though we can't determine exactly how much, as the incentives in the IPO prospectus are not consistent with CCTVM's audit.

The CCTVM audit claims R$30,541 million in incentives were paid in 2017, yet XP's IPO prospectus records R$33,903 million.

Here's the IPO prospectus:

---

[62] BSM Administration Process No. 50/2012  https://bit.ly/3abb7yL
[63] The Braziian Investment Landscape https://owy.mn/2OyckHL
[64] XP IPO Prospectus 12/10/2019 p. F-78 https://bit.ly/2H1jT5M

**13. Prepaid expenses**

| | 2018 | 2017 |
|---|---|---|
| Incentives for business acceleration program (a) | 22,125 | 33,903 |
| Marketing expenses | 41,276 | 6,105 |
| Commissions and premiums paid in advance | 21,431 | 16,273 |
| Services paid in advance | 5,180 | 4,928 |
| Other expenses paid in advance | 6,711 | 4,134 |
| **Total** | **96,723** | **65,343** |
| Current | 56,302 | 29,280 |
| Non-current | 40,421 | 36,063 |

**(a) Business Acceleration Program ("PAN")**

Starting in the first half of 2014, the subsidiary XP CCTVM implemented an incentive campaign to attract new customers called Business Acceleration Program ("PAN") through its network of IFAs, offering an advance on compensation with the main objective of increasing client acquisition and net inflows and consequently the increase in revenue that will be generated over time by such investments. This campaign establishes the payment of a financial incentive to activate new accounts. These amounts are characterized as part of the compensation for the IFAs and, therefore, are classified as prepaid expenses and, according to a technical study, are being appropriated to the income statement, linearly, over four years.

F-78

And here's the CCTVM audit:

## 11.   Other amounts and assets

Prepaid expenses are broken down as follows:

| | 2018 | 2017 |
|---|---|---|
| Wolwacz & Ruschel Ltda. | 1,321 | 2,009 |
| Pan - Business Acceleration Program | 22,124 | 30,541 |
| Expenses paid in advance (a) | 49,410 | 19,606 |
| **Total** | **72,855** | **52,156** |

(a) Mainly includes prepaid expenses relating to the marketing campaign.

It's a R$3.4 million discrepancy XP is obligated to explain.

However, these figures understate the true upfront cost of the incentive program on XP's income statement. XP classifies these payments as prepaid expenses. Rather than immediately expensing IFA payments, XP capitalizes them over four years. While this is an acceptable accounting treatment, amortizing IFA advances allows XP to report higher annual net income figures than it otherwise might.

# IFA Incentives Don't Guarantee Exclusivity

***IFAs receiving incentive payments may soon be allowed to work for XP's competitors.***

Investors are likely not aware of the risk in XP's IFA payments. XP's core asset, CCTVM, is highly dependent on its IFA network. The IFAs, according to XP, are responsible for serving nearly a third of CCTVM's active clients. The twenty largest IFA entities serve nearly 10% of

CCTVM's active clients. The defection of a significant IFA or IFA entity would have a material impact on XP's results.

But it's not just concentration risk of which investors should be aware.

If amendments currently under consideration by Brazil's SEC (CVM) are adopted, IFAs may no longer be required to be exclusive to a single financial services platform. Terminating what's known as the exclusivity clause could allow IFAs to work with XP's competitors. While we can assume XP would try to claw back incentive payments should an IFA leave for a competitor, this magnifies the risk in XP's strategy of purchasing growth through IFAs.

Two other notable risks include:

**Competitive Risk**
The competition for IFAs among Brazil's financial institutions is intensifying. The incentives XP offers may rise significantly which may further pressure margins. There's also risk in that the IFAs own the relationship they have with retail clients, not XP. The company acknowledges that losing an IFA may also result in the loss of retail clients. Likewise, if XP is forced to cut fees similar to its U.S. peers, as it recently did at its brokerage Clear Correctora, IFA incentives may not generate the returns XP currently expects.

**Legal Risk**
IFAs are considered independent contractors. If XP were required to classify IFAs as employees, by legal or legislative action, the company would incur significant additional expenses, including potentially retroactively paying IFAs for years of service. XP has successfully challenged a number of legal proceedings claiming IFAs should be treated as employees.

## Broker Allegedly Fired for Violating Rules Became XP's U.S. Chief Compliance Officer

***Itaú Unibanco S.A. allegedly fired the broker who would become Chief Compliance Officer for XP's U.S. Subsidiary.***

It appears Itaú takes Brazil's IFA exclusivity requirement seriously. Remember, IFAs can't use competing financial services platforms once they've selected and aligned with a custodian or platform. Court records[65] from the Curley lawsuit suggest Itaú terminated an employee when the bank learned the employee had also registered with a second broker-dealer.

---

[65] Curley vs. XP Investimentos Et al.  https://bit.ly/39T1LYf

*"Although Curley was unaware at the time, upon information and belief, Cantreva actually had been fired from Itaú because he had registered with another broker-dealer in January, 2010, Murex Capital, LLC, while simultaneously employed by Itaú."*

Adriano Cantreva is the person to which Curley is referring. This is of interest to investors because after allegedly being fired for violating Brazil's exclusivity requirement, court records indicate XP hired Cantreva to be its Chief Compliance Officer at its U.S. broker-dealer. Later, it appears as if XP even promoted Cantreva as he indicates on the XP Securities, LLC's 2012 annual report he is the CEO:

### AFFIRMATION

I, Adriano Cantreva, affirm that, to the best of my knowledge and belief, the accompanying financial statements for the year ended December 31, 2012 and supplemental schedules pertaining to XP Securities, LLC as of December 31, 2012 are true and correct.  I further affirm that neither the Corporation nor any officer has any proprietary interest in any account classified solely as that of a customer.

Signature _____   Date  2/25/13

Title  CEO

It was in 2012, while Cantreva was at the helm of XP Securities, LLC, that our investigation first revealed that auditors identified material weaknesses in the internal controls for XP's financial reporting. If Curley's account of Cantreva's firing is accurate, hiring Cantreva to head up a key overseas subsidiary is an indictment on XP's judgement and diligence.

Interestingly, Cantreva's LinkedIn profile[66] states he did work for Itaú in the Middle East as Curley states in court records:

---

[66] Adriano Cantreva LinkedIn Profile  https://bit.ly/2STsEFI



Yet Cantreva's FINRA broker registration history[67] makes no mention of his time at Itaú, a time he'd likely prefer anyone checking his background not know about if he were fired. It does however record Cantreva's stint at Murex, the broker-dealer Curley alleges Cantreva wrongly registered with while simultaneously working for Itaú:

---

[67] Adriano Cantreva FINRA Broker Check  https://bit.ly/32kraHH



If Cantreva was fired from Itaú for violating the rules, it's telling that XP would hire him to head up its U.S. broker dealer, especially when you consider the importance Benchimol and Maisonnave placed on establishing business with institutional investors in the U.S.

If XP was unaware Cantreva was allegedly fired from Itaú for breaking the rules, it means the company's due diligence in hiring for key positions is suspect.

## R$100 Million in Systems Failure Costs Not Disclosed

***Systems failures and order execution errors are significant recurring costs and are not being disclosed in XP's IPO prospectus.***

XP is not disclosing expenses related to systems failures and order execution errors in its IPO prospectus. Included here are errors made by XP employees that have resulted in the payment of tens of millions of reais. We also believe XP is being less than forthcoming in its disclosures regarding these expenses.

While XP warns investors that an increase in volume or other errors could cause its systems to malfunction, it says it has never experienced a significant failure of its trading systems.[68] This doesn't appear to be wholly accurate as we've discovered, for example, order execution errors equal to 7.8% of net income in 2018.

In CCTVM's 2018 audit, XP reports more than R$36.7 million in what it calls "operating errors". In a footnote,[69] the company explains that these are largely payments made to customers due to order execution errors for system failures or human error:

### 20.    Other operating expenses

| | | 2018 | 2017 |
|---|---|---|---|
| | **2nd semester** | **Fiscal year** | **Fiscal year** |
| Operating errors (a) | (17,813) | (36,768) | (28,123) |
| Fines | (6,865) | (7,091) | (2,323) |
| Negative exchange variations | (6) | (272) | (388) |
| Others (b) | (11,681) | (20,249) | (11,864) |
| **Total** | **(36,365)** | **(64,380)** | **(42,698)** |

(a) Operating errors are the result of indemnities paid to customers by XP CCTVM, mostly derived from errors in execution of orders for failures of the system or of people.

(b) Mainly comprised by provision and update of contingencies.

The operating errors are significant when measured as percentage of XP's net income. In 2016, operating errors were equivalent to 8.1% of net income. In 2017, operating errors amounted to 6.6% of net income. In 2018, operating errors are equal to 7.8% of net income. The operating errors used to calculate these figures were taken from CCTVM audits and divided by the annual net income reported in XP's IPO prospectus.

However, the  "Other operating expenses" section in XP's IPO prospectus makes no mention of order execution errors, system failures, or human error:

---

[68] XP Prospectus 12/10/2019 p. 29  https://bit.ly/38h7WVm
[69] XP CCTVM 2018 Audit p. 35  https://bit.ly/2Ozpe8r

**29. Other operating expenses, net**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| **Other operating income** | **20,682** | **23,764** | **5,594** |
| Recovery of charges and expenses | 6,873 | 3,165 | 3,436 |
| Reserval of operating provisions | 2,641 | 2,684 | 1,116 |
| Revenue from incentives from Tesouro Direto | 9,931 | 4,226 | — |
| Other | 1,237 | 13,689 | 1,042 |
| **Other operating expenses** | **(51,971)** | **(31,468)** | **(12,060)** |
| Legal proceedings and agreement with customers (a) | (16,385) | (18,370) | (388) |
| Tax incentive expenses | (2,015) | (2,980) | (2,638) |
| Losses on write-off and disposal of assets | (11,064) | (1,503) | (1,355) |
| Fines and penalties | (7,446) | (2,755) | (718) |
| Associations and regulatory fees | (3,059) | (2,073) | (634) |
| Charity | (5,938) | (50) | (59) |
| Other | (6,064) | (3,737) | (6,268) |
| **Total** | **(31,289)** | **(7,704)** | **(6,466)** |

(a)   Mainly related to reimbursements to customers due losses they had from their relationship with a former IFA associated to the subsidiary XP CCTVM. A part of these reimbursements has been charged back to IFA's office, included in Other financial assets, under Receivables from IFAs (Note 11).

We wondered if the lack of disclosure in the prospectus might be because the operating errors had been fixed and no longer an issue in 2019. But an examination of CCTVM's audit from the first half of 2019[70] indicates the failures persist:

## 20.   Outras despesas operacionais

| | 2019 | 2018 |
|---|---|---|
| Erros operacionais [a] | (10.971) | (18.955) |
| Multas | (487) | (226) |
| Variações cambiais passivas | (7.023) | (266) |
| Patrocínios | (5.065) | - |
| Outras [b] | (7.161) | (8.568) |
| **Total** | **(30.707)** | **(28.015)** |

[a] Erros operacionais são resultantes de indenizações pagas a clientes pela XP CCTVM na sua maioria derivada de erros na execução de ordens por falhas de sistema ou pessoas.

[b] Composto principalmente por doações a entidades civis.

From 2016 through the first half of 2019, CCTVM's audits report operating errors of more than R$95.8 million. In the years 2016-2018, operating errors were the equivalent of more than 5.2% of net income. This is significant in our view and should be disclosed in XP's prospectus just as it is in CCTVM's audits.

Brazil's Securities and Exchange Commissions (CVM) has taken notice of XP's systems issues. The CVM has accused XP and CEO Benchimol of failing to implement appropriate internal systems controls in connection with securities transactions.[71]

---

[70] XP CCTVM 2019 Audit  https://bit.ly/3838hv2
[71] CNF  https://bit.ly/2Psdplb

## Downside Risk for XP's Shares

***Even based on the questionable financials XP provides, our models conservatively suggest downside risk of 53%-to-$64%[72] and a USD per share value of $14.41- $18.63.***

We end where we began, arguing that XP doesn't deserve to be compared to Charles Schwab just because it's copying Schwab's marketing. With a P/E multiple of 100X, investors are ignoring the risks we've outlined. While the accounting discrepancies we've discovered may simply be the result of ineptitude, a company forced to restate a portion of its financial statements (EPS) in the lead up to its IPO doesn't inspire confidence.

We are using the financial statements provided by XP as the basis for our valuation. While we have serious concerns regarding the accuracy of XP's financial reporting, valuing XP based on the numbers it has provided only serves to strengthen our case. We aim to be generous and conservative in our valuation so as to provide investors with a margin of safety. Even if we have reason not to trust XP's financial statements, the stock is still significantly overvalued based on suspect financials.

Embedded in XP's stock price are lofty expectations. At more than $40 USD per share at the time of this writing, investors expect XP to grow revenue 55% every year through 2030. To justify today's stock price, XP must also achieve a net operating profit after tax (NOPAT) margin of 15%, which is 3x what we calculate its current NOPAT margin:

*FCF Model*

| Year | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Rev | 1,102 | 1,708 | 2,648 | 4,104 | 6,361 | 9,860 | 15,282 | 23,688 | 36,716 | 56,910 | 88,210 | 136,726 | 211,925 | 328,483 | 509,149 |
| NOPAT | 165 | 256 | 397 | 616 | 954 | 1,479 | 2,292 | 3,553 | 5,507 | 8,536 | 13,232 | 20,509 | 31,789 | 49,273 | 76,372 |
| IC | 2,204 | 3,416 | 5,295 | 8,208 | 12,722 | 19,719 | 30,565 | 47,375 | 73,432 | 113,819 | 176,420 | 273,451 | 423,849 | 656,967 | 1,018,298 |
| Change in IC | | 1,212 | 1,879 | 2,912 | 4,514 | 6,997 | 10,846 | 16,811 | 26,056 | 40,388 | 62,601 | 97,031 | 150,398 | 233,117 | 361,332 |
| FCF | | (956) | (1,482) | (2,297) | (3,560) | (5,518) | (8,553) | (13,257) | (20,549) | (31,851) | (49,369) | (76,522) | (118,609) | (183,845) | (284,959) |
| | | | | | | | | | | | | | | | |
| PV FCF | | (769) | (1,486) | (2,066) | (2,872) | (3,992) | (5,550) | (7,715) | (10,724) | (14,908) | (20,725) | (28,810) | (40,050) | (55,675) | |
| Cumlative PV of Cash Flows | | (769) | (1,838) | (3,324) | (5,390) | (8,262) | (12,254) | (17,803) | (25,518) | (36,243) | (51,151) | (71,876) | (100,686) | (140,736) | (196,411) |
| | | | | | | | | | | | | | | | |
| TV | | 3,453 | 5,353 | 8,297 | 12,860 | 19,934 | 30,897 | 47,890 | 74,230 | 115,057 | 178,338 | 276,424 | 428,457 | 664,108 | 1,029,367 |
| PV of TV | | 2,778 | 3,862 | 5,368 | 7,462 | 10,374 | 14,421 | 20,047 | 27,868 | 38,740 | 53,854 | 74,865 | 104,072 | 144,674 | 201,116 |
| | | | | | | | | | | | | | | | |
| Corporate Value | | 2,009 | 2,024 | 2,044 | 2,073 | 2,112 | 2,167 | 2,244 | 2,350 | 2,498 | 2,703 | 2,989 | 3,386 | 3,938 | 4,705 |
| Total Debt | | 152 | 152 | 152 | 152 | 152 | 152 | 152 | 152 | 152 | 152 | 152 | 152 | 152 | 152 |
| Shareholder Value | | 2,161 | 2,176 | 2,196 | 2,225 | 2,264 | 2,319 | 2,396 | 2,502 | 2,650 | 2,855 | 3,141 | 3,538 | 4,090 | 4,857 |
| Shares Outstanding | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 |
| Value Per Share | | $29.80 | $30.01 | $30.29 | $30.68 | $31.23 | $31.99 | $33.04 | $34.51 | $36.55 | $39.38 | $43.32 | $48.80 | $56.41 | $67.00 |

| Drivers | |
|---|---|
| Rev growth | 55% |
| NOPAT Mrgn | 15% |
| Capital Turns | 0.5 |
| WACC | 11.50% |
| IC Previous Year | 3,860 |
| Rev Previous Year | 711 |

---

[72] Based on a $40.00+ USD price per share as of this writing

Separately, if we assume revenue growth slows to 30% by the end of the decade, and we reduce XP's cost of capital to 9.5%, a second DCF model (based on 10 years of discounted cash flows) results in a per share intrinsic value of $18.63 USD:

| Perpetuity approach | 5 Year | | Fair value per share | 5 Year |
|---|---|---|---|---|
| Unlevered FCF in last forecast period (t) | 40 | | | |
| $FCF^{t+1}$ | 40 | | Enterprise value | 640 |
| Long term growth rate (g) | 2.00% | | Less: Net debt | 152 |
| Terminal value | 537 | | Less: Trapped cash | |
| Present value of terminal value | 537 | | **Equity value** | **488** |
| Present value of stage 1 cash flows | 102 | | Diluted shares | 73 |
| **Enterprise value** | **640** | | Equity value per share | $6.73 |

| Perpetuity approach | 10 Year | | Fair value per share | 10 Year |
|---|---|---|---|---|
| Unlevered FCF in last forecast period (t) | 163 | | Enterprise value | 1,503 |
| $FCF^{t+1}$ | 167 | | Less: Net debt | 152 |
| Long term growth rate (g) | 2.00% | | Less: Trapped cash | |
| Terminal value | 2,220 | | **Equity value** | **1,351** |
| Present value of terminal value | 896 | | Diluted shares | 73 |
| Present value of stage 1 cash flows | 607 | | **Equity value per share** | **$18.63** |
| **Enterprise value** | **1,503** | | *Market prem/disc to FV* | *114.95%* |

If we maintain the same WACC as in the prior model (11.5%), we get a per share intrinsic value of $14.41 USD, or approximately 66% below the current share price. We're being extremely conservative as XP uses a WACC of 13.57% to discount future cash flows in its own goodwill impairment tests.

To price the stock relative to peers or the overall market, let's assume XP approximately doubles its 2020 EPS to $0.88 USD Pro forma per share (We don't have XP's full year 2019 EPS as of this writing). If XP trades between $14-$18USD per share, this range gives XP a P/E multiple between 15.9-and-20.4, a range in which the majority of U.S. peers trade.

This range is consistent with the multiple Itaú Unibanco S.A., which acquired a 49.9% stake in XP in August 2018, suggests is appropriate. While regulators may not allow it,[73] Itaú's initial investment includes provisions that allow the bank to ultimately take a controlling stake in XP based on a multiple of 19 times XP's earnings.[74]

If you believe XP deserves a premium due to its first mover advantage and the infancy of the Brazilian market, a per share price of $25 gives you a 28.4 P/E multiple. This is still 37% below the current stock price. We don't believe XP deserves to trade at a premium.

---

[73] Itau Barred From Taking Over XP Until 2026   https://bit.ly/2SNbsS6
[74] Itau MD*A 2018 3Q  p51 https://bit.ly/32gMZYx

We admire XP's mission and its disruption of traditional, dominant financial institutions that house the majority of investor capital in Brazil. Educating new classes of investors and democratizing access to a wider range of financial services and products is noble. We wish XP success and hope one day to be shareholders.

But not until XP reconciles its financial statements with its internal audits, remediates its material weaknesses, and satisfactorily explains why it made an acquisition with links to a Swiss bank money laundering probe at 10x the market value of the acquisition's assets.

The lockup preventing insiders from selling shares expires June 8, 2020.

***Even without penalizing XP for the accounting discrepancies we've raised, our models suggest downside risk of at least 53%-to-64% and a USD per share value of $14.41-$18.63.***

March 2019
Nick Winkler | Principal
The Winkler Group
Use of our reports is limited by the Terms of Use at the end of this report and on our website

## Terms of Use

The reports on this website have been prepared by Nick Winkler Inc. (DBA: The Winkler Group) Each report is for informational purposes only. Each report specifies the publisher and owner of that report. Under no circumstances should any of these reports or any information herein be construed as investment advice, or as an offer to sell or the solicitation of an offer to buy any securities or other financial instruments.

Nick Winkler Inc. is an online publisher that produces investigative financial research reports on publicly traded securities. Nick Winkler Inc. is not an investment adviser registered with the U.S. Securities and Exchange Commission. Nick Winkler Inc. does not hold or trade in any of the securities mentioned in the research reports produced though you should assume Nick Winkler Inc.'s Related Persons do.

By downloading from, or viewing material on this website, you agree to the following Terms of Use. You agree that use of the research on this website is at your own risk. You (or any person you are acting as agent for) agree to hold harmless Nick Winkler Inc. and related parties, including, but not limited to any principals, officers, directors, employees, subscribers, clients, consultants and agents (collectively, the "Nick Winkler Inc. Related Persons") for any direct or indirect losses (including trading losses) attributable to any information on this website or in a research report. You further agree to do your own research and due diligence before making any investment decision with respect to securities of the issuers covered herein (each, a "Covered Issuer") or any other financial instruments that reference the Covered Issuer or any securities issued by the Covered Issuer.

You should assume that, as of the publication date of a Nick Winkler Inc. report, Nick Winkler Inc. Related Persons (possibly along with or through its members, partners, affiliates, employees, and/or consultants) have a position (long or short) in one or more of the securities of a Covered Issuer (and/or options, swaps, and other derivatives related to one or more of these securities), and therefore stand to realize significant gains in the event that the prices of either equity or debt securities of a Covered Issuer decline or appreciate. Nick Winkler Inc. Related Persons intend to continue transacting in the securities of Covered Issuers for an indefinite period after an initial report on a Covered Person, and such person may be long, short, or neutral at any time hereafter regardless of their initial position and views as stated in the research report published by Nick Winkler Inc. Nick Winkler Inc. may or may not update any report or information on its website to reflect changes in positions that may be held by a Nick Winkler Inc. Related Person.

This is not an offer to sell or a solicitation of an offer to buy any security. Neither Nick Winkler Inc. nor its Related Person are offering, selling or buying any security to or from any person through this website or reports on this website.

The research and reports presented on this website express the opinion of Nick Winkler Inc. only. Reports are based on generally available information, field research, inferences and deductions through due diligence and investigatory processes. To the best of Nick Winkler Inc.'s ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources that Nick Winkler Inc. believes to be accurate and reliable, and who are not insiders or connected persons of the Covered Issuers or who may otherwise owe a fiduciary duty, duty of confidentiality or any other duty to the Covered Issuer (directly or indirectly). However, such information is presented "as is," without warranty of any kind, whether express or implied. Nick Winkler Inc. makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. Further, our reports contain large amounts of analysis and opinion. All expressions of opinion are subject to change without notice, and neither Nick Winkler Inc. nor its Related Persons undertakes to update or supplement any reports or any of the information, analysis and opinion contained in them.

In no event shall Nick Winkler Inc. be liable for any claims, losses, costs or damages of any kind, including direct, indirect, punitive, exemplary, incidental, special or, consequential damages, arising out of or in any way connected with any information on this website. This limitation of liability applies regardless of any negligence or gross negligence of Nick Winkler Inc. or any Nick Winkler Inc. Related Persons. You accept all risks in relying on the information on this website.

You agree that the information in any Nick Winkler Inc. report is copyrighted, and you therefore agree not to distribute this information in any manner without the express prior written consent of Nick Winkler Inc. If you have obtained Nick Winkler Inc. research in any manner other than as provided by Nick Winkler Inc., you may not read such research without agreeing to these Terms of Use. You further agree that any dispute between you and Nick Winkler Inc. and their affiliates arising from or related to this report or viewing the material presented herein shall be governed by the laws of the State of Illinois, without regard to any conflict of law provisions. The failure of Nick Winkler Inc. to exercise or enforce any right or provision of these Terms of Use shall not constitute a waiver of this right or provision. You agree that each Nick Winkler Inc. Related Person is a third-party beneficiary to these Terms of Use. If any provision of these Terms of Use is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of these Terms of Use remain in full force and effect, in particular as to this governing law and jurisdiction provision. You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to Nick Winkler Inc. reports or related material must be filed within one (1) year after the occurrence of the alleged harm that gave rise to such claim or cause of action, or such claim or cause of action is forever barred.