UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                      :
                                        :

IN RE: XP INC. SECURITIES LITIGATION  :    **MEMORANDUM DECISION**

                                        :    **AND ORDER**

This Document Relates to:              :
All Actions                            :    Master File: 20-cv-1502 (BMC)
                                        :
                                        :
--------------------------------------------------------- X

**COGAN**, District Judge.

This securities action stems from the initial public offering for XP Inc. ("XP"), a Brazilian financial services company.  Plaintiffs have sued XP, several of its officers, and the underwriters of the IPO, asserting claims under the Securities Act of 1933.  Defendants have moved to dismiss the Consolidated Amended Complaint.  Because plaintiffs have failed to allege an actionable misstatement or omission, the motion to dismiss is granted.

## BACKGROUND

XP bills itself as "a technology-driven financial services platform and a trusted provider of low-fee financial products and services" – the so-called "Charles Schwab of Brazil."  It controls several related entities.  By all accounts, the "core" entity is XP's broker-dealer business, XP Investimentos Corretora de Câmbio, Títulos e Valores Mobiliários S.A., or "XP CCTVM."  That business depends on a network of "independent financial advisors," or "IFAs," who interact with customers, receive and register orders, and provide information on XP's various products and services.

After continued growth in Brazil, XP decided to conduct an initial public offering of Class A common shares on the Nasdaq stock exchange.  The initial offering price was $27 per share.  XP filed its final amended registration statement with the Securities and Exchange

Commission on December 9, 2019.  XP filed its final prospectus with the SEC on December 11, and the IPO closed on December 13.  Raising over $1.1 billion in proceeds, it was the fourth-largest IPO of the year.

All seemed to be going well until an entity called the "Winkler Group" released a report on XP's finances.  Plaintiffs cast this entity as an "investigative and financial reporting firm," although the report reveals that the Winkler Group was also a short seller.  In any event, the so-called "Winkler Report" claimed to "raise[] questions regarding the accuracy of XP's financial statements following the discovery of accounting irregularities, inadequate financial disclosures, and discrepancies between the company's IPO prospectus and internal audits."

Three problems are relevant here.  First, the report claimed that XP's consolidated financial statements failed to disclose that XP CCTVM had suffered R$100 million[1] worth of "systems failures and order execution errors" – *i.e.*, technological or human errors that required XP to indemnify customers.  Second, XP failed to disclose that it had become embroiled in an increasing number of legal proceedings in Brazil.  Third, XP did not disclose that it was the target of several Brazilian regulatory investigations.  Although XP vigorously denied these allegations, the damage was done.  By March 18, 2020, its stock price had fallen to $15.50 per share – more than 42 percent below the initial offering price.  This suit followed.

In the Consolidated Amended Complaint, plaintiffs assert claims under sections 11, 12(a)(2), and 15 of the Securities Act.  The complaint echoes the Winkler Report, alleging that XP's registration statement made several material misstatements and omissions.  Defendants have moved to dismiss the complaint in its entirety.  They contend that plaintiffs have failed to state a claim.

---

[1] Many of the relevant documents report figures in Brazilian reais (R$) rather than U.S. dollars.

**DISCUSSION**

I.     **Legal Framework**

When publicly filed documents in a registered security offering contain material

misstatements or omissions, certain participants are liable under sections 11, 12(a)(2), and 15 of

the Securities Act.  See 15 U.S.C. §§ 77k; 77*l* (a)(2); 77*o*.  Sections 11 and 12(a)(2) provide for

"primary liability," while Section 15 extends that liability to "individuals or entities that control

any person liable under section 11 or 12."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d

347, 358 (2d Cir. 2010) (*colatus*).  Because control liability often depends on primary liability,

id., all here agree that plaintiffs' claims under section 15 rise and fall with the success of their

claims under sections 11 and 12(a)(2).

Section 11 "imposes strict liability on issuers and signatories, and negligence liability on

underwriters, for material misstatements or omissions in a registration statement."  Fed. Hous.

Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 99 (2d Cir.

2017) (quotation omitted).  To state a claim, a plaintiff must allege that "(1) she purchased a

registered security, either directly from the issuer or in the aftermarket following the offering;

(2) the defendant participated in the offering in a manner sufficient to give rise to liability under

section 11; and (3) the registration statement contained an untrue statement of a material fact or

omitted to state a material fact required to be stated therein or necessary to make the statements

therein not misleading."  In re Morgan Stanley Info. Fund, 592 F.3d at 358–59 (quotation

omitted).

Section 12(a)(2) is "closely related."  Nomura Holding, 873 F.3d at 99.  It provides a

cause of action "where the securities at issue were sold using prospectuses or oral

communications that contain material misstatements or omissions."  In re Morgan Stanley Info.

Fund, 592 F.3d at 359.  To state a claim, a plaintiff must allege that "(1) [he or she] was offered

3

or purchased a security by means of a prospectus or oral communication; (2) from a statutory

seller; (3) when the prospectus or oral communication includes an untrue statement of a material

fact or omits to state a material fact necessary in order to make the statements, in the light of the

circumstances under which they were made, not misleading; and (4) the plaintiff did not know of

such untruth or omission at the time of sale."  Nomura Holding, 873 F.3d at 98 (*colatus*).

"Scienter, reliance, and loss causation are not *prima facie* elements of a Section 12(a)(2) claim."

Id.

In this case, the claims under sections 11 and 12(a)(2) rest on three categories of

allegations.  Specifically, plaintiffs allege (1) that XP did not disclose that XP CCTVM had

suffered R$100 million worth of "systems failures and order execution errors"; (2) that XP did

not disclose the increasing number of legal proceedings it faced in Brazil; (3) that XP did not

disclose several pending regulatory investigations in Brazil; and (4) that XP violated Item 303 of

SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) (2019), which requires a registrant in a

securities offering to "[d]escribe any known trends or uncertainties that have had or that [it]

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues

or income from continuing operations."

Defendants do not dispute that plaintiffs have adequately alleged several of these

elements.  Instead, the contested question is whether plaintiffs have alleged a material

misstatement or omission under sections 11 and 12(a)(2).  I address each claim in turn.[2]

---

[2] Although defendants also contend that plaintiffs lack standing to bring a claim under section 12(a)(2), I need not
reach this issue.  "To have standing under section 12(a)(2), . . . [a plaintiff] must have purchased securities directly
from the defendants."  Freidus v. Barclays Bank PLC, 734 F.3d 132, 141 (2d Cir. 2013) (quotation omitted).  This is
an issue of statutory standing, not Article III standing, so it "may be assumed for the purposes of deciding whether
the plaintiff otherwise has a viable cause of action."  See Coan v. Kaufman, 457 F.3d 250, 256 (2d Cir. 2006)
(addressing statutory standing under ERISA).  Because plaintiffs have otherwise failed to state a claim, I will
assume that they have statutory standing under Section 12(a)(2).

## II.      The Systems Failures and Operating Errors

For their first claim, plaintiffs allege that XP failed to disclose R$100 million worth of "systems failures and order execution errors" at XP CCTVM.  In large part, the claim rests on a discrepancy between XP CCTVM's regulatory filings in Brazil and XP's registration statement in the United States.  The Brazilian filings specified that XP CCTVM incurred these costs as a "result of indemnities paid to customers . . . derived from errors in the execution of orders or failures of the systems or of people."  The filings also compiled these costs in a single line item, labeled "Other operating errors."

The registration statement took a different approach.  It did not specifically explain that these costs resulted from "errors in the execution of orders or failures of the systems or of people"; instead, it stated that the costs were "[m]ainly related to reimbursements to customers due [to] losses they had from their relationship with a former IFA associated to the subsidiary XP CCTVM."  The registration statement also spread those costs over three line items, labeled "Operating costs – operating losses and provisions," "Operating costs – other costs," and "Other operating expenses – legal proceedings and agreements with customers."[3]

---

[3] The tables below reference "XP Investimentos S.A." rather than "XP Inc." This discrepancy stems from the corporate reorganization that occurred shortly before the IPO, when XP Inc. was incorporated to become the 100 percent holder of XP Investimentos, the principal non-operating holding company that owned and controlled the other XP entities.  The registration statement included the financial statements of XP Investimentos rather than the newly incorporated XP.  For clarity, I will continue to refer to "XP," since the parties have not indicated that the corporate reorganization bears on plaintiffs' claims.

XP Investimentos S.A. and its subsidiaries
Notes to unaudited interim condensed consolidated financial statements
As of September 30, 2019
*In thousands of Brazilian Reais, unless otherwise stated*



**17. Operating costs**

| | Nine months period ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| Commission costs | 877,502 | 489,491 |
| Operating losses and provisions | 14,825 | 6,791 |
| Other costs | 226,640 | 135,896 |
| Clearing house fees | 141,251 | 76,947 |
| Third parties' services | 60,562 | 38,130 |
| Other | 24,827 | 20,819 |
| **Total** | **1,118,967** | **632,178** |

**29. Other operating expenses, net**

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| **Other operating income** | **20,682** | **23,764** | **5,594** |
| Recovery of charges and expenses | 6,873 | 3,165 | 3,436 |
| Reserval of operating provisions | 2,641 | 2,684 | 1,116 |
| Revenue from incentives from Tesouro Direto | 9,931 | 4,226 | — |
| Other | 1,237 | 13,689 | 1,042 |
| **Other operating expenses** | **(51,971)** | **(31,468)** | **(12,060)** |
| Legal proceedings and agreement with customers (a) | (16,385) | (18,370) | (388) |
| Tax incentive expenses | (2,015) | (2,980) | (2,638) |
| Losses on write-off and disposal of assets | (11,064) | (1,503) | (1,355) |
| Fines and penalties | (7,446) | (2,755) | (718) |
| Associations and regulatory fees | (3,059) | (2,073) | (634) |
| Charity | (5,938) | (50) | (59) |
| Other | (6,064) | (3,737) | (6,268) |
| **Total** | **(31,289)** | **(7,704)** | **(6,466)** |

(a)   Mainly related to reimbursements to customers due losses they had from their relationship with a former IFA associated to the subsidiary XP CCTVM. A part of these reimbursements has been charged back to IFA's office, included in Other financial assets, under Receivables from IFAs (Note 11).

Plaintiffs maintain that this reporting "obfuscated" the "pervasive and recurring expenses" at XP's most important entity.  In their view, an adequate registration statement would have (1) compiled the costs into a single line item and (2) stated specifically that the costs stemmed from "systems failures and order execution errors."

But notably, plaintiffs do not claim that XP failed to disclose any particular costs.  Nor do plaintiffs argue that XP's accounting methods affected its bottom line.  The issue is not whether the disclosure occurred, but how – and for that, plaintiffs fail to explain why the Securities Act required XP to take the specific steps that they contend.

Plaintiffs rely primarily on the discrepancy between the Brazilian and American filings, but those documents followed different accounting standards.  XP CCTVM's filings followed

the Brazilian Central Bank's Generally Accepted Accounting Principles, while the registration statement adhered to the International Financial Reporting Standards ("IFRS").  Where there is no "plausible basis for believing that the discrepancies were due to anything other than different reporting standards," the mere allegation that a company's foreign filings differed from domestic filings does not adequately allege a misrepresentation.  In re China Valves Tech. Sec. Litig., 979 F. Supp. 2d 395, 410–11 (S.D.N.Y. 2013).[4]

Next, plaintiffs argue that the IFRS required XP to aggregate these expenses and to adopt plaintiffs' preferred description.  The IFRS include the International Accounting Standards ("IAS"), and plaintiffs rely on two related standards.  The first, IAS 1, "sets out overall requirements for the presentation of financial statements, guidelines for their structure and minimum requirements for their content."  To that end, it provides that "[w]hen items of income or expense are material, an entity shall disclose their nature and amount separately." Additionally, "[a]n entity shall not reduce the understandability of its financial statements by obscuring material information with immaterial information or by aggregating material items that have different natures or functions."  Plaintiffs also cite a related provision, IAS 34.  It requires that "an interim financial report include[] all information that is relevant to understanding an entity's financial position and performance during the interim period." Plaintiffs maintain that the registration statement ran afoul of both provisions.

---

[4] Admittedly, In re China Valves Technology arose under Section 10(b) of the Securities Act and thus involved a heightened pleading standard.  See No. 11-cv-796, 2012 WL 4039852, at *6 (S.D.N.Y. Sept. 12, 2012) (dismissing the same claim in an earlier version of the complaint and discussing the heightened pleading standard).  For this particular issue, however, the same logic applies under sections 11 and 12(a)(2).  If plaintiffs cannot offer a "plausible basis for believing that the discrepancies were due to anything other than different reporting standards," In re China Valves Tech., 979 F. Supp. 2d at 410–11, the allegations are "merely consistent with" defendants' liability" and stop short of stating a claim under Rule 8 of the Federal Rules of Civil Procedure, In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 761 (S.D.N.Y. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

It is true that violations of accounting standards can support a claim under the Securities Act.  See, e.g., City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450 F. Supp. 3d 379, 417 (S.D.N.Y. 2020).  And whether a violation occurred is often a question of fact, not properly resolved on a motion to dismiss.  See, e.g., In re CitiGroup Inc. Bond Litig., 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010).  But a plaintiff cannot rely on the bare allegation that the defendant violated accounting standards.  See In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 376 (S.D.N.Y. 2011).  The plaintiff must identify "in what manner those provisions were violated."  In re CitiGroup, 723 F. Supp. 2d at 594.

This task becomes quite difficult when the standards at issue "tolerate a range of reasonable treatments" and "leav[e] the choice among alternatives to management."  Stratte-McClure v. Morgan Stanley, 784 F. Supp. 2d 373, 386 (S.D.N.Y. 2011) (quotation omitted), aff'd, 776 F.3d 94 (2d Cir. 2015); 598 F. App'x 25 (2d Cir. 2015).  When standards "are subject to interpretation" and "allow reasonable accountants to reach different conclusions," courts are loath to "intervene in a business and accounting judgment."  Kuriakose v. Fed. Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012), aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp., 543 F. App'x 72 (2d Cir. 2013).  Rather, courts require "allegations pointing to objective facts that [the defendants'] accounting methods violated" the applicable accounting standards.  Harris v. AmTrust Fin. Servs., Inc., 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015), aff'd, 649 F. App'x 7 (2d Cir. 2016).  This rule often determines claims under section 10(b), see, e.g., Stratte-McClure, 784 F. Supp. 2d at 383, but it can still apply under sections 11 and 12(a)(2), see Harris, 135 F. Supp. 3d at 170–72 (addressing section 11).

Such is the case here.  Crucially, plaintiffs have relied on a uniquely broad set of standards.  Most accounting cases – including the ones that plaintiffs cite – involve the Generally Accepted Accounting Principles ("GAAP").  See, e.g., In re CitiGroup, 723 F. Supp. 2d at 594–95.  Generally speaking, GAAP follow a "rules-based" approach, in which "a particular statement gives relatively detailed instructions regarding specific accounting treatment to be given to particular transactions."  Martin Gelter & Zehra G. Kavame Eroglu, Whose Trojan Horse? The Dynamics of Resistance Against IFRS, 36 U. Pa. J. Int'l L. 89, 115–16 (2014).  The IFRS are often broader.  They follow a "principles-based" approach, whereby "the applicable accounting standard applies to a more general set of transactions, which consequently requires the accountant to employ greater discretion to comply with a general objective such as fair presentation."  Id. at 116.  Indeed, "[t]he lack of guidance and emphasis on substance under IFRS commonly requires management to employ estimates, assumptions, and judgment calls in financial reporting."  Karim Popatia, IFRS & GAAP: Reconciling Differences Between Accounting Systems and Assessing the Proposed Changes to the IFRS Constitution, 38 Nw. J. Int'l L. & Bus. 137, 141–42 (2017); see also Lance J. Phillips, The Implications of IFRS on the Functioning of the Securities Antifraud Regime in the United States, 108 Mich. L. Rev. 603, 618 (2010) (noting that, at the time of publication, the IFRS comprised "approximately 2000 pages of text" whereas GAPP "consist[ed] of 2000 separate pronouncements, many of which [we]re several hundred pages long").

Although scholars can debate whether this "rules-principles dichotomy" truly captures the differences between GAAP and IFRS, Gelter & Eroglu, Whose Trojan Horse?, 36 U. Pa. J. Int'l L. at 120, there can be no question that the standards in this case fall firmly on the principles side of the line.  Plaintiffs contest whether XP "reduce[d] the understandability of its financial

statements," "obscure[ed] material information with immaterial information," and "include[d] all

information that [was] relevant to understanding [its] financial position and performance."

These provisions contemplate a range of reasonable interpretations.

      With such broad language, I cannot conclude that IAS 1 or IAS 34 required XP to take

the specific steps that plaintiffs claim.  No standards specifically required the expenses to appear

in a single line item.  Nor did they render the description insufficient.  Beyond conclusory

allegations, plaintiffs do not explain why IAS 1 or IAS 34 required XP to group these expenses

together as "systems failures and order execution errors" – indeed, plaintiffs offer no further

detail regarding the nature of these costs or the meaning of these terms.  Therefore, the

allegations are "merely consistent with" defendants' liability and fail to state a claim.  In re Bear

Stearns Mortg. Pass-Through Certificates, 851 F. Supp. 2d at 761 (quoting Iqbal, 556 U.S. at

678); see also Harris, 135 F. Supp. 3d at 170–72 (dismissing a section 11 claim based on alleged

GAAP violations while noting that the standards were open to interpretation); Stratte-McClure,

784 F. Supp. 2d at 386 (dismissing a section 10(b) claim premised on violations of "GAAP

provisions which call[ed] for financial reporting that is 'useful', prioritizes substance over form,

and comports with principles of 'reliability', 'completeness' and 'conservatism'"); Phillips, The

Implications of IFRS, 108 Mich. L. Rev. at 625 (positing that the "existence of a misstatement

. . . will be harder to prove under IFRS than [it is] under GAAP").[5]

## III.  The Increase in Civil Proceedings

      For their second claim, plaintiffs allege that XP failed to disclose material facts regarding

its increasing legal exposure in Brazil.  The registration statement stated:

---

[5] For these same reasons, plaintiffs have not adequately alleged that the registration statement was misleading when it stated that its "consolidated financial statements were prepared in accordance with IFRS."

We are subject to a number of judicial and administrative proceedings in the Brazilian court systems, including civil, labor and tax law and social security claims and other proceedings, which we believe are common and incidental to business operations in Brazil in general. . . .

As of September 30, 2019, we have provisions recorded in our unaudited interim condensed consolidated financial statements in connection with legal proceedings for which we believe a loss is probable in accordance with accounting rules, in an aggregate amount of R$16 million and have made judicial deposits in an aggregate amount of R$15 million.

. . .

We were also party to 178 judicial proceedings of a civil nature totaling R$69 million, where the likelihood of loss has been assessed by our management as possible based on the opinion of our external legal advisors and for which we have not recorded a provision.

The registration statement then offered an accounting for these "possible" contingent liabilities:

**Contingent liabilities—probability of loss classified as possible**

In addition to the provisions constituted, the Company and its subsidiaries have several labor, civil and tax contingencies in progress, in which they are the defendants, and the likelihood of loss, based on the opinions of the internal and external legal advisors, is considered possible, and the contingencies amount to approximately R$ 91,518 (December 31, 2018—R$ 89,323).

Below is summarized these possible claims by nature:

|  | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Tax (i) | 17,484 | 19,971 |
| Civil (ii) | 68,737 | 64,820 |
| Labor | 5,297 | 4,532 |
| **Total** | **91,518** | **89,323** |

(i)   In 2014, the Group was notified by tax authorities for a requirement of social security contributions due to employee profit sharing payments, allegedly in violation of Brazilian Law 10.101/00. Currently, the case at administrative level in assessment by the Administrative Council of Tax Appeals ("CARF"), awaiting the decision on the Group's appeal. There are other favorable CARF precedents on the subject and the Group obtained legal opinions that support the Group's defense and current practice.

(ii)  The Group is defendant in 178 civil claims by customers and investment agents, mainly related to portfolio management, risk rating, copyrights and contract termination. The total amount represents the collective maximum value to which the Group is exposed based on the claims' amounts monetarily restated.

According to plaintiffs, these disclosures were inadequate because XP's legal exposure had "surged" in the quarter in which XP filed the registration statement. The filing occurred in December 2019, towards the end of the fourth quarter. And during that quarter, the number of civil proceedings more than doubled. As XP explained in a subsequent SEC filing:

As of December 31, 2019, we were party to 29 judicial proceedings of a civil nature for which we recorded a provision of R$3 million. We were also party to 453 judicial proceedings of a civil nature totaling R$81 million, where the likelihood of loss has been assessed by our management as possible based on the

> opinion of our external legal advisors and for which we have not recorded a
> provision.  With respect to potential judicial proceedings, only 6 claims represent
> 47% of the total amount and the remaining claims are not individually
> representative.

Thus, in the quarter in which XP filed the registration statement, the number of civil proceedings

with "possible" losses rose from 178 to 453 – a more than 150 percent increase.  According to

plaintiffs, XP had a duty to disclose this "adverse trend."

      Yet plaintiffs do not seem to argue that XP had a freestanding duty to report this trend.

For instance, plaintiffs do not allege that XP ran afoul of Item 103 of SEC Regulation S-K,

which requires a registrant to "[d]escribe briefly any material pending legal proceedings, other

than ordinary routine litigation incidental to the business, to which the registrant or any of its

subsidiaries is a party or of which any of their property is the subject."  17 C.F.R. § 229.103

(2017).[6]  Instead, the gist of the complaint is that omitting the rise in civil proceedings caused the

disclosures regarding XP's legal exposure to become misleading.

      To be sure, a duty to disclose may arise when another disclosure "would otherwise be

'inaccurate, incomplete, or misleading.'"  Stratte-McClure, 776 F.3d at 101 (quoting Glazer v.

Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)).  "Even in the absence of an independent duty

to disclose information, once a company speaks on an issue, it has a duty to be accurate and

complete."  In re Inv. Tech. Grp., Inc. Sec. Litig., 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017).

But even if plaintiffs could point to a misstatement in XP's registration statement, not every

misstatement is actionable – it must also be material.  See In re Morgan Stanley Info. Fund, 592

F.3d at 358–59.  And in this case, plaintiffs have not adequately alleged that any misstatements

regarding XP's legal exposure were material.

---

[6] Plaintiffs do allege that defendants violated Item 303, but plaintiffs have styled this as a separate claim, and I address it separately.

Materiality is "an objective, totality-of-the-circumstances inquiry," which asks whether "a reasonable investor would view [the omission] as significantly altering the total mix of information made available." Nomura Holding, 873 F.3d at 146 (quotations omitted).  That is a mixed question of fact and law.  Id. at 147 n.69.  Thus, while materiality "is usually a matter reserved for the trier of fact," some misstatements and omissions are immaterial as a matter of law.  In re Inv. Tech. Grp, 251 F. Supp. 3d at 610.  And misstatements and omissions are immaterial as a matter of law if "they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  Id. (quotation omitted).

To determine whether a misstatement or omission falls below this standard, a court must assess both quantitative and qualitative factors.  See, e.g., ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 204 (2d Cir. 2009).  On the quantitative side, "SEC administrative guidance, which [the Second Circuit has] repeatedly cited with approval, counsels that 5% falsity for statements in offering documents may provide 'a preliminary assumption' of materiality."  Nomura Holding, 873 F.3d at 147 (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150, 45,151 (Aug. 19, 1999) ("SAB No. 99")).  Accordingly, several courts have held that misrepresentations that fell below this threshold were immaterial as a matter of law.  See ECA, 553 F.3d at 204 (collecting cases).  But this inquiry provides only "a good starting place," id., for "a bright line percentage cannot appropriately be used as a substitute for a full analysis of all relevant considerations," Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2d Cir. 2011) (quotation omitted).  Thus, a court must consider a range of qualitative factors, including (1) "whether the misstatement masks a change in earnings or other trends"; (2) "whether the misstatement involves concealment of an unlawful transaction"; and (3) "whether the misstatement concerns a segment or other portion of the

registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."  SAB No. 99, 64 Fed. Reg. at 45,152; see also ECA, 553 F.3d at 204–05 (applying the qualitative factors from SAB No. 99).

Here, plaintiffs cannot point to any helpful quantitative or qualitative factors.  On the quantitative side, the rise in the number of legal proceedings cannot mask that the total exposure fell well short of the five percent threshold.  The "possible" losses jumped from R$69 million to R$81 million, yet the registration statement showed that XP held over R$39.1 billion in assets at the time of filing, and it had over R$3.4 billion in revenue in the first nine months of 2019.  The allegations thus fall short of the threshold for "a preliminary assumption of materiality." Nomura Holding, 873 F.3d at 147 (quotation omitted).

The qualitative factors point in the same direction.  Of the numerous factors available, plaintiffs can point to only one: that "the misstatement[s] concern[] a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."  Hutchison, 647 F.3d at 485 (quoting SAB No. 99, 64 Fed. Reg. at 45,152).  As plaintiffs point out, the registration statement stated that the civil proceedings "mainly related to portfolio management, risk rating, copyrights and contract termination." These activities, plaintiffs continue, tend to involve the IFAs – the lifeblood of the company.

But plaintiffs conflate the importance of the IFAs with the materiality of a statement regarding IFAs.  See ECA, 553 F.3d at 206 (noting a similar conflation).  No other facts point toward materiality.  Plaintiffs do not explain whether the listed activities were a significant portion of the IFAs' work, whether the civil proceedings involved a significant number of IFAs, or whether the proceedings threatened XP's relationship with the IFAs.  For all we know, the lawsuits involved an insignificant number of IFAs and presented an insignificant risk to the

14

company.  The allegations do not show that any misstatements or omissions concerned a significant segment of XP's operations.

The remaining arguments fare no better.  Plaintiffs first maintain that the increase in civil proceedings *itself* was material, emphasizing that the number of proceedings grew by over 150 percent.  But plaintiffs focus on the wrong metric.  An insignificant number can increase tenfold and still be insignificant.  It is the absolute effect on the company, not the relative change, that determines materiality.  See In re Ply Gem Holdings, Inc. Sec. Litig., 135 F. Supp. 3d 145, 153 (S.D.N.Y. 2015).

Next, plaintiffs argue that XP violated IAS 10, which requires an entity to "update its disclosures to address events that occurred after the reporting period."  But without more, an IAS violation does not make a misstatement or omission material.  See Dekalb Cnty. Emps.' Ret. Sys. v. Controladora Vuela Compañía de Aviación, S.A.B. de C.V., No. 15-cv-1337, 2016 WL 3685089, at *5 (S.D.N.Y. July 6, 2016) (addressing alleged IFRS violations); In re Royal Bank of Scotland Grp. PLC Sec. Litig., No. 09-cv-300, 2012 WL 3826261, at *9 (S.D.N.Y. Sept. 4, 2012) (addressing alleged IAS violations), aff'd sub nom. Freeman Grp. v. Royal Bank of Scotland Grp. PLC, 540 F. App'x 33 (2d Cir. 2013).  Because plaintiffs have failed to allege that the misstatements or omissions were otherwise material, this claim cannot survive a motion to dismiss.

## IV.    The Anticompetitive Conduct and Regulatory Investigations

For their third claim, plaintiffs allege that the registration statement omitted material facts regarding XP's "anticompetitive conduct" and ongoing regulatory investigations.  The main allegation concerns an agreement between XP and Brazil's competition regulator, the Administrative Council for Economic Defense (the Conselho Administrativo de Defesa Econômica or "CADE").  The parties entered into this agreement long before the IPO.  Among

other things, it prohibited XP from entering into exclusive agreements with IFAs.  As the

registration statement explained:

> We are subject to regulatory activity and antitrust litigation under competition
> laws.
>
>  . . .
>
> Pursuant to our agreement with CADE, we agreed, among other measures, to:
> (1) adopt equal treatment practices in our relationships with suppliers of financial
> products; (2) refrain from entering into exclusive relationships with financial
> advisors (except as permitted by applicable regulations); (3) facilitate
> transferability of clients' financial products to competing platforms; and
> (4) maintain a "no fee" policy for specific types of financial products.  A breach
> by us of any of the aforementioned measures could result in financial penalties,
> antitrust investigations and the revision of the agreement with CADE.

However, the registration statement did not disclose that an XP competitor, Banco BTG Pactual

S.A. ("BTG"), had filed a complaint with CADE.  It accused XP of violating the CADE

agreement by using "burdensome contractual provisions, intimidation, and threats" to maintain

its exclusive relationship with IFAs.  Based on those allegations, the CADE had launched an

investigation.  It remained pending at the time of the IPO.

At the same time, XP was facing several other regulatory actions.  First, the Securities

and Exchange Commission of Brazil (the Comissão de Valores Mobiliários or "CVM") was

investigating XP CCTVM and several XP officers for failing to implement "internal procedures

and controls in order to verify the implementation, application, and effectiveness of standards

contained in [CVM] Instruction 505," which governs securities transactions.  XP was also facing

charges from the BSM Supervisão de Mercados ("BSM").[7]  It had charged XP and one of its

---

[7] The parties vaguely describe that BSM as a "market regulator" and "market supervisor."  Commentators have
described it as "a functionally autonomous and financially independent non-profit subsidiary" of the Brazilian Stock
Exchange that "conduct[s] market surveillance."  Eugenio J. Cárdenas, Self-Regulation by the Mexican Stock
Exchange: A Promising Path Toward Developing Mexico's Securities Market?, 47 Stan. J. Int'l L. 199, 238 n.29
(2011).  It wields "considerable rule-making and enforcement powers."  Eugenio J. Cárdenas, Globalization of

officers with "disregarding and otherwise failing to take action to stop a fraudulent securities trading scheme."  Finally, the BSM had charged XP and its CEO with "failing to oversee certain trading functions that benefited [XP] to the detriment of its customers."  Plaintiffs maintain that XP had a duty to disclose these actions.[8]

Once again, plaintiffs have failed to allege an actionable omission.  An omission is actionable "only when the corporation is subject to a duty to disclose the omitted facts."  Stratte-McClure, 776 F.3d at 101 (quotation omitted).  "Such a duty may arise when there is a corporate insider trading on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading."  Id. (quotations omitted).  None of these categories encompass the BTG complaint, CADE investigation, the CVM investigation, or the BSM actions.

Indeed, "a government investigation, without more, does not trigger a generalized duty to disclose."  In re Inv. Tech. Grp., 251 F. Supp. 3d at 615 (quotation omitted).  Nor do federal securities laws "require a company to accuse itself of wrongdoing."  Id. at 617 (quotation omitted).  Accordingly, several courts have dismissed claims premised on the failure to disclose ongoing regulatory investigations.  See In re Global Brokerage, Inc., No. 1:17-cv-00916, 2019 WL 1428395, at *13 (S.D.N.Y. March 28, 2019); In re Inv. Tech. Grp., 251 F. Supp. 3d at 614–18; In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 11–14 (S.D.N.Y. 2016).

Faced with these holdings, plaintiffs retreat to the idea that "a duty to disclose uncharged wrongdoing arises . . . when a corporation puts the reasons for its success at issue, but fails to

---

Securities Enforcement: A Shift Toward Enhanced Regulatory Intensity in Brazil's Capital Market?, 37 Brook. J. Int'l L. 807, 837 (2012).

[8] In their complaint and their opposition to the motion to dismiss, plaintiffs grouped the BSM allegations with the allegations regarding the increase in civil proceedings.  Because I view the BSM actions as akin to an undisclosed regulatory action, I will address them alongside the CVM and CADE investigations.

disclose that a material source of its success is the use of improper or illegal business practices."
In re Virtus Inv. Partners, Inc. Sec. Litig., 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016)
(quoting Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 581 (S.D.N.Y.
2016)).  Yet this rule does not stem from cases addressing regulatory investigations but from
those addressing "corporate mismanagement or uncharged criminal conduct."  Id. (quotation
omitted) (addressing allegations that the defendant failed to disclose that returns were based on
hypothetical back testing rather than actual asset management); see also In re Van der Moolen
Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (illicit trading scheme).  In
these cases, the plaintiffs alleged not only that the defendants actually engaged in criminal
conduct, but also that the conduct produced the defendants' success.  Thus, "[w]hen a securities
fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a
plausible claim that the underlying conduct occurred."  Menaldi, 164 F. Supp. 3d at 578.
Plaintiffs have not made that allegation.  They rely solely on the *accusation* and *investigation* of
anticompetitive conduct, yet they never allege that this conduct was the secret behind XP's
success.  In these circumstances, XP did not have an independent duty to disclose the
investigations.

      The question, then, is not whether defendants "had an independent duty" to disclose the
investigations but "whether, in light of th[ose] investigation[s], the statements [d]efendants chose
to make were materially misleading."  In re Inv. Tech. Grp., 251 F. Supp. 3d at 615–16 (*colatus*).
Some courts in this Circuit have held "that this obligation is only triggered by an 'express prior
disclosure.'"  In re Global Brokerage, 2019 WL 1428395, at *13 (quoting In re UBS AG Sec.
Litig., No. 07-cv-11225, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012), aff'd sub nom.

18

City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173 (2d Cir. 2014)).  Plaintiffs cannot point to any express prior disclosure here.

Plaintiffs instead rely on a different set of cases.  In assessing whether the omission of regulatory investigations renders statements in a registration statement misleading, some courts have reasoned that the distinction between actionable and unactionable misstatements "turn[s] closely on whether the disclosure language at issue is phrased in terms that appear hypothetical or speculative . . . or in terms that convey current investigative activity."  In re Inv. Tech. Grp., 251 F. Supp. 3d at 616 (comparing Menaldi, 164 F. Supp. 3d at 583–84, and In re Lions Gate, 165 F. Supp. 3d at 15).  Seizing on this distinction, plaintiffs cast the disclosure regarding the CADE agreement as hypothetical.  It stated, "A breach by us of any of the aforementioned measures could result in financial penalties, antitrust investigations and the revision of the agreement with CADE."  In plaintiffs' view, this language misled investors because it spoke of the risk of investigation hypothetically when that risk had already materialized.

Plaintiffs' argument ignores the remainder of the registration statement.  Just two pages after disclosing the CADE agreement, the registration statement explained:

> We are, and may be in the future, party to legal, arbitration and administrative investigations, inspections and proceedings arising in the ordinary course of our business or from extraordinary corporate, tax or regulatory events, involving our clients, suppliers, customers, as well as competition, government agencies, tax and environmental authorities, particularly with respect to civil, tax and labor claims. . . . Further, even if we adequately address issues raised by an inspection conducted by an agency or successfully defend our case in an administrative proceeding or court action, we may have to set aside significant financial and management resources to settle issues raised by such proceedings or to those lawsuits or claims, which could adversely affect our business.  See "Business – Legal Proceedings."

Given this disclosure, plaintiffs "at most plead[] that the defendants disclosed an investigation was ongoing, but refused to provide details."  In re Inv. Tech. Grp, 251 F. Supp. 3d at 617 (quoting In re Lions Gate, 165 F. Supp. 3d at 16).  The disclosure also mirrors those that other

19

courts have held to be unactionable.  See id. at 615 ("We are not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business."); In re Lions Gate, 165 F. Supp. 3d at 15 ("From time to time, the Company is involved in certain claims and legal proceedings arising in the normal course of business.  While the resolution of these matters cannot be predicted with certainty, the Company does not believe, based on current knowledge, that the outcome of any currently pending claims or legal proceedings in which the Company is currently involved will have a material adverse effect on the Company's financial statements.").[9]

Therefore, the omission of the BTG complaint, the CADE investigation, the CVM investigation, and the BSM actions does not support a claim.

## V.     Item 303

For their final claim, plaintiffs allege that XP violated SEC Regulation S-K.  That regulation "provides standard instructions for filing forms under the Securities Act."  In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 442 (S.D.N.Y. 2009).  It offers "detailed guidance about the items to be disclosed, and the nature and specificity required of each disclosure."  Id. at 443.  "Failure to make the requisite disclosures under Regulation S-K will generally produce liability under the Securities Act."  Id. (quotation omitted).

Here, plaintiffs point to Item 303 of Regulation S-K.  It requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income

---

[9] Separately, plaintiffs have not adequately alleged that the CVM investigation or the BSM actions were material. The complaint alleges that the CVM investigation resulted in a R$500,000 fine for XP and a R$250,000 fine for two executives.  The complaint is not entirely clear as to the cost of the BSM actions, though it generally alleges that XP "failed to expressly disclose the R$5.47 million in regulatory settlements involving [XP's] key executives."  These figures fall well short of the standard for quantitative materiality, and plaintiffs have pointed to no factors that would indicate qualitative materiality.  Perhaps recognizing this difficulty, plaintiffs fail to mention the BSM actions altogether in their opposition to the motion to dismiss.

from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii) (2019).  According to plaintiffs, this regulation required XP to disclose (1) the systems failures and operating errors, (2) the rise in the number of civil proceedings, and (3) the pending regulatory investigations.  But for many of the same reasons above, these allegations cannot support a claim based on Item 303.

First, for the systems failures and operating errors, plaintiffs have failed to allege a "trend" or "uncertainty."  The complaint alleges that these costs equaled 8.1 percent of XP's next income in 2016, 6.6 percent in 2017, and 7.8 percent in 2018.  That fluctuation is not the type of loss that Item 303 addresses.  Indeed, plaintiffs repeatedly characterize the losses as "systemic" and "recurring," suggesting that they, too, fail to see a trend or uncertainty.

Second, for the rise in civil proceedings, plaintiffs fail to allege that XP "reasonably expect[ed]" the known trends or uncertainties to have a material impact.  "[T]he 'reasonably expects will have' standard suggests that there must a fairly substantial probability that the known risk at issue will materialize and have a material impact – if not a more-likely-than-not standard, then something not too much below that."  In re BHP Billiton Ltd. Sec. Litig., 276 F. Supp. 3d 65, 88 (S.D.N.Y. 2017).  The civil proceedings risked only R$81 million to a company with $3.4 billion in revenue, and plaintiffs have not pointed to any qualitative factors that would suggest that XP could have reasonably expected these proceedings to have a material impact on its revenue.

Finally, the allegations regarding regulatory investigations suffer from that same problem.  To the extent these investigations presented any "uncertainties," plaintiffs have not alleged that XP could have "reasonably expected" those uncertainties to have a material impact.  Plaintiffs allege only that "an adverse determination or outcome in these pending investigations and proceedings included *possible* material financial penalties, costly regulatory investigations,

and modification of the CADE Agreement." That allegation is simply too speculative. It thus falls short of the standard under Item 303. See id.

**CONCLUSION**

Defendants' motion to dismiss [76] is granted. The Clerk is directed to enter judgment dismissing the case.

**SO ORDERED.**

Digitally signed by
Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
       March 7, 2021